**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 13-cv-2013-RGA |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ZYXEL COMMUNICATIONS, INC. | ) | |
| and | ) | |
| ZYXEL COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF TQ DELTA, LLC'S OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIMS OF
<u>DEFENDANT ZYXEL COMMUNICATIONS, INC.</u>**

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted pro hac vice)
Timothy J. Malloy (admitted pro hac vice)
Thomas J. Wimbiscus (admitted pro hac vice)
Sharon A. Hwang (admitted pro hac vice)
Paul W. McAndrews (admitted pro hac vice)
Anna M. Targowska (admitted pro hac vice)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

Counsel for Plaintiff TQ Delta, LLC

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ............................................................................ 2

SUMMARY OF ARGUMENT ................................................................................................... 3

STATEMENT OF FACTS ......................................................................................................... 4

ARGUMENT ............................................................................................................................ 10

I.      ZYXEL'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH
        RELIEF CAN BE GRANTED ....................................................................................... 10

        A.      Legal Standard .................................................................................................... 10

        B.      ZyXEL's Counterclaim One for Breach of Contract Must Be Dismissed
                for Failure to State a Claim ................................................................................. 10

                1.      ZyXEL fails to plead facts showing that it is entitled to the benefit
                        of a RAND license. .................................................................................. 10

                2.      TQD may seek injunctive relief against ZyXEL given ZyXEL's
                        unwillingness apply for and negotiate a RAND License. ......................... 13

        C.      ZyXEL's Counterclaim Two for a Declaratory Judgment Must Be
                Dismissed for Failure to State a Claim ............................................................... 15

II.     THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER ZYXEL'S
        REQUEST FOR DECLARATORY RELIEF AND SPECIFIC PERFORMANCE ........ 16

CONCLUSION ......................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apple, Inc. v. Motorola Mobility, Inc.*,
No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012) ............. 4, 17

*Apple, Inc. v. Motorola Mobility, Inc.*,
No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854 (W.D. Wisc. Oct. 29, 2012) ................... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................... 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................................................... 10

*Ericsson Inc. v. D-Link Sys., Inc.*,
No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013) ...................... 3, 12

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ........................................................................................... 7

In the Matter of Certain Electronic Devices, Including Wireless Communication Devices,
Portable Music and Data Processing Devices, and Tablet Computers,
Inv. No. 337-TA-794, at p. 63 ......................................................................................... 14

*Microsoft Corp. v. Motorola, Inc.*,
864 F. Supp. 2d 1023 (W.D. Wash. 2012) ........................................................................ 12

*Nami v. Fauver*,
82 F.3d 63 (3d Cir. 1996) ............................................................................................... 13

*Pension Benefit Guaranty Corp. v. White Consolidated Indus.*,
998 F.2d 1192 (3d. Cir. 1993) ........................................................................................... 7

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007) ........................................................................................... 10

*Willow Bay Assoc. v. Zannett Sec. Corp.*,
C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426 (D. Del. Mar. 21, 2003) ........................ 7

**Statutes**

19 U.S.C. § 1337 ............................................................................................................. 15

19 U.S.C. § 1337(d) ......................................................................................................... 14

35 U.S.C. § 283 .............................................................................................................. 13

**Other Authorities**

Common Patent Policy for ITU-T/ITU-R/ISO/IEC (2014) ...................................................... 7, 9

Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005) ............................... 9

Nat'l Research Council of the Nat'l Acads.,
   *Patent Challenges for Standard-Setting in the Global Economy* (2013) ................................. 12

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................................... 2

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 2

Fed. R. Civ. P. 8(a)(2) ............................................................................................................... 10

