# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TQ DELTA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 13-cv-2013-RGA |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| ZYXEL COMMUNICATIONS, INC. | ) | |
| and | ) | |
| ZYXEL COMMUNICATIONS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF TQ DELTA, LLC'S OPENING
## BRIEF IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED
## COUNTERCLAIMS OF DEFENDANT ZYXEL COMMUNICATIONS, INC.
## AND COUNTERCLAIMS OF ZYXEL COMMUNICATIONS CORPORATION

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301 (Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Peter J. McAndrews (admitted *pro hac vice*)
Timothy J. Malloy (admitted *pro hac vice*)
Thomas J. Wimbiscus (admitted *pro hac vice*)
Sharon A. Hwang (admitted *pro hac vice*)
Paul W. McAndrews (admitted *pro hac vice*)
Anna M. Targowska (admitted *pro hac vice*)
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 (Fax)
pmcandrews@mcandrews-ip.com

*Counsel for Plaintiff TQ Delta, LLC*

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS .............................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT ....................................................................................................................... 9

I.     ZYXEL'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH
       RELIEF CAN BE GRANTED ....................................................................................... 9

       A.     Legal Standard ................................................................................................. 9

       B.     ZyXEL's Counterclaim One for Breach of Contract Must Be Dismissed
              for Failure to State a Claim ............................................................................. 9

       C.     ZyXEL's Counterclaim Two for a Declaratory Judgment Must Be
              Dismissed for Failure to State a Claim ......................................................... 15

II.    ZyXEL's Counterclaim Two SEEKS AN ADVISORY OPINION AND
       SHOULD BE DIMISSED FOR LACK OF SUBJECT MATTER
       JURISDICTION .......................................................................................................... 15

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Motorola Mobility, Inc.*,
   No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012)................. 3, 16

*Apple, Inc. v. Motorola Mobility, Inc.*,
   No. 11-cv-178-bbc, 2012 U.S. Dist. LEXIS 181854 (W.D. Wisc. Oct. 29, 2012) .................. 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................ 9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................ 9

*Commonwealth Scientific And Industrial Research Organisation v. Buffalo Technology* Inc.,
   492 F. Supp. 2d 600 (E.D. Tex. 2007) ....................................................................... 13

*Ericsson Inc. v. D-Link Sys., Inc.*,
   No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013) ....................... 2, 11

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ........................................................................................ 6

*In the Matter of Certain Elec. Devices, Including Wireless Commc'n Devices, Portable
   Music and Data Processing Devices, and Tablet Computers*, Inv. No. 337-TA-794, at 63
   (July 5, 2013) (Final)...................................................................................................... 14

*Microsoft Corp. v. Motorola, Inc.*,
   864 F. Supp. 2d 1023 (W.D. Wash. 2012) ................................................................... 11

*Nami v. Fauver*,
   82 F.3d 63 (3d Cir. 1996)................................................................................................ 12

*Pension Benefit Guaranty Corp. v. White Consolidated Indus.*,
   998 F.2d 1192 (3d. Cir. 1993)......................................................................................... 6

*Victaulic Co. v. Tieman*,
   499 F.3d 227 (3d Cir. 2007)............................................................................................ 9

*Willow Bay Assoc. v. Zannett Sec. Corp.*,
   C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426 (D. Del. Mar. 21, 2003) ............. 6

**Statutes**

19 U.S.C. § 1337......................................................................................................... 14

19 U.S.C. § 1337(d)..................................................................................................... 13

35 U.S.C. § 283............................................................................................................. 12, 13

**Other Authorities**

Common Patent Policy for ITU-T/ITU-R/ISO/IEC (2014)...................................... 7, 8

Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005)............... 8

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................................................ 1

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 1

Fed. R. Civ. P. 8(a)(2).................................................................................................................. 9