## NATURE AND STAGE OF PROCEEDINGS

On December 9, 2013, Plaintiff, TQ Delta, LLC ("Plaintiff" or "TQD"), filed a complaint against ZyXEL Communications, Inc. ("ZyXEL")[1] alleging infringement of 32 U.S. patents. D.I. 1.  The asserted patents relate to digital subscriber line ("DSL") technology, which is used to provide, e.g., high-speed broadband Internet access and video services via copper wires of a local telephone network.  *Id.* ¶¶ 8-9.  On February 3, 2014, ZyXEL filed its Answer, Affirmative Defenses and Counterclaims to Plaintiff's Complaint for Patent Infringement, which included two counterclaims.  D.I. 7.  Counterclaim One asserts breach of contract based on "express or implied contractual communication with standard-setting entities such as the IEEE[[2]]."  *Id.* at pp. 37-38.  Counterclaim Two seeks a declaratory judgment (1) finding "that Plaintiff has not offered license terms to ZyXEL on terms consistent with the referenced policy of the standards and bylaws of the standard-setting entities" and (2) "setting forth the RAND terms and conditions for a license to the RAND terms[[3]], including the applicable royalty rate."  *Id.* at pp. 37-38.  TQD hereby moves to dismiss ZyXEL's counterclaims (1) under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and (2) under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

---

[1]   TQD also named as a defendant ZyXEL's Taiwanese parent, ZyXEL Communications Corporation ("ZyXEL Corp." or, collectively with ZyXEL, "Defendants"). TQD is still in the process of serving the Taiwanese parent.  As such, ZyXEL Corp. has yet to file an answer (or counterclaims) in this matter.

[2]  ZyXEL's counterclaims reference unspecified standards and alleged policies of the IEEE (Institute of Electrical and Electronics Engineers) and alleged agreements TQD made with the IEEE.  However, DSL standards, which are at issue in this case, are created and maintained by the International Telecommunications Union ("ITU").  Consequently, the alleged policies of the IEEE are not relevant to the present action.  Nevertheless, TQD will address ZyXEL's counterclaims with the assumption that they were intended to reference the standards and patent policies of the ITU, and the actual agreements TQD made with the ITU.

[3]  We assume ZyXEL meant to request a declaration of "RAND terms and conditions for a license to" the asserted patents; not "to the RAND terms."

2

## SUMMARY OF ARGUMENT

1.      ZyXEL is not entitled to the benefits of TQD's agreement with the ITU. Consistent with ITU patent policy, TQD/Aware agreed that it would be "willing to negotiate licenses" with an "unrestricted number of applicants" on reasonable and non-discriminatory ("RAND") terms and conditions with respect to "implementations" of any standard essential claim ("SEC").  Because (1) ZyXEL did not plead that it was, nor was it, "willing to negotiate" with TQD, (2) ZyXEL did not plead that it was an "applicant," nor did it apply, for a license, and/or (3) ZyXEL did not plead that any of its products constitute an "implementation" of any SEC of any asserted patent, ZyXEL has failed plead a set of fact showing that it is entitled to the benefit of TQD's agreement with the ITU.  *See, e.g., Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013). (holding that "Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer."). Accordingly, ZyXEL's Counterclaim One should be dismissed because it fails to state a claim for breach of contract.

2.      The declaratory judgment claims of ZyXEL's Counterclaim Two rely on entitlement to the benefits of TQD's agreement with the ITU.  Thus, for the same reasons stated above in paragraph 1, ZyXEL's Counterclaim Two should be dismissed because it fails to state a claim upon which the requested declaratory relief can be granted.

3.      The declaratory judgment claims of ZyXEL's Counterclaim Two should also be dismissed for lack of subject matter jurisdiction because ZyXEL has not agreed to be bound by the determination that it seeks.  ZyXEL's Counterclaim Two requests that the Court declare the RAND terms, including the royalty rate, for a license to TQD's asserted patents.  In addition to ZyXEL's failure to plead conditions precedent to qualifying as a beneficiary to TQD's

3

agreement with the ITU (e.g., ZyXEL has not pled that (1) it is an "applicant" for a RAND license and (2) its products are an "implementation" of any SEC), ZyXEL did not plead that it would agree, nor did it agree, to be bound by the Court's determination of the RAND terms it seeks.  In other words, ZyXEL, by refusing to agree to accept a license under the RAND terms set by the Court, is seeking an advisory opinion.  Unless and until ZyXEL agrees to be bound by the RAND terms set by the Court, it does not have standing to bring this claim.  *See, e.g., Apple, Inc. v. Motorola Mobility, Inc.*, No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012) (dismissing Apple's breach of contract claims and refusing request that the court set a RAND rate for failing to agree to be bound by court's determination).