## NATURE AND STAGE OF PROCEEDINGS

On December 9, 2013, Plaintiff, TQ Delta, LLC ("Plaintiff" or "TQD"), filed a complaint against ZyXEL Communications, Inc. and its Taiwanese parent, ZyXEL Communications Corporation (collectively "ZyXEL" or "Defendants") alleging infringement of 32 U.S. patents. D.I. 1.  The asserted patents relate to digital subscriber line ("DSL") technology, which is used to provide, e.g., high-speed broadband Internet access and video services via copper wires of a local telephone network.  *Id.* ¶¶ 8-9.  On March 17, 2014, ZyXEL Communications, Inc. filed its Amended Counterclaims (D.I. 18) and ZyXEL Communications Corporation filed its Answer, Affirmative Defenses and Counterclaims (D.I. 19).  The counterclaims filed by each of the Defendants are substantively identical.[1]  Counterclaim One asserts breach of contract based on "express or implied contractual communication with ITU and its members, affiliates and adopters relating to DSL standards."  D.I. 18 at ¶¶ 13-23.  Counterclaim Two seeks a declaratory judgment that (1) "TQ Delta has not offered license terms to ZyXEL on terms consistent with the referenced policy of the standards and bylaws of the ITU" and (2) "if TQ Delta refuses to offer a license on FRAND terms, the allegedly essential patents shall be unenforceable as to ZyXEL." *Id.* at ¶¶ 27-28.  TQD hereby moves to dismiss the Defendants' counterclaims (1) for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and (2) for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF ARGUMENT

1.      ZyXEL is not entitled to the benefits of TQD's agreement with the ITU. Consistent with ITU patent policy, TQD and its predecessor, Aware, Inc., agreed that it would be

---

[1] The present motion seeks dismissal of the counterclaims of both Defendants.  Because the counterclaims of both Defendants are identical, for simplicity, this memorandum will cite only to D.I. 18.

"willing to negotiate licenses" with an "unrestricted number of applicants" on reasonable and non-discriminatory ("RAND") terms and conditions with respect to "implementations" of any standard essential claim ("SEC").  Because ZyXEL did not plead (1) that it was an "applicant" for a license (presumably because it did not apply for a license), (2) that it was "willing to negotiate for a license," and (3) that any of its products constitute an "implementation" of any SEC of any asserted patent, ZyXEL has failed to plead facts showing that it is entitled to the benefit of TQD's agreement with the ITU.  *See, e.g.*, *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013) (holding that "Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer."). ZyXEL makes only an insufficient and incomplete allegation that it is now "willing to take a license."  *Id.* at ¶ 12.  But, a "willingness to take a license" (e.g., conditioned upon an adjudication of infringement and validity) is not an "application" for a license, nor is it a representation that one has products "implementing" the standard.  Accordingly, ZyXEL's Counterclaim One should be dismissed because it fails to state a claim for breach of contract.

2.      The declaratory judgment claim of ZyXEL's Counterclaim Two likewise relies on entitlement to the benefits of TQD's agreement with the ITU.  Thus, ZyXEL's Counterclaim Two should be dismissed for the same reasons stated in paragraph 1 above, as it fails to state a claim upon which the requested declaratory relief can be granted.

3.      ZyXEL's Counterclaim Two should also be dismissed for lack of subject matter jurisdiction because ZyXEL has not agreed to be bound by any adjudicated RAND rate.  In an allegation pled in the alternative, ZyXEL's Counterclaim Two requests that the Court declare the "RAND license terms and conditions."  But, in addition to ZyXEL's failure to plead conditions precedent to qualifying as a beneficiary to TQD's agreement with the ITU (e.g., that (1) it is an

"applicant" for a RAND license and (2) its products are an "implementation" of any SEC), ZyXEL did not plead that it would accept a license on the adjudicated RAND terms. Tellingly, ZyXEL's prayer for relief seeks a "decree that ZyXEL is entitled to license" to the subject patents—and not specific performance of the alleged contract (by which it would necessarily accept and be bound by the adjudicated terms). This only serves to highlight the fact that ZyXEL has failed to allege that it unconditionally agrees to be bound by an adjudicated RAND rate. ZyXEL's declaratory judgment claim therefore seeks an advisory opinion and should be dismissed for lack of subject matter jurisdiction. *See, e.g., Apple, Inc. v. Motorola Mobility, Inc.,* No. 11–cv–178–bbc, 2012 U.S. Dist. LEXIS 157525 (W.D. Wisc. Nov. 2, 2012) (dismissing Apple's breach of contract claims and refusing request that the court set a RAND rate because Apple failed to unconditionally agree to accept a license on terms set by the court.).