## STATEMENT OF FACTS

TQD owns a portfolio of patents that generally relate to DSL technology.  D.I. 1 at ¶ 8. This technology is used to provide, for example, high-speed broadband Internet access via copper wires of a local telephone network.  *Id.* at ¶ 9.  More recently, DSL technology has been used by telephone carriers to deliver video services to subscribers.  *Id.*  Independent companies and individuals cooperating under the framework of the ITU, including TQD and its predecessor Aware, contributed to the development of technical standards regarding DSL technology to ensure that DSL equipment from different manufacturers could operate together in the same system.  *Id.* at ¶ 10.  At least some of the claims of TQD's asserted patents may be SECs, i.e., essential for practicing such DSL standards.  *See id.* at ¶ 15.

ZyXEL makes, uses, sells, offers for sale, and/or imports customer premise equipment ("CPE") and central office equipment ("CO") products such as modems, routers, gateways, and multiplexers that purport (according to publicly-available product literature) to operate in accordance with various DSL standards.  *See id.* at ¶ 11.

4

As recited in TQD's Complaint, TQD attempted to negotiate a license to TQD's patents with ZyXEL, including a license to any to standard essential claims consistent with ITU policy:

12.     On June 26, 2013, TQD sent a first letter to Defendants, including an overview of TQD's DSL patent portfolio and an invitation to open licensing discussions.  Having received no response, TQD sent a follow-up letter to Defendants on July 12, 2013.

13.     On July 24, 2013, a representative of Defendants sent an email stating that Defendants are "studying the documents you provided internally.  I anticipate it will take some time to reach a conclusion.  I will contact you when we have questions."

14.     On July 25, 2013, TQD responded to Defendants by email, stating that "It will be difficult for you to fully evaluate the TQ Delta portfolio without additional information, such as the identification of specific patents and their applicability to technologies used in DSL products and services.  In order to provide this level of detail, we would like to enter into a confidentiality/standstill agreement to ensure that our discussions can take place outside the context of litigation."

15.     Not having heard from Defendants in response to TQD's July 25, 2013 email, on August 7, 2013, TQD again sent an email to Defendants inviting licensing discussions and explaining that "the use of one or more patent claims in the [TQ Delta DSL patent] portfolio may be required to practice or otherwise comply with certain DSL-related Recommendations, Deliverables and/or standards.  TQ Delta is willing to negotiate a license with Zyxel on a non-discriminatory basis on reasonable terms and conditions with respect to any such standard-essential patent claims."  Defendants did not respond.

16.     TQD sent a further follow-up email on August 23, 2013. Defendants eventually responded on October 2, 2013, suggesting that their delay had been due to an email spam filter issue.  After a brief exchange regarding a draft confidentiality agreement over October 2-3, 2013, Defendants failed to respond to further email communications.  On October 29, 2013, TQD sent a package by Federal Express to Defendants, including a copy of prior emails and a letter asking "if ZyXEL intends to enter into an NDA with TQ Delta so that we may move forward with license discussions."

17.     On November 12, 2013, Defendants and TQD exchanged emails about the scope of the NDA.  On November 25, 2013, TQD sent a follow-up email seeking Defendants' final position on the NDA by November 29, 2013. Defendants again failed to respond.

D.I. 1 at ¶¶ 12-17.

Despite TQD's repeated good-faith efforts to negotiate a license under TQD's DSL patent portfolio, Defendants failed to engage in timely, good-faith negotiations.  Importantly, ZyXEL never applied for a license under TQD's DSL patent portfolio. *Id.* at ¶ 19.  TQD was left with no choice but to initiate the current suit.