## STATEMENT OF FACTS

TQD owns a portfolio of patents that generally relate to DSL technology. D.I. 1 at ¶ 8. This technology is used to provide, for example, high-speed broadband Internet access via copper wires of a local telephone network. *Id.* at ¶ 9. More recently, DSL technology has been used by telephone carriers to deliver video services to subscribers. *Id.* Independent companies and individuals cooperating under the framework of the ITU, including TQD and its predecessor Aware, contributed to the development of technical standards regarding DSL technology to ensure that DSL equipment from different manufacturers could operate together in the same system. *Id.* at ¶ 10. At least some of the claims of TQD's asserted patents may be SECs, i.e., essential for practicing such DSL standards. *See id.* at ¶ 15.

ZyXEL makes, uses, sells, offers for sale, and/or imports customer premise equipment ("CPE") and central office equipment ("CO") products such as modems, routers, gateways, and

multiplexers that purport (according to publicly-available product literature) to operate in accordance with various DSL standards. *See id.* at ¶ 11.

As recited in TQD's Complaint, TQD attempted to negotiate a license to TQD's patents with ZyXEL, including a license to any to standard essential claims consistent with ITU policy:

12.     On June 26, 2013, TQD sent a first letter to Defendants, including an overview of TQD's DSL patent portfolio and an invitation to open licensing discussions.  Having received no response, TQD sent a follow-up letter to Defendants on July 12, 2013.

13.     On July 24, 2013, a representative of Defendants sent an email stating that Defendants are "studying the documents you provided internally.  I anticipate it will take some time to reach a conclusion.  I will contact you when we have questions."

14.     On July 25, 2013, TQD responded to Defendants by email, stating that "It will be difficult for you to fully evaluate the TQ Delta portfolio without additional information, such as the identification of specific patents and their applicability to technologies used in DSL products and services.  In order to provide this level of detail, we would like to enter into a confidentiality/standstill agreement to ensure that our discussions can take place outside the context of litigation."

15.     Not having heard from Defendants in response to TQD's July 25, 2013 email, on August 7, 2013, TQD again sent an email to Defendants inviting licensing discussions and explaining that "the use of one or more patent claims in the [TQ Delta DSL patent] portfolio may be required to practice or otherwise comply with certain DSL-related Recommendations, Deliverables and/or standards.  TQ Delta is willing to negotiate a license with Zyxel on a non-discriminatory basis on reasonable terms and conditions with respect to any such standard-essential patent claims."  Defendants did not respond.

16.     TQD sent a further follow-up email on August 23, 2013. Defendants eventually responded on October 2, 2013, suggesting that their delay had been due to an email spam filter issue.  After a brief exchange regarding a draft confidentiality agreement over October 2-3, 2013, Defendants failed to respond to further email communications.  On October 29, 2013, TQD sent a package by Federal Express to Defendants, including a copy of prior emails and a letter asking "if ZyXEL intends to enter into an NDA with TQ Delta so that we may move forward with license discussions."

17.     On November 12, 2013, Defendants and TQD exchanged emails about the scope of the NDA.  On November 25, 2013, TQD sent a follow-up email seeking Defendants' final position on the NDA by November 29, 2013. Defendants again failed to respond.

D.I. 1 at ¶¶ 12-17.

Despite TQD's repeated good-faith efforts to negotiate a license under TQD's DSL patent portfolio, Defendants failed to engage in timely, good-faith negotiations.  Importantly, ZyXEL never applied for a license under TQD's DSL patent portfolio.  *Id.* at ¶ 19.  TQD was left with no choice but to initiate the current suit.

ZyXEL asserts two counterclaims.  ZyXEL's Counterclaim One alleges that "Plaintiff was contractually obligated, among other things, to offer a license to its identified patents consistent with the applicable patent policy of the standards and bylaws of the ITU."  D.I. 18 at ¶ 16.  ZyXEL also alleged that "TQ Delta breached its contractual commitments when it (i) failed to provide ZyXEL with a FRAND offer and to conclude a license on FRAND terms and conditions, (ii) failed to seek a determination of FRAND license terms and conditions from a competent court or tribunal; and (iii) prosecuted this infringement action seeking a permanent injunction."[2]  *Id.* at ¶ 17.  ZyXEL further alleged that TQD breached its contract by "seeking to enjoin ZyXEL's implementation of the technology of the allegedly 'essential' patents" by filing the present lawsuit.  *Id.* at ¶ 18.