ZyXEL asserts two counterclaims. ZyXEL's Counterclaim One alleges that "Plaintiff was contractually obligated, among other things, to offer a license to their identified patents consistent with the applicable patent policy of the standards and bylaws of the standard-setting entities." *Id.* at ¶ 12; *see also id.* at ¶ 14.   ZyXEL also alleged that "Plaintiff breached their contract . . . by refusing to offer licenses to their identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis." *Id.* at ¶ 13.  ZyXEL further alleged that TQD breached its contract by seeking to enjoin ZyXEL from "implementation of the technology of the allegedly 'essential' patents" by filing the present lawsuit. *Id.* at ¶ 14.

ZyXEL's Counterclaim Two is captioned as a "Declaratory Judgment that Plaintiff Must Offer ZyXEL A RAND License Or That The Alleged 'Essential' Patents Are Unenforceable As To ZyXEL." *Id.* at p. 38.  In support, ZyXEL alleges that "there is a dispute between the parties concerning whether Plaintiff has offered to license to ZyXEL patents consistent with the referenced policy of the standards and bylaws of the standard-setting entities." *Id.* at ¶ 19.  ZyXEL seeks a "declaratory judgment that Plaintiff has not offered license terms to ZyXEL" consistent with the policy and bylaws of the standard setting organization. *Id.* at ¶ 21.  ZyXEL further seeks a declaratory judgment "setting forth the RAND terms and conditions for a license to the RAND terms, including the applicable royalty rate." *Id.* at ¶ 22.  Finally, ZyXEL seeks a

declaratory judgment that "if Plaintiff refuses to offer a license on RAND terms, the allegedly 'essential' patents shall be unenforceable as to ZyXEL." *Id.* at ¶ 23.

ZyXEL's counterclaims purport to be based on unspecified contractual agreements TQD purportedly made with a standard setting organization, and the unspecified policies of such organization. For purposes of this motion, TQD will assume that ZyXEL's counterclaims are based on the actual agreements TQD/Aware made with the ITU, and the ITU's patent policies.[4]

The actual agreements TQD/Aware made with the ITU are expressed in documents submitted to the ITU by TQD/Aware, which are referred to as a Patent Statement and Licensing Declaration ("Patent Declaration").  An example of a Patent Declaration submitted by Aware to the ITU, the relevant wording of which is representative of all such Patent Declarations submitted by TQD/Aware, is submitted herewith as Exhibit A to the Declaration of Paul McAndrews (the "McAndrews Declaration").   The Common Patent Policy for ITU-T/ITU-R/ISO/IEC ("ITU Patent Policy") is submitted herewith as Exhibit B to the McAndrews Declaration.

---

[4] Because ZyXEL's pleading relies exclusively on such agreements and patent policies, the Court should consider these documents in ruling on this Motion to Dismiss, despite the fact that they are outside the four corners of ZyXEL's Counterclaims.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'  '[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'") (internal citations omitted); *Pension Benefit Guaranty Corp. v. White Consolidated Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *see also Willow Bay Assoc. v. Zannett Sec. Corp.*, C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426 at *4-5 (D. Del. Mar. 21, 2003).

TQD's Patent Declaration provides that TQD is "<u>willing to negotiate</u>" a license to its SECs on RAND terms:

> In accordance with [ITU Patent Policy], Aware is not prepared to waive its patent rights but would be **<u>willing to negotiate</u>** with other parties on a non-discriminatory basis on reasonable terms and conditions with respect to patent claims held or controlled by Aware that are essential for compliance on a technological basis with [listed DSL standards].

McAndrews Decl., Ex. A at A-1 (emphasis added); *see also id.,* Ex. B at § 2.2 ("The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions").   TQD's Patent Declaration further provides that TQD is "<u>prepared to grant</u>" a license to its SECs on RAND terms to an "<u>applicant</u>" that seeks a license for "<u>implementations</u>" of the particular DSL standard:

> The Patent Holder is **<u>prepared to grant</u>** a license to an unrestricted number of **<u>applicants</u>** on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell **<u>implementations</u>** of the [specified DSL standard].

*Id.* at A-3 (emphasis added).  Thus, the express language of the Patent Declaration only requires TQD to participate in good-faith negotiations (i.e., be "willing to negotiate" and "prepared to grant" a license) with a party who has requested a license (i.e., an "applicant").  Further, TQD only is required to negotiate a RAND license with an applicant for products that comply with the DSL standard(s) (i.e., "implementations") for which TQD's claims are essential.  A party whose products are not compliant with the DSL standard(s)[5] to which TQD's SECs apply is not entitled to a RAND license.