ZyXEL's Counterclaim Two is captioned as a "Declaratory Judgment that TQ Delta Must Offer ZyXEL A FRAND License Or That The Alleged 'Essential' Patents Are Unenforceable As To ZyXEL."  *Id.* at p. 8.  In support, ZyXEL alleges that "there is a dispute between the parties concerning whether Plaintiff has offered to license to ZyXEL patents consistent with the

_____

[2] The terms FRAND and RAND are used interchangeably in addressing licensing terms for standards-essential patents.  The "F" in FRAND adds the word "Fair" to "Reasonable And Non-Discriminatory."

referenced policy of the standards and bylaws of the standard-setting entities."   *Id.* at ¶ 19.

ZyXEL seeks a "declaratory judgment that Plaintiff has not offered license terms to ZyXEL on

terms consistent with the referenced policy of the standards and bylaws of the ITU."   *Id.* at ¶ 27.

ZyXEL further seeks a declaratory judgment "establishing the proper FRAND license terms and

conditions for the Asserted Patents."   *Id.* at ¶ 26.   Finally, ZyXEL seeks a declaratory judgment

that "if TQ Delta refuses to offer a license on FRAND terms, the allegedly essential patents shall

be unenforceable as to ZyXEL."   *Id.* at ¶ 28.

ZyXEL's counterclaims purport to be based on agreements TQD/Aware made with the

ITU, and on unspecified policies and bylaws of the ITU.[3]   The actual agreements TQD/Aware

made with the ITU are expressed in documents submitted to the ITU by TQD/Aware, which are

referred to as a Patent Statement and Licensing Declaration ("Patent Declaration").   An example

of a Patent Declaration submitted by Aware to the ITU, the relevant wording of which is

representative of all such Patent Declarations submitted by TQD/Aware, is submitted herewith as

Exhibit A to the Declaration of Paul McAndrews (the "McAndrews Declaration").   The

---

[3] Because ZyXEL's pleading relies exclusively on such agreements and patent policies, the Court should consider these documents in ruling on this Motion to Dismiss, despite the fact that they are outside the four corners of ZyXEL's Counterclaims.   *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.   However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' '[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'") (internal citations omitted); *Pension Benefit Guaranty Corp. v. White Consolidated Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *see also Willow Bay Assoc. v. Zannett Sec. Corp.*, C.A. No. 00-99-GMS, 2003 U.S. Dist. LEXIS 4426 at *4-5 (D. Del. Mar. 21, 2003).

Common Patent Policy for ITU-T/ITU-R/ISO/IEC ("ITU Patent Policy") is submitted herewith as Exhibit B to the McAndrews Declaration.

TQD's Patent Declaration provides that TQD is "<u>willing to negotiate</u>" a license to its SECs on RAND terms:

> In accordance with [ITU Patent Policy], Aware is not prepared to waive its patent rights but would be **<u>willing to negotiate</u>** with other parties on a non-discriminatory basis on reasonable terms and conditions with respect to patent claims held or controlled by Aware that are essential for compliance on a technological basis with [listed DSL standards].

McAndrews Decl., Ex. A at A-1 (emphasis added); *see also id.,* Ex. B at § 2.2 ("The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions").  TQD's Patent Declaration further provides that TQD is "<u>prepared to grant</u>" a license to its SECs on RAND terms to an "<u>applicant</u>" that seeks a license for "<u>implementations</u>" of the particular DSL standard:

> The Patent Holder is **<u>prepared to grant</u>** a license to an unrestricted number of **<u>applicants</u>** on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell **<u>implementations</u>** of the [specified DSL standard].

*Id.* at A-3 (emphasis added).  Thus, the express language of the Patent Declaration only requires TQD to participate in good-faith negotiations (i.e., be "willing to negotiate" and "prepared to grant" a license) with a party who has requested a license (i.e., an "applicant").  Further, TQD only is required to negotiate a RAND license for products that comply with the DSL standard(s) (i.e., "implementations") for which TQD's claims are essential.  A party whose products do not comply with the DSL standard(s)[4] to which TQD's SECs apply is not entitled to a RAND license.