---

[5] ZyXEL generally admitted only that it "sells certain products that **<u>may</u>** operate in accordance with various DSL-related standards." D.I. 7, Answer, at ¶ 11 (emphasis added).  However, in each instance where ZyXEL responded to an allegation that certain of its products operated in accordance with a specific DSL standard, it denied the allegation.  *Compare*, *e.g.*, D.I. 1 at ¶ 22 *with* D.I. 7, Answer at ¶ 22.

The Patent Declaration further indicates that parties are to engage in good-faith negotiations where the ITU plays no role in the negotiations:

> **Negotiations** are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.

*Id.* (emphasis added).

The ITU Patent Policy recognizes that the appropriate RAND terms and royalty rate cannot be set in a vacuum outside the case-by-case context of specific negotiations between the patent holder and license applicant:

> The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might **differ from case to case**.

McAndrews Decl., Ex. B at p. 1 (emphasis added).  The explanation the ITU provides for staying out of negotiations between the patent holder and prospective licensee is that:

> … standardization organizations will most probably not be in a position to act as genuine arbitrators in patent rights disputes, for the simple reason that the disputing patent rights holders will never disclose all the information they need to act as a fair judge in a patent rights controversy.  For example, **in order to define what is fair and "reasonable" in a given case, one needs to know development and manufacturing costs, profits, etc.**  This kind of information is normally not disclosed to a third party with which no legal relationship has been established, as would be the case for a standardization organization vis-à-vis its member organizations.

McAndrews Decl., Ex. C (Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005) at § 2.3 (emphasis added).  These policies are inconsistent with ZyXEL's assertion that TQD was required to offer "RAND terms, including the applicable royalty rate" (*see* D.I. 7, Counterclaims at ¶¶ 12-14, 21, and 22) in the absence of ZyXEL's good-faith participation in negotiations.

<u>**ARGUMENT**</u>

**I.    ZYXEL'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

**A.    Legal Standard**

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557 (2007)).  In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts in the pleading that "raise a right to relief above the speculative level."  *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007).

**B.    ZyXEL's Counterclaim One for Breach of Contract Must Be Dismissed for Failure to State a Claim**

**1.    ZyXEL fails to plead facts showing that it is entitled to the benefit of a RAND license.**

ZyXEL's breach of contract counterclaim fails to plead fact sufficient to show that it is entitled to the benefits of TQD's agreement with the ITU.  ZyXEL's Counterclaim One is based on ZyXEL's incorrect belief that TQD was "obligated to offer licenses to ZyXEL on RAND terms," notwithstanding ZyXEL's refusal to engage in good-faith negotiations.  (D.I. 7, Counterclaims at ¶¶ 12-14.)  Contrary to ZyXEL's assertions, TQD's Patent Declaration only

requires that TQD be "willing to negotiate" and "prepared to grant" a license to its SECs on RAND terms to an "applicant" that seeks a license.  *See* McAndrews Decl., Ex. A at A-1, A-3.

ZyXEL does not deny that TQD repeatedly contacted ZyXEL prior to filing suit. Compare D.I. 1 at ¶¶ 12-17 with D.I. 7, Answer at ¶¶ 12-17.  Nor does ZyXEL deny that TQD stated that it was willing to negotiate a license with Zyxel on a nondiscriminatory basis on reasonable terms and conditions with respect to any such standard essential patent claims." *Compare* D.I. 1 at ¶ 15 with D.I. 7, Answer at ¶ 15 (only denying "allegations pertaining to ZyXEL").  As for ZyXEL's response to TQD's efforts, nowhere does ZyXEL plead facts showing that is was willing to negotiate, that it applied for a license, or that it would be willing to accept a license to TQD's SECs on RAND terms.