---

[4] ZyXEL generally admitted only that it "sells certain products that **<u>may</u>** operate in accordance with various DSL-related standards."  D.I. 7, Answer, at ¶ 11 (emphasis added).  However, in each instance where ZyXEL responded to an allegation that certain of its products operated in

The Patent Declaration further indicates that parties are to engage in good-faith negotiations where the ITU plays no role in the negotiations:

> **Negotiations** are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.

*Id.* (emphasis added).

The ITU Patent Policy recognizes that the appropriate RAND terms and royalty rate cannot be set in a vacuum outside the case-by-case context of specific negotiations between the patent holder and license applicant:

> The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might **differ from case to case**.

McAndrews Decl., Ex. B at p. 1 (emphasis added).  The ITU provides the following explanation for staying out of negotiations between the patent holder and prospective licensee:

> … standardization organizations will most probably not be in a position to act as genuine arbitrators in patent rights disputes, for the simple reason that the disputing patent rights holders will never disclose all the information they need to act as a fair judge in a patent rights controversy.  For example, **in order to define what is fair and "reasonable" in a given case, one needs to know development and manufacturing costs, profits, etc.**  This kind of information is normally not disclosed to a third party with which no legal relationship has been established, as would be the case for a standardization organization vis-à-vis its member organizations.

McAndrews Decl., Ex. C (Guidelines for Implementation of ITU-T Patent Policy (November 2, 2005)) at § 2.3 (emphasis added).  These policies are inconsistent with ZyXEL's assertion that TQD was required to provide it with a "FRAND offer" in the absence of ZyXEL's good-faith participation in negotiations.  *See* D.I. 18, Counterclaims at ¶¶ 17, 20, 22, and 23.

---

accordance with a specific DSL standard, it denied the allegation.  *Compare*, *e.g.*, D.I. 1 at ¶ 22 *with* D.I. 7, Answer at ¶ 22.

**ARGUMENT**

## I.   ZYXEL'S COUNTERCLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Legal Standard

Federal Rule of Civil Procedure 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (2007)).  In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts in the pleading that "raise a right to relief above the speculative level." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007).

### B.   ZyXEL's Counterclaim One for Breach of Contract Must Be Dismissed for Failure to State a Claim

#### 1.   ZyXEL fails to plead facts showing that it is entitled to the benefit of a RAND license

ZyXEL's breach of contract counterclaim fails to plead facts sufficient to show that it is entitled to the benefits of TQD's agreement with the ITU.  ZyXEL's Counterclaim One is based on ZyXEL's incorrect belief that TQD was obligated to provide it with a "FRAND offer" (and do so even in the absence of ZyXEL's good-faith participation in negotiations).  *See* D.I. 18, Counterclaims at ¶ 17, 20, 22, and 23.   Contrary to ZyXEL's assertions, TQD's Patent Declaration only requires that TQD be "willing to negotiate" and "prepared to grant" a license to

its SECs on RAND terms to an "applicant" that seeks a license.  *See* McAndrews Decl., Ex. A at A-1, A-3.

ZyXEL does not deny that TQD repeatedly contacted ZyXEL prior to filing suit. Compare D.I. 1 at ¶¶ 12-17 with D.I. 7, Answer at ¶¶ 12-17.  Nor does ZyXEL deny that TQD stated that it was "willing to negotiate a license with ZyXEL on a nondiscriminatory basis on reasonable terms and conditions with respect to any such standard essential patent claims." *Compare* D.I. 1 at ¶ 15 with D.I. 7, Answer at ¶ 15 (only denying "allegations pertaining to ZyXEL").  As for ZyXEL's response to TQD's efforts, nowhere does ZyXEL plead facts showing that is was willing to negotiate, that it applied for a license, or that it would be willing to unconditionally accept a license to TQD's SECs on RAND terms.

Instead, ZyXEL's counterclaims are based on the incorrect premise that TQD was obligated to provide it with a "FRAND offer" (*see* D.I. 18, Counterclaims at ¶ 17)—even in the absence of good-faith negotiation by ZyXEL.  ZyXEL goes so far as to allege that TQD failed to "to conclude a license on FRAND terms and conditions."  *Id.*  However, as the ITU Patent Policy provides, absent good-faith participation in negotiations by the prospective licensee, including the exchange of relevant information such as sales data, revenues, costs, profits, etc., the patent owner cannot be expected to propose terms in a vacuum.  *See* McAndrews Decl., Ex. A.  The Patent Declaration and ITU Patent Policy recognize these fundamentals of the negotiation process.  *Id.* at A-3 ("Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC."); *id.*, Ex. B at p. 1 ("The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case.); *id.*, Ex. C at § 2.3 ("In order to define what is fair and 'reasonable' in a given case, one needs to know development and manufacturing costs, profits, etc.").