Instead, ZyXEL's counterclaims are based on the incorrect premise that TQD was obligated to "offer a license" with specific terms, including a royalty rate (*see* D.I. 7, Counterclaims at ¶¶ 12, 13, 21, and 22)—even in the absence of good-faith negotiation by ZyXEL.  ZyXEL goes so far as to allege that TQD did not attempt to negotiate in good faith because it never put forth financial terms.  *Id.* at ¶ 18.  However, absent good-faith participation in negotiations by the prospective licensee, including the exchange of relevant information such as sales data, revenues, costs, profits, etc., the patent owner cannot be expected to propose terms in a vacuum.  The Patent Declaration and ITU Patent Policy recognize these fundamentals of the negotiation process.  See McAndrews Decl., Ex. A at A-3 ("Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC."); *id*., Ex. B at p. 1 ("The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case.); *id.*, Ex. C at § 2.3 ("In order to

define what is fair and 'reasonable' in a given case, one needs to know development and manufacturing costs, profits, etc.").

The RAND commitment attempts to strike a balance between two parties, namely: (1) innovators and patent holders that should be fairly compensated so they are encouraged to innovate and voluntarily contribute their technology to a standard; and (2) implementers that seek to manufacture and sell standards-compliant products.  For this process to work, the potential licensee must actually apply for (hence the term "applicants"), and be willing to engage in good-faith negotiations to enter into, a license on RAND terms.  In RAND-related litigation, it is common for accused infringers to avoid applying for a license (to avoid undercutting its non-infringement and/or invalidity arguments).  If an infringer chooses this path, however, it should not be entitled to also seek a remedy for an alleged breach of contract—where it has refused to participate in the RAND negotiation process.  For example, in a recent case involving SECs and RAND issues, Intel argued that Ericsson breached its RAND obligations by refusing to offer Intel a license on RAND terms.  The court rejected Intel's claim of breach of contract, noting that Intel had failed to engage in good faith negotiations with Ericsson.  *See Ericsson Inc.*, 2013 U.S. Dist. LEXIS 110585 at *58 (holding that "Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer."); *see also Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (holding that "the implied duty of good faith and fair dealing inherent in every contract" applies to FRAND negotiations) (citation omitted);  Nat'l Research Council of the Nat'l Acads*., Patent Challenges for Standard-Setting in the Global Economy*, at 5 (2013) (describing a FRAND commitment as mutual in the sense that "[b]oth the SEP holder and any prospective licensee are expected to negotiate in good

faith towards a license on reasonable terms and conditions that reflect the economic value of the patented technology."), attached as Ex. D to the McAndrews Decl..

ZyXEL did not plead that it was, nor was it, "willing to negotiate" with TQD.  On the other hand, ZyXEL did not deny that TQD was "willing to negotiate."[6]  ZyXEL also did not plead that it was an "applicant," nor did it apply, for a license. Accordingly, ZyXEL has not pled predicate facts showing that it is a beneficiary of, or entitled to enforce, TQD's contract with the ITU.  For the foregoing reasons, ZyXEL's breach of contract claim should be dismissed.

## 2.  TQD may seek injunctive relief against ZyXEL given ZyXEL's unwillingness apply for and negotiate a RAND License.

ZyXEL's counterclaim for breach of contract also fails to state a claim upon which relief can be granted insofar as it is based on the incorrect assumption that TQD is precluded from seeking an injunction against an unwilling licensee.

In patent cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.  The Western District of Wisconsin recently addressed whether an owner of a standard-essential patent may seek to enjoin an infringer that refuses to negotiate in good faith.  *See Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854 (W.D. Wisc. Oct. 29, 2012).  In *Apple*, the court found that "[n]one of [the patent policies of the ETSI and IEEE standards bodies] expressly precludes Motorola or any patent owner from pursuing an injunction or other relief as a remedy for infringement." *Id.*, 2012 U.S. Dist. LEXIS 181854, at *44; *id.* at *46 ("[I]n light of the fact that patent owners generally have the right to seek injunctive relief both in district courts, 35 U.S.C. § 283, and in the International

---

[6] Although ZyXEL asserts that TQD did not attempt to negotiate in good faith because TQD did not offer specific financial terms for a license, the contract upon which ZyXEL's assertion relies does not require such an offer.  Moreover, a court need not accept factual allegations that are "self-evidently false."  *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Trade Commission, 19 U.S.C. § 1337(d), I conclude that any contract purportedly depriving a patent owner of that right should clearly do so. The contracts at issue are not clear. Therefore, I conclude that Motorola did not breach its contracts simply by requesting an injunction and exclusionary order in its patent infringement actions."). In the present case, ZyXEL has not and cannot point to any ITU policy precluding an injunction against a party who has not applied for and agreed to be bound by a RAND license.