The RAND commitment attempts to strike a balance between two parties, namely: (1) innovators and patent holders that should be fairly compensated so they are encouraged to innovate and voluntarily contribute their technology to a standard; and (2) implementers that seek to manufacture and sell standards-compliant products.   For this process to work, <u>the potential licensee must actually apply for (hence the term "applicants"),</u> and <u>be willing to engage in good-faith negotiations to enter into, a license on RAND terms</u>.

In RAND-related litigation, it is common for the accused infringer to avoid applying for a license (to avoid undercutting its non-infringement and/or invalidity arguments).   If an infringer chooses this path, however, it should not be entitled to also seek a remedy for an alleged breach of contract, as the infringer has refused to participate in the RAND negotiation process.   For example, in a recent case involving SECs and RAND issues, Intel argued that Ericsson breached its RAND obligations by refusing to offer Intel a license on RAND terms.   The court rejected Intel's claim of breach of contract, noting that Intel had failed to engage in good faith negotiations with Ericsson.   *See Ericsson Inc.*, 2013 U.S. Dist. LEXIS 110585 at *58 (holding that "Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer."); *see also Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (holding that "the implied duty of good faith and fair dealing inherent in every contract" applies to RAND negotiations) (citation omitted);  National Research Council. *Patent Challenges for Standard-Setting in the Global Economy: Lessons from Information and Communication Technology*. Washington, DC: The National Academies Press, 2013 (describing a FRAND commitment as mutual in the sense that "[b]oth the SEP holder and any prospective licensee are expected to negotiate in good faith towards a license on reasonable terms and

conditions that reflect the economic value of the patented technology."), attached as Ex. D to the McAndrews Decl.

ZyXEL only makes a vague and incomplete allegation that it is "willing to take a license." *Id. at* ¶ 12. Importantly, however, like other accused infringers who seek to litigate validity and infringement defenses, ZyXEL fails to plead that it has "applied" (i.e., is an "applicant"), and will thus *unconditionally* agree to accept a RAND license. For example, a "willingness to take a license" only after a favorable adjudication of validity and infringement does not constitute an application for a license.[5] Having failed to plead that it is an "applicant," or that its products "implement" the standard, ZyXEL has not pled predicate facts showing that it is a beneficiary of, or entitled to enforce, TQD's contract with the ITU. Accordingly, ZyXEL's breach of contract claim should be dismissed.

### 2.    TQD may seek injunctive relief against ZyXEL given ZyXEL's unwillingness to apply for and negotiate a RAND License

ZyXEL's counterclaim for breach of contract also fails to state a claim upon which relief can be granted insofar as it is based on the incorrect assumption that TQD is precluded from seeking an injunction against an unwilling licensee.

In patent cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The Western District of Wisconsin recently addressed whether an owner of a standard-essential patent may seek to enjoin an infringer that refuses to negotiate in good faith. *See Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2012 U.S. Dist.

---

[5] Although ZyXEL asserts that TQD did not attempt to negotiate in good faith because TQD did not "provide ZyXEL with a FRAND offer" (i.e.,. specific financial terms for a license), the contract upon which ZyXEL's assertion relies does not require such an offer. A court need not accept factual allegations that are "self-evidently false." *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

LEXIS 181854 (W.D. Wisc. Oct. 29, 2012).  In *Apple*, the court found that "[n]one of [the patent policies of the ETSI and IEEE standards bodies] expressly precludes Motorola or any patent owner from pursuing an injunction or other relief as a remedy for infringement." *Id.*, 2012 U.S. Dist. LEXIS 181854, at *44; *id.* at *46 ("[I]n light of the fact that patent owners generally have the right to seek injunctive relief both in district courts, 35 U.S.C. § 283, and in the International Trade Commission, 19 U.S.C. § 1337(d), I conclude that any contract purportedly depriving a patent owner of that right should clearly do so. The contracts at issue are not clear. Therefore, I conclude that Motorola did not breach its contracts simply by requesting an injunction and exclusionary order in its patent infringement actions.").  In the present case, ZyXEL has not and cannot point to any ITU policy precluding an injunction against a party who has not applied for and agreed to be bound by a RAND license.  Nor are "non-practicing entities" barred from pursuing injunctive relief.  *See Commonwealth Scientific And Industrial Research Organisation v. Buffalo Technology* Inc., 492 F. Supp. 2d 600 (E.D. Tex. 2007) (rev'd on other grounds).