Commentators have also recognized the public policy concern that arises from "reverse hold-up"—when an infringer uses standard-essential technology without compensation to the patent owner under the guise that an offer to licenses was not made under RAND terms. As aptly stated by the ITC:

> Apple's position illustrates the potential problem of so-called reverse patent hold-up, a concern identified in many of the public comments received by the Commission. In reverse patent hold-up, an implementer utilizes declared-essential technology without compensation to the patent owner under the guise that the patent owner's offers to license were not fair or reasonable. The patent owner is therefore forced to defend its rights through expensive litigation. In the meantime, the patent owner is deprived of the exclusionary remedy that should normally flow when a party refuses to pay for the use of a patented invention.

McAndrews Decl., Ex. E; In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Portable Music and Data Processing Devices, and Tablet Computers, Inv. No. 337-TA-794, at p. 63 (emphasis added).

Recognizing the reverse hold-up problem, the Department of Justice ("DOJ") issued a "Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments." McAndrews Decl., Ex. F. The DOJ recognized that injunctive relief may be appropriate for infringement of standard-essential patents that are encumbered by a RAND commitment where an infringer refuses to engage in negotiations or pay what has been determined to be a RAND rate:

14

> An exclusion order may still be an appropriate remedy in some circumstances, such as where the putative licensee is unable or refuses to take a F/RAND license and is acting outside the scope of the patent holder's commitment to license on F/RAND terms.  For example, <u>if a putative licensee</u> refuses to pay what has been determined to be a F/RAND royalty, or <u>refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate</u>. Such a refusal could take the form of a constructive refusal to negotiate, such as by insisting on terms clearly outside the bounds of what could reasonably be considered to be F/RAND terms in an attempt to evade the putative licensee's obligation to fairly compensate the patent holder.

*Id.* at p. 7 (emphasis added; footnotes omitted).[7]

As discussed above, the pleadings themselves show that ZyXEL never requested a license under TQD's patents and, in fact, refused multiple offers from TQD to engage in negotiations for such a license. There is nothing in the language of TQD's Declaration or the ITU Patent Policy that precludes TQD from seeking such an injunction.  *See* McAndrews Decl., Exs. A-C.  Nor did ZyXEL ever allege (nor can it allege) any affirmative action by TQD to waive its right to enjoin infringers of its patented technology, particularly where, as here, the infringer refuses to enter into good-faith negotiations for a license.  In such situations, a patentee is allowed to seek injunctive relief to prevent and deter reverse patent hold-up by unwilling licensee infringers.  Accordingly, ZyXEL's breach of contract counterclaim should be dismissed for this reason as well.

## C.     ZyXEL's Counterclaim Two for a Declaratory Judgment Must Be Dismissed for Failure to State a Claim

ZyXEL's request for declaratory relief in Counterclaim Two relies on the same alleged contract, standards, and policies upon which it bases its Counterclaim One.[8]  Accordingly,

---

[7] The DOJ's Policy Statement states that, "[a]lthough the focus of the present policy statement is on exclusion orders issued pursuant to 19 U.S.C. § 1337, similar principles apply to granting of injunctive relief in U.S. federal courts …."  *Id.* at n. 1.

[8] For example, ZyXEL seeks a declaration that TQD "has not offered license terms to ZyXEL on terms consistent with the referenced policy of the standards and bylaws of the standard-setting entities."  D.I. 7, Counterclaims at ¶ 21.