Commentators have also recognized the public policy concern that arises from "reverse hold-up"—when an infringer uses standard-essential technology without compensation to the patent owner under the guise that an offer to licenses was not made under RAND terms.  As aptly stated by the ITC:

> Apple's position illustrates the potential problem of so-called reverse patent hold-up, a concern identified in many of the public comments received by the Commission. In reverse patent hold-up, an implementer utilizes declared-essential technology without compensation to the patent owner under the guise that the patent owner's offers to license were not fair or reasonable. The patent owner is therefore forced to defend its rights through expensive litigation. In the meantime, the patent owner is deprived of the exclusionary remedy that should normally flow when a party refuses to pay for the use of a patented invention.

McAndrews Decl., Ex. E; *In the Matter of Certain Elec. Devices, Including Wireless Commc'n Devices, Portable Music and Data Processing Devices, and Tablet Computers*, Inv. No. 337-TA-

794, at 63 (July 5, 2013) (Final).

Recognizing the reverse hold-up problem, the Department of Justice ("DOJ") issued a "Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments." McAndrews Decl., Ex. F. The DOJ recognized that injunctive relief may be appropriate for infringement of standard-essential patents that are encumbered by a RAND commitment where an infringer refuses to engage in negotiations or pay what has been determined to be a RAND rate:

> An exclusion order may still be an appropriate remedy in some circumstances, such as where the putative licensee is unable or refuses to take a F/RAND license and is acting outside the scope of the patent holder's commitment to license on F/RAND terms. For example, <u>if a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate</u>. Such a refusal could take the form of a constructive refusal to negotiate, such as by insisting on terms clearly outside the bounds of what could reasonably be considered to be F/RAND terms in an attempt to evade the putative licensee's obligation to fairly compensate the patent holder.

*Id.* at p. 7 (emphasis added; footnotes omitted).[6]

As discussed above, the pleadings themselves show that ZyXEL never requested a license under TQD's patents—and, in fact, refused multiple offers from TQD to engage in negotiations for such a license. There is nothing in the language of TQD's Declaration or the ITU Patent Policy that precludes TQD from seeking an injunction under such circumstances. *See* McAndrews Decl., Exs. A-C. Nor did ZyXEL ever allege (nor can it allege) any affirmative action by TQD to waive its right to enjoin infringers of its patented technology, particularly where, as here, the infringer refuses to enter into good-faith negotiations for a license. In such situations, a patentee is allowed to seek injunctive relief to prevent and deter reverse patent hold-

---

[6] The DOJ's Policy Statement states that, "[a]lthough the focus of the present policy statement is on exclusion orders issued pursuant to 19 U.S.C. § 1337, similar principles apply to granting of injunctive relief in U.S. federal courts …." *Id.* at n. 1.

up by unwilling licensee infringers.   Accordingly, ZyXEL's breach of contract counterclaim should be dismissed for this reason as well.

### C. ZyXEL's Counterclaim Two for a Declaratory Judgment Must Be Dismissed for Failure to State a Claim

ZyXEL's request for declaratory relief in Counterclaim Two relies on the same alleged contract, standards, and policies upon which it bases its Counterclaim One.[7]   Accordingly, Counterclaim Two should be dismissed because it fails to state a claim for the same reasons discussed, *supra*, with respect to Counterclaim One.

## II. ZYXEL'S COUNTERCLAIM TWO SEEKS AN ADVISORY OPINION AND SHOULD BE DIMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

ZyXEL's Counterclaim Two further requests that the Court determine "proper FRAND license terms and conditions for the Asserted Patents" and if TQD refuses to offer ZyXEL a license on such terms and conditions, a finding that TQD's essential patents are unenforceable. D.I. 18, Counterclaim at ¶¶ 26-28.