Counterclaim Two should be dismissed because it fails to state a claim for the same reasons discussed, *supra*, with respect to Counterclaim One.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER ZYXEL'S REQUEST FOR DECLARATORY RELIEF AND SPECIFIC PERFORMANCE

ZyXEL's Counterclaim Two further requests that the Court determine "RAND terms and conditions for a license . . . including the applicable royalty rate," and if TQD refuses to offer ZyXEL a license on such terms and conditions, a finding that TQD's essential patents are unenforceable.   D.I. 7, Counterclaim at ¶¶ 22-23.

As noted above, TQD's Patent Declaration and the ITU Patent Policy require a patent holder and a party seeking a license to essential claims to enter into good-faith negotiations.  If those negotiations fail, there may be a justiciable controversy between the parties, at which time the alleged infringer may seek specific performance of the patent holder's RAND obligations, including asking the court to determine whether the patent holder has offered a license on RAND terms.  But, in order for such a justiciable controversy to exist, the alleged infringer must be willing to accept a license on the terms set by the court.  Otherwise, such an adjudication would amount to an advisory opinion that the infringer would likely use as a "ceiling" in continued negotiations.  Such an advisory opinion, in addition to wasting judicial resources, would inevitably lead to terms that would not fairly compensate the patent holder, i.e., a "sub-RAND" royalty rate.

This issue was recently raised in a dispute between Apple and Motorola, in which Apple requested a declaratory judgment setting a RAND rate for certain Motorola standard-essential

patents.  The court dismissed Apple's claims on the eve of trial because Apple would not agree to accept a license at the FRAND[9] rate set by the court:

> [I]t has become clear that Apple's interest in a license is qualified. In its response to Motorola's motion for clarification on the specific performance issue, Apple states that it will not commit to be bound by any FRAND rate determined by the court and will not agree to accept any license from Motorola  unless the court sets a rate of $1 or less for each Apple phone.  In other words, if Apple is unsatisfied with the rate chosen by the court, it "reserves the right to refuse and proceed to further infringement litigation."
>
> *** 
>
> I questioned whether it was appropriate for a court to undertake the complex task of determining a FRAND rate if <u>the end result would be simply a suggestion that could be used later as a bargaining chip between the parties</u>. Apple responded that the rate would resolve the dispute in this particular case, namely, whether Motorola's  license offer was FRAND and if not, what the rate should have been.
>
> Apple's response was not satisfactory and <u>did not assuage my concerns about determining a FRAND rate that may be used solely as a negotiating tool between the parties</u>.  After further consideration, I believe it would be inappropriate to grant Apple's clarified request for specific performance. As I explained in the October 29 order, the normal remedy for a breach of contract is an award of damages, while specific performance is an "exceptional" remedy.

*Apple, Inc.,* 2012 U.S. Dist. LEXIS 157525, at *6-7 (internal citations omitted).

There is no dispute that ZyXEL has not agreed to accept a license on the RAND terms it asks the Court to declare.  Unless and until ZyXEL agrees to be bound by the Court's determination of RAND terms by applying for and agreeing to accept a license to TQD's SECs on such RAND terms, such a ruling would be strictly advisory and a waste of time and resources. Such an advisory opinion would also unduly prejudice TQD's ability to negotiate reasonable compensation for its inventive contributions to valuable DSL standards. For the forgoing reasons, ZyXEL's Counterclaim Two should be dismissed for lack of subject matter jurisdiction.

---

[9] The terms FRAND and RAND are used interchangeably in addressing licensing terms for standards-essential patents.  The "F" in FRAND adds the word "Fair" to "Reasonable And Non-Discriminatory."

## CONCLUSION

For the reasons set forth above, TQD respectfully requests that the Court grant this motion and dismiss ZyXEL's counterclaims.

Respectfully submitted,

FARNAN LLP

 _/s/ Brian E. Farnan_
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted pro hac vice)
Timothy J. Malloy (admitted pro hac vice)
Thomas J. Wimbiscus (admitted pro hac vice)
Sharon A. Hwang (admitted pro hac vice)
Paul W. McAndrews (admitted pro hac vice)
Anna M. Targowska (admitted pro hac vice)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

Counsel for Plaintiff TQ Delta, LLC

Date: February 24, 2014

18