As noted above, TQD's Patent Declaration and the ITU Patent Policy require a patent holder and a party requesting a license to essential claims to enter into good-faith negotiations. If those negotiations fail, there may then be a justiciable controversy between the parties, at which time the alleged infringer may seek specific performance of the patent holder's RAND obligations.   But, in order for such a justiciable controversy to exist, the alleged infringer must be willing to accept a license on the adjudicated terms.   Otherwise, such an adjudication would amount to an advisory opinion that the infringer would likely use as a "ceiling" in continued negotiations.   Rendering such an advisory opinion would be an enormous waste of judicial

---

[7] For example, Counterclaim Two seeks a declaratory judgment that (1) "TQ Delta has not offered license terms to ZyXEL on terms consistent with the referenced policy of the standards and bylaws of the ITU"  D.I. 18, Counterclaims at ¶ 27.

resources.  And, as discussed below, it would also inevitably lead to terms that would not fairly compensate the patent holder, i.e., a "sub-RAND" royalty rate.

This issue was recently raised in a dispute between Apple and Motorola, in which Apple requested a declaratory judgment setting a RAND rate for certain Motorola standard-essential patents.  The court dismissed Apple's claims on the eve of trial because Apple would not agree to accept a license at the RAND rate set by the court:

> [I]t has become clear that Apple's interest in a license is qualified. In its response to Motorola's motion for clarification on the specific performance issue, Apple states that it will not commit to be bound by any FRAND rate determined by the court and will not agree to accept any license from Motorola unless the court sets a rate of $1 or less for each Apple phone.  In other words, if Apple is unsatisfied with the rate chosen by the court, it "reserves the right to refuse and proceed to further infringement litigation."
>
> * * *
>
> I questioned whether it was appropriate for a court to undertake the complex task of determining a FRAND rate if <u>the end result would be simply a suggestion that could be used later as a bargaining chip between the parties</u>. Apple responded that the rate would resolve the dispute in this particular case, namely, whether Motorola's license offer was FRAND and if not, what the rate should have been.
>
> Apple's response was not satisfactory and <u>did not assuage my concerns about determining a FRAND rate that may be used solely as a negotiating tool between the parties</u>.  After further consideration, I believe it would be inappropriate to grant Apple's clarified request for specific performance. As I explained in the October 29 order, the normal remedy for a breach of contract is an award of damages, while specific performance is an "exceptional" remedy.

*Apple, Inc.,* 2012 U.S. Dist. LEXIS 157525, at *6-7 (internal citations omitted).

There is no dispute that ZyXEL has not pled that it has products that implement the standard and that it agrees to accept a license on the RAND terms that it asks the Court to declare.  Unless and until ZyXEL unconditionally agrees to be bound by the adjudicated RAND terms, the requested RAND determination would be strictly advisory and a waste of time and resources.  Such an advisory opinion would also unduly prejudice TQD's ability to obtain fair and reasonable compensation for its inventive contributions to valuable DSL standards.

ZyXEL's Counterclaim Two should therefore be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the reasons set forth above, TQD respectfully requests that the Court grant its motion and dismiss ZyXEL's counterclaims.

Date: April 7, 2014                    Respectfully submitted,

                                       FARNAN LLP

                                       /s/ Brian E. Farnan
                                       Brian E. Farnan (Bar No. 4089)
                                       Michael J. Farnan (Bar No. 5165)
                                       919 North Market Street, 12th Floor
                                       Wilmington, Delaware 19801
                                       (302) 777-0300
                                       (302) 777-0301 (Fax)
                                       bfarnan@farnanlaw.com
                                       mfarnan@farnanlaw.com

                                       Peter J. McAndrews (admitted *pro hac vice*)
                                       Timothy J. Malloy (admitted *pro hac vice*)
                                       Thomas J. Wimbiscus (admitted *pro hac vice*)
                                       Sharon A. Hwang (admitted *pro hac vice*)
                                       Paul W. McAndrews (admitted *pro hac vice*)
                                       Anna M. Targowska (admitted *pro hac vice*)
                                       MCANDREWS, HELD & MALLOY, LTD.
                                       500 West Madison Street, 34th Floor
                                       Chicago, Illinois 60661
                                       (312) 775-8000
                                       (312) 775-8100 (Fax)
                                       pmcandrews@mcandrews-ip.com

                                       *Counsel for Plaintiff TQ Delta, LLC*

17