1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4      TQ DELTA LLC,                   :    CA NO. 13-1835-RGA,

5                                      :    13-1386-RGA

6                    Plaintiff,        :    13-2013-RGA

7                                      :

8          v.                         :    May 5, 2015

9                                      :

10     2WIRE INC, ZHONE                :

11     TECHNOLOGIES INC, & ZyXEL       :

12     COMMUNICATIONS INC., et al., :

13                                      :

14                 Defendants.    :    11:03 O'clock a.m.

15     ...........................

16

17

18                 TRANSCRIPT OF STATUS CONFERENCE

19           BEFORE THE HONORABLE RICHARD G. ANDREWS

20                 UNITED STATES DISTRICT JUDGE

21

22

23     APPEARANCES:

24

25     For Plaintiff:     FARNAN LLP

```
 1                          BY:  MICHAEL E. FARNAN, ESQ

 2                                    -and-

 3                          MCANDREWS, HELD & MALLOY

 4                          BY:  PETER J. MCANDREWS, ESQ

 5

 6

 7    For Defendants:       MORGAN, LEWIS & BOCKIUS

 8                          BY:  JODY BARILLARE, ESQ

 9                                    -and-

10                          PROCTOR HEYMAN

11                          BY:  BRETT M. SCHUMAN, ESQ

12                          For Defendant 2Wire

13

14                          MORRIS JAMES LLP

15                          BY:  MARY MATTERER, ESQ.

16                                    -and-

17                          ALSTON & BIRD

18                          BY:  ELIZABETH J. RADER, ESQ

19                          For Defendant ZyXEL

20

21                          SEITZ, VAN OGTROP & GREEN

22                          BY:  JAMES S. GREEN, ESQ

23                                    -and-

24

25
```

1                            FARELLA, BRAUN & MARTELL LLP

2                            BY:  JAMES L. DAY, ESQ

3                            For Defendant Zhone

4

5

6

7

8

9

10    Court Reporter:        LEONARD A. DIBBS

11                           Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2

3              (The proceedings commenced at 11:04 o'clock a.m. as

4     follows:)

5              THE COURT:  Please be seated.

6              So we have a status conference in <u>TQ Delta v. 2Wire,</u>

7     <u>Zhone and ZyXEL</u>.

8              Mr. Farnan, who have you got with you?

9              MR. FARNAN:  Peter McAndrews from McAndrews, Held &

10    Malloy.

11             THE COURT:  Good morning.

12             MR. MCANDREWS:  Good morning, your Honor.

13             THE COURT:  And Mr. Green?

14             MR. GREEN:  James Day.

15             THE COURT:  All right.

16             And where are you from, sir?

17             MR. DAY:  I'm now with Farella, Braun & Martel.

18             THE COURT:  That's in San Francisco?

19             MR. DAY:  San Francisco, yes.

20             THE COURT:  Okay.  Ms. Matterer?

21             MS. MATTERER:  Good morning, your Honor.

22             I have with me Elizabeth Rader from Alston & Bird.

23             THE COURT:  All right.

24             And Mr. Barillare.

25             MR. BARILLARE:  Good morning, your Honor.

1          Jody Barillare from Morgan Lewis for 2Wire.

2          On the phone is my co-counsel, Brett Schuman, from

3     Proctor Heyman.

4          THE COURT:  Good morning, Mr Schuman.

5          MR. SCHUMAN:  Good morning, your Honor.

6          THE COURT:  Well, I guess you can hear me.

7          Okay.  So I got these letters.  And, so, I guess I had

8     a question on what seemed like maybe the easier stuff.

9          So one of the plaintiffs' complaints is that they've

10    done some interrogatories, asking for the names of witnesses

11    with knowledge, and apparently defendants have not provided the

12    names of any witnesses with knowledge.

13         Because this is a status conference, I didn't get the

14    usual back and for the letters, so I don't know what the

15    defendants' response to this might be.

16         I would be interested in hearing what it is.

17         MR. DAY:  Well, your Honor, James Day for Zhone.

18         Maybe I'll take the lead just on that point.

19         The first point, your Honor, is you didn't got back and

20    forth on it, because it was raised with you before it was raised

21    with us.  This was an issue that was not raised with the

22    defendants.  There was no meet-and-confer, which I just wanted

23    to point out --

24         THE COURT:  No, no, you --

25         MR. DAY:  -- I know it's not the appropriate way to do

1   this.

2        THE COURT:  I hear you.  Go ahead.

3        MR. DAY:  I would add, at least for Zhone, we

4   identified witnesses in our initial disclosures back in October,

5   so I think the suggestion that this has somehow slowed down

6   anything, I think is incorrect.  The witnesses were identified a

7   long time ago.

8        THE COURT:  Even though I gather, without having

9   actually having looked at any interrogatories, the

10  interrogatories were probably more trying to focus on which

11  witnesses had information about particular interrogatories as

12  opposed to just generally who are the witnesses?

13       MR. DAY:  I'm not sure that -- well, I think what I

14  think is, the interrogatories that I believe the letter is

15  taking about are the ones that led to our non-infringement

16  positions that we set out.

17       So it's how our products work and what do we know about

18  them?

19       Those are the witnesses that we identified in initial

20  disclosures a long time ago.  I don't think that these

21  interrogatories are looking for something more particular than

22  that.

23       THE COURT:  Well, I don't know.  Mr. McAndrew seems to

24  think it was worth bringing up as a Complaint.

25       Mr. McAndrew, what am I missing here?

1          MR. MCANDREWS:  Your Honor, so -- and I apologize to

2     the extent that an additional meet-and-confer would have been

3     required here.

4          The procedural posture, as we see it, though, is that

5     you actually -- you know, we had this meet-and-confer four

6     months ago, and at the last meeting you ordered the parties to

7     provide full answers to the extent they had knowledge to these

8     interrogatories, and they chose not to answer that party

9     interrogatory.

10         THE COURT:  Well, so we're just talking about the more

11     specific thing here.

12         You had did some interrogatories that apparently, am I

13     correct, requested witnesses with knowledge of the answers of

14     the particular interrogatory?

15         MR. MCANDREWS:  That's correct, your Honor.

16         THE COURT:  Okay.

17         MR. MCANDREWS:  And --

18         THE COURT:  And, so, did they provide -- what is it

19     exactly that you want that you don't have?

20         MR. MCANDREWS:  So it is true that for some of the

21     defendants -- and Mr. Day may have been speaking only for Zhone

22     -- in that where they did their initial disclosures, we might be

23     able to identify from the initial disclosures, based on the

24     category of information, the witness with knowledgeable.  We

25     might be able to identify witnesses that at least at that time,

1   you know, which was far earlier in time, would have been

2   knowledgeable of this topic.

3          THE COURT:  Okay.  Am I correct in deducing what it is

4   you're looking for is, you're trying to identify witnesses with

5   the particular topics that are in particular interrogatories?

6          MR. MCANDREWS:  That's correct, your Honor.

7          THE COURT:  Okay.  So taking in -- bearing in mind --

8   and I'm not, in any way, criticizing anyone, because this has

9   just arisen in a different format than these things usually

10  arise in -- but it would seem to me that that's something that

11  you could discuss, and that at least so far as I can see, the

12  defendants ought to be, if there is an interrogatory asking for

13  witnesses who can provide the basis for knowledge of a

14  particular interrogatory, it ought to be answered, but, you

15  know, you all can talk about it yourself.

16         I assume then that probably the same discussion would

17  be had about the document request that you raised in your

18  letter?

19         MR. MCANDREWS:  That's correct, your Honor.

20         THE COURT:  Okay.  All right.

21         So, you know, just generally, but I don't have the -- I

22  don't have a written admission from you, and I shouldn't have a

23  written submission from you, and perhaps this particularly thing

24  could have been discussed more -- but I think you ought to -- it

25  sounds to me like the plaintiff has legitimate concern, and you

1    ought to see if you can't work that out between yourselves.

2         All right.

3         So that was, as I said, what I thought might be the

4    low-hanging fruit here.

5         What I was inclined to do was, it seems to me that it's

6    probably time for the defendant to pony up with some invalidity

7    contentions, and how much time do the defendants need to do

8    this?

9         MR. DAY:  Your Honor, before we get to that, maybe we

10   should step back a little.

11        At the end of the last hearing, the very last thing you

12   said was, we're not going to do invalidity contentions until we

13   do some narrowing on the case.

14        THE COURT:  I guess I'm thinking differently about it

15   right now, but go ahead.

16        MR. DAY:  So I want to -- let's talk a little bit about

17   how we got to where we are, and what's been going on.

18        A year ago the defendants narrowed their case down --

19        THE COURT:  Right.

20        MR. DAY:  -- to 32 patents in nine families, 64 claims,

21   so that was the narrowing a year ago.

22        THE COURT:  Right.

23        MR. DAY:  After that we produced core-technical

24   documents on more than a hundred accused products, and then we

25   got infringement contentions.

1          And you'll recall in September we had a discussion

2     about those, where we, the defendants, explained why we thought

3     those really were not adequate, because what they do, you'll

4     recall, is take the claims --

5          THE COURT:  Right.  They mapped them to the standards.

6          MR. DAY:  -- and mapped them onto standards.  They

7     don't say anything about the accused products, even though we

8     had produced our documents.

9          So what we came out of that hearing with was, you said,

10    okay, well, I'm a getting to allow infringement discovery.

11         And the plaintiffs said, okay, we're going to go out

12    and we'll take third-party discovery, and we'll, you know --

13         THE COURT:  Right, and then they changed their minds.

14         MR. DAY:  They did.

15         So then we -- they said, well, what we really need is

16    list a name of all the chips in all these accused products.

17         THE COURT:  Right.  This is what you said in your

18    letter.  I read it.

19         MR. DAY:  Right.  And we gave them that.

20         Then they came in and said, now what we need are your

21    non-infringement positions.

22         And, so, we gave them Zhone, this, you know, stack of

23    paper, 63 charts, detailed charts, hundreds of thousands of

24    dollars in charts to explain to them our positions in response

25    to what they had given us last year.

1          That's where we are today.

2          In each of the last few status conferences, we've been

3     talking about ways to narrow the case down.  That's why we've

4     been giving them all of this information.  We gave them summary

5     damages data, so they could use that to try to focus in on some

6     of the particular products.

7          And, in each of these hearings, we've talked about the

8     enormous burden of doing invalidity contentions on 32 patents,

9     all with potentially different priority dates, so potentially

10    different prior art, certainly nine families that are all going

11    to have different prior art.

12         THE COURT:  But here's the thing is, you know, I think

13    I have a fair amount of discretion to force narrowing of the

14    case, and I exercised that a year ago, at least in part.

15         And the question of how many products they accuse, you

16    know, that's a different issue, but they've got 32 patents, and

17    as you've said, they have a different priority dates for this

18    and that.  Presumably they claim different things.

19         I'm not really sure that I have so much discretion to

20    say, without them even knowing what your invalidity positions

21    are, okay, we'll start dropping patents entirely.

22         And, so, that's kind of -- you know, I'm not saying

23    that the only thing that should be happening here is you should

24    be filing invalidity contentions, but I think it's time, I think

25    it's time for you to be doing that.

1    And, yes, maybe we'll narrow this down in some way --

2 we're going to have to -- but it seems that to me at least

3 before they have to start picking among the patents, and the

4 asserted claims, at least that part, I think they need to know

5 what your invalidity theories are that might affect which ones

6 they pick, right?

7    MR. DAY:  Your Honor, I don't think that that's right.

8 I think they've talked about -- we've talked about the overlap

9 in the various different families.

10    And, so, I think at most, if we were to pick one claim

11 per family, and tell them what our invalidity positions were,

12 that would give them enough information on each of the families

13 to move ahead.

14    So I think that the burden doesn't justify going in

15 that direction.  I think if we are going to go in that

16 direction, and you seem to have -- that seems to be where we're

17 headed --  then I think giving them our position on one claim in

18 each of the families would be sufficient to give them an idea of

19 where they are vulnerable, or where they're strong, or whatever

20 they are going to take from that.

21    And, at the same time, I think we should be moving

22 towards infringement contentions that tell us what it is in our

23 products that they think actually infringes.

24    So, if we're going to be put to the burden of these

25 invalidity contentions, I think that, you know, we ought to be

1    narrowing the case at the same time, or the process ought to be

2    leading toward narrowing the case.

3          THE COURT:  You actually bring up something that I was

4    thinking about when I was reading the letters.

5          What are your accused products?

6          MR. DAY:  DSL modems.  So there's pieces -- for Zhone

7    anyway -- it's pieces that fit in what's called the central

8    office.  Something like AT&T might have in a central hub been.

9    And then DSL modems that sit on top of your TV.  DSL is a way to

10    get internet over a telephone line.

11          THE COURT:  Okay.  So, yes, DSL is the only thing I

12    actually recognize in what you just said.

13          So you make pieces of, or you presumably sell pieces of

14    equipment that somehow allow people like AT&T to send stuff over

15    the telephone lines to the world?

16          MR. DAY:  To AT&T DSL subscribers.  So I call AT&T and

17    say, I want to have a DSL modem in my house to get internet

18    connectivity, and they have a central place where they've got

19    sort of a computer-type thing that sends out these DSL signals

20    over the telephone lines.

21          I plug my DSL modem into my telephone line, and when

22    they turn me on, now my house has a DSL signal that is coming

23    from AT&T to my set top box.

24          THE COURT:  And, so, is your accused thing something

25    that is in the AT&T home office, or is it something that's in

1    the consumer's home, or both?

2         MR. DAY:  For Zhone it's both.  That's not true of all

3    the defendants, but for Zhone we sell both.

4         And the way these things work, and we've talked about

5    this a little bit in the past is, we order from third-party

6    vendors, the DSL chip.

7         THE COURT:  Right, right, I've heard that part.

8         MR. DAY:  So we're not actually building these things

9    from scratch.  We're doing the assembling and sending them out

10   to the consumer or AT&T.

11        To answer your question, Zhone sells both the central

12   office piece, and what's called the consumer premises equipment

13   piece.

14        THE COURT:  And, so, these hundreds products that are

15   accused, are they different generations of basically the same

16   thing, or how do you get to having so many different accused

17   products?

18        MR. DAY:  It's a combination of multiple generations

19   and just changes in product line.

20        There are actually -- I haven't counted them -- but

21   many of the products use the same DSL chip.  In fact, I think

22   we've determined that many of each of the defendants' products

23   use similar or the same chips.

24        So I don't -- I don't, frankly, know the total number,

25   if we were to get down to a representative number.

1           THE COURT:  So what I was trying to do was just figure

2    out whether -- you know, how related they are to each other, and

3    it sounds to me like there's some degree of heavy relatedness,

4    if one is, you know, 15X modem, and the next one is the 15.2

5    modem or --

6           MR. DAY:  No.  There are a hundred, if you count them

7    up, and that would be one line item.  The 15X, the 15X1 is one

8    line item, and there about a hundred line items, roughly, of

9    that nature.

10           Now, there may be an overlap between the first line

11   item and the second, they may use the same DSL chip which would

12   be for purposes of this case, would make them closely related,

13   but they are different products.

14           And then there's a significant difference between the

15   piece that sits in the consumer's premises, and the piece that

16   sits in the central offers.

17           I'm not sure I'm answering your question.

18           THE COURT:  Well, you're in the right ballpark.

19           Mr. McAndrew, do you have anything to say?

20           MR. MCANDREWS:  No, I mean that's generally correct.

21           These products are -- I mean, as a baseline, they are

22   all very related given that they all practice the DSL standards,

23   right?

24           So at a baseline they're exceedingly related to each

25   other, but then it is true that there are going to be multiple

1    generations, and then within those generations you're going to

2    have different models, depending on potentially a different

3    feature set.

4         And the feature set, you know, it may have two bells

5    and whistles, or three and four bells and whistles, and

6    depending on how many of those will impact which patent families

7    are in play for that particular product.

8         But, overall, we agree.  In fact, we proposed in the

9    original Scheduling Order that the parties should be able to

10   work out a way to agree on the representative products.

11        THE COURT:  Right.  I've been hearing that for a long

12   time and apparently no progress has been made.

13        MR. MCANDREWS:  That's correct, your Honor.

14        But this is the first time this letter here -- actually

15   when I saw it was the first time that I had seen the defendants

16   seem to agree to that proposal.

17        And, in fact, they proposed several ways in which we

18   could agree, and, so I was actually very encourage by this

19   particular paragraph about representative products.

20        As long as the understanding is that we're talking

21   about representative products, not I'm eliminating my claim

22   against anything that I don't call a representative product.

23        In other words --

24        THE COURT:  Right.

25        MR. MCANDREWS:  -- that product would represent the

1      other ones that are not going to be in play in front of the jury

2      and your Honor for pretrial matters.

3              And, so, the defendants would have to agree that this

4      product is representative of this class of products, whether

5      it's because it's a generational thing, or because it's the

6      same, even though there are four bells and whistles in this one,

7      and this one has two, two are the same across models.

8              So I think there is a way to do that, and I think that

9      would be a positive step forward, to take the next possibly

10     three weeks to try to agree on representative products.

11             As far as representative claims go, your Honor -- and I

12     appreciate, because I had mentioned that it would be difficult

13     for us to reduce further from 64, if we didn't yet know an

14     invalidity position.  At the same time, I do understand that

15     given that there is overlap in the patents, I don't think it's

16     an unreasonable suggestion, actually, to do invalidity

17     contentions on fewer than 64 claims.

18             I don't think one claim for each patent family would do

19     the trick, but some number between 64 and I guess they are

20     suggesting nine per, you know, one --

21             THE COURT:  So how would you -- what would you -- make

22     a suggestion.

23             MR. MCANDREWS:  I would suggest that we pick at least

24     two patents from each family, and some -- I think there might be

25     at least one family with only one patent, so that's an easy one.

1    And then they would do an invalidity contention on -- typically,

2    we have two claims asserted per patent, you know, that's the

3    average that we wound up with.  And there will be a dependent

4    claim in that, and, of course, the dependent claim, the purposes

5    of that is initial insulation against prior art.

6         So we would suggest -- so I guess I'm suggesting

7    approximately four claims per family with the exception of the

8    family that has only one patent in it.

9         THE COURT:  Four times nine is 36?

10        MR. MCANDREWS:  Correct.

11        MR. DAY:  Your Honor, the goal here is to narrow down

12   the case, so we're necessarily going to be doing work that is

13   going to be thrown away.

14        That's the point of what we're going to do, so doing

15   more is not efficient, and it continues to put all the burden on

16   the defendants who borne all of the burden for the last year.

17        One per family?

18        And if there's some concern there, perhaps we can

19   meet-and-confer about two in a family, if there are two patent

20   claims that are so different that the plaintiffs think they need

21   an extra claim.

22        But we've heard, and I think it's true, there's

23   significant overlap in the claims they've chosen in each patent

24   family, and I think one claim per is going to tell them all they

25   need to know about where they are vulnerable.

1          And, you know, you could have sort of a safety valve.

2     If they come to you and show good cause why they need two in a

3     particular family, we could respond to the specific request,

4     give you enough information to make a decision, or we could

5     meet-and-confer and agree on it, perhaps, I don't know, but the

6     safety valve would be you let them come to you and show you good

7     cause.

8          MR. MCANDREWS:  Your Honor, I think maybe he

9     misunderstood what I was agreeing to, actually.

10          What I thought he was suggesting was that they would do

11     claim charts initially, you know, avoid the burden of doing

12     charts on 64 claims, and then we would decide which claims we

13     would go forward in the case on, because that creates the

14     problem that I was -- that I believe you recognized, that if I

15     have to select which claims ahead of time, then I may be giving

16     up on claims that would have better insulation against the prior

17     art.

18          And, so, what I was suggesting is that they do a

19     smaller set of invalidity contentions, and then from that we can

20     determine what the representative claims are, and I don't think

21     it would be a burden.

22          So, for example --

23          THE COURT:  Is that correct?

24          I'm sorry, Mr. Day.

25          MR. DAY:  That's correct.

1          THE COURT:  Under your suggestion, Mr. McAndrew, who

2     would pick the ones that they were doing the infringement

3     contentions on -- I mean the invalidity contentions?

4          MR. MCANDREWS:  The invalidity contentions.

5          The first time through, I suppose that they -- they

6     could pick.

7          So, if we're going to do this, they do representative

8     invalidity contentions, and then we can determine from that

9     which claims we want to go forward as representative claims in

10    the case.

11         And, again, we're talking about representative claims.

12    We're not talking about eliminating patents from the case, I

13    believe.  We're talking about this claim or these two claims

14    that's going to be representative of these six patents in the

15    family.  And we will agree that the case rises and falls for

16    that patent family on those claims.

17         THE COURT:  I'm sorry.  I've lost track of your timing

18    because you were just saying it --

19         MR. MCANDREWS:  I'm sorry.  I'm just trying to clarify

20    the issue of what representative means.  It doesn't mean that

21    I'm eliminating all those additional claims from the case.  I'm

22    just agreeing that I'm going to try the case for a particular

23    patent family on the claims that we determine are

24    representative.

25         MR. DAY:  The --

1             THE COURT:  Hold on a second, Mr. Day.

2             I'm sorry, Mr. McAndrew, there was something about the

3        timing, which is, your proposal is somebody, let's say says,

4        this is your proposal, as I understand it.  They do invalidity

5        contentions on approximately 36 of the asserted claims.

6             And then, after that, you would be proposing to them

7        some subset as representative claims?

8             MR. MCANDREWS:  Correct, with the possible substitution

9        of a claim that they didn't yet do a chart on, and understand

10       that -- you know, so what they might say is, well, we've bore

11       the burden of doing an invalidity contention on this claim, and

12       now you're telling me that this claim is at issue.

13            But, as we both agreed, there is substantial overlap,

14       and, so, they may be looking at one additional claim element,

15       for example.

16            THE COURT:  All right.  I understand that.

17            Mr. Day?

18            MR. DAY:  Okay.  I was not suggesting something

19       different, your Honor.  In an approach, I was suggesting

20       something different just in the -- among in the goal, but just

21       in big steps.

22            THE COURT:  Well, I --

23            MR. DAY:  I understand we're all on the same page.

24            THE COURT:  Okay.

25            MR. DAY:  But what I was suggesting specifically is,

1     they can pick nine claims --

2           THE COURT:  Actually, I have to say, I was thinking

3     that they should pick, because they are the ones who are going

4     to be making a decision on the basis of it, so you probably know

5     which ones you'd like -- it doesn't make sense that you pick

6     which -- however many we're talking about -- that you pick them?

7           MR. MCANDREWS:  I suppose it does.

8           MR. DAY:  And what we would suggest is they pick one

9     claim from each family.  They can pick the one they think is

10    going to be most informative, for us to provide them one

11    invalidity -- one set of invalidity contentions on that one

12    claim, for that one family, a total of nine.

13          And what I was saying is, if one for a family is not

14    sufficient for them to be informed of our invalidity

15    contentions, if they don't think that's going to work, if they

16    need ten, they can make some particularized showing to say, no,

17    no, no, we actually need ten invalidity contentions from you.

18          THE COURT:  All right.

19          So let me propose this.

20          (Pause)

21          Well, first off, let me go back.

22          Mr. McAndrew, when you were talking about picking

23    representative claims, are you talking about, essentially, one

24    per patent family?

25          MR. MCANDREWS:  I was thinking, potentially, as many as

1    four claims per patent family.

2         THE COURT:  Okay.  So I don't want it to look like I'm

3    just splitting the baby here, but it seems to me, just listening

4    to you, and having read this, and considering what Mr. McAndrew

5    has said, what seems to me to be a reasonable thing would be

6    that Mr. McAndrew pick two claims per patent family, so that's

7    18 total.

8         And I say "two per patent family."  If, for some reason

9    or other, there's one he's particularly interested in, he wants

10   to go three on that, and one on some other, but a total of 18

11   which -- which are not presumptively, but the ones that will

12   give Mr. McAndrew the best -- in his judgment -- the best

13   information to be able to make intelligent decisions as to which

14   ones he would like to have as a representative claim.

15        And that the idea would be that there would be no more

16   than, you know, absent some really good reason, no more than two

17   representative claims per patent family.

18        Would that work?  Would that be reasonable?

19        MR. DAY:  I think it's less reasonable than nine

20   claims, your Honor, and I frankly -- I don't believe that they

21   need two per family, because the claims are similar enough.

22        THE COURT:  But if that's the case, then, in fact, it's

23   going to be a very marginal amount of extra effort on your part

24   to do the second one per family, right?

25        MR. DAY:  Potentially, it depends on which -- if they

1    pick two that are very, very similar, true.  If they pick one

2    take raises a Section 101 patentability problems, written

3    description problems, enablement problems.

4         For instance, if they pick two that are based on

5    somewhat different specifications, then it's just double the

6    work.

7         THE COURT:  Okay.  But, I mean, if it is double the

8    work, then it's because they have some reason to believe that,

9    you know, maybe picking too closely related ones is not in their

10   best interest.

11        MR. DAY:  Potentially.

12        THE COURT:  So I hear what you're saying.

13        Mr. McAndrew?

14        MR. MCANDREWS:  Your Honor, I think we can live with

15   18.  There is -- we've -- we've -- I think there's a tacit

16   agreement here that there are nine patent families.  I believe

17   there's at least one family where the relatedness is not as much

18   as it might be in the other family, so I'm on little concerned

19   with 18.  That family might -- may merit an additional two, but

20   I can either ask for those two now, or come back to you.

21        THE COURT:  Well, I'll tell you what.

22        I'm in no position to possibly make an intelligent

23   decision, so why don't we -- so what I'd like to do is to say,

24   pick 18, you can discuss with all the defendants whether this

25   other patent family has sufficiently disparate claims, or

1   patents, or whatever the case may be.  You know, you can

2   meet-and-confer on that and hopefully reach some resolution.

3          If it is really the case -- you know, if it is the case

4   that they really are, for whatever reason, quite different from

5   each other, you know, it seems reasonable to me.  And after all,

6   a half hour ago I was going to make you do them all, so I think

7   that would be a reasonable way to proceed.  And that's the way

8   that I'd like to proceed.

9          In terms of picking your 18, possibly plus two, how

10  much time do you think you need to do that, Mr. McAndrews?

11         MR. MCANDREWS:  Two weeks maximum.

12         THE COURT:  Okay.  I know we haven't made much progress

13  here, but give yourself enough time, and if two weeks is enough,

14  that's fine.

15         Mr. Day, or Ms. Rader, or anybody, Mr. Schuman, if you

16  are still there, how much time -- I mean, I guess this is

17  actually -- how much do each of the defendants need to provide

18  invalidity contentions based on Mr. McAndrew picking his 18 to

19  20 claims, two weeks from now?

20         MR. DAY:  Your Honor, we haven't had a chance to

21  discuss that, obviously, and I can't speak for the other

22  defendants.

23         Does anybody want to shout out a number?

24         MR. SCHUMAN:  Your Honor, this is Brett Schuman for

25  2Wire.

1          I want to answer the Court's question quickly, but I

2     just want to point out 2Wire case has fewer patent families.

3     Only six.

4          And, so, I assume under the structure that the Court

5     has been discussing with Mr. McAndrews and Mr. Day, that's 12

6     claims, two per family.

7          As the Court said, if there is some family where you

8     need three, then you go one with the other family, is that

9     correct?

10          THE COURT:  Well, actually, what I said was -- well,

11     first off, I tend to think that, yes, you're talking about

12     working as a starting point from 12 for 2Wire based on the fact

13     that there are only six asserted patent families against you.

14          What I think I said was, Mr. McAndrew, if, in his own

15     judgment wants to designate three from one, and one from

16     another, that's all right, it's okay, but it's also the case

17     that if you -- and I don't know whether his patent family with

18     many strange relatives in it is one of the ones that is asserted

19     against 2Wire -- but if he also wants to do two per family, and

20     try to convince you that you should get three or four on this

21     other family -- on this family with the odd relatives -- that's

22     all right, too.

23          But, basically, what I would be talking about in terms

24     of 2Wire is 12 claims, possibly 13 or 14, depending on

25     discussions you would have between yourselves.

1          MR. SCHUMAN:  Okay.  Fair enough.  I appreciate the

2     Court's clarification there, and I'm sure -- I don't think the

3     family with the odd relations in it is against 2Wire, but we can

4     meet-and-confer with Mr. McAndrews about that, and I'm

5     optimistic we can clarify that.

6          So, I think, your Honor, 75 days to do those charts for

7     2Wire?

8          THE COURT:  All right.

9          I hear you, Mr. Schuman.

10         Do the other defendants have something they want to

11    say?

12         MR. DAY:  Yes, your Honor.  I guess I look at this as

13    we're looking at invalidity contentions in an 18 patent case at

14    this point, and, so, we need a fair amount of time to do these,

15    a little more than Mr. Schuman, because we're going to have a

16    third more.

17         I was thinking more like a 120 days.

18         THE COURT:  Ms. Rader?

19         MS. RADER:  My argument last time we were here, I think

20    so, I agree with that, I mean, a 120 days sounds reasonable.

21         THE COURT:  Mr. McAndrew -- or, actually, I'm sorry --

22    it's Mr. McAndrews.  Sorry.

23         MR. MCANDREWS:  Thank you, your Honor.

24         I can't argue over -- I was going to suggest a hundred

25    days, but --

1          THE COURT:  All right.

2          Well, since you can't argue over it, a 120 days.  So

3   that's a 120 days from, essentially, the two week -- whenever it

4   is that Mr. McAndrews identifies the patents -- the claims for

5   your client that he's interested in.

6          And then, if there is some discussion about the patent

7   family that apparently doesn't involve 2Wire, then you should

8   talk about that, you know, in the first week or two to try to

9   figure that out, and see if you can't reach an agreement on

10  that, but while you're talking about that, you'll have the other

11  12 -- the other 18 -- and you can certainly get going.

12         MR. DAY:  Understood, your Honor.

13         One point I want to try to be clear on, is that these

14  are preliminary contentions.

15         THE COURT:  They are preliminary.

16         And, so -- and so that -- so the 120 days plus two

17  weeks, so that's nearly a 140 days.

18         And, so, under what we're talking about here, after you

19  provide these contentions, which I take it will probably take a

20  little bit of time to digest by Mr. McAndrews and his team,

21  he'll be proposing some representative claims; is that right?

22         MR. MCANDREWS:  Yes, your Honor.

23         THE COURT:  All right.

24         Do you have a sense, you know, and the further we get

25  into the future, the hazier the estimates might be, but once you

1    get these invalidity contentions, what's your estimate as to how

2    long it will take for you to analyze them, and make your

3    reasoned decisions as to a proposal as to representative claims?

4              MR. MCANDREWS:  30 days I think would be adequate.

5              THE COURT:  All right.

6              And I'm asking this, because I don't know the answer --

7    and I haven't really thought about it before -- if Mr. McAndrews

8    proposes representative claims, are the -- the defendants are

9    probably -- I guess what I'm wondering is, if he says, I'd like

10   these to be the representative claims, how much of an

11   opportunity do the defendants have, or does it make any sense

12   even that they would say, no, those are not good representative

13   claims, or is it pretty much whatever he says, that's what it's

14   going to be?

15             MR. DAY:  That's a good point, your Honor, and I was

16   thinking about -- I actually thought about that last night.

17             It occurred in me that they have accused some of our

18   products that we know cannot possibly infringe.

19             And, so, if they say -- if they pick a representative

20   product -- the first step would be to tell us the representative

21   product, then give us the --

22             THE COURT:  Well, actually, the first thing we're doing

23   is representative claims, which is not necessarily the same

24   thing as the representative products, right?

25             MR. DAY:  I'm sorry.  I skipped ahead of you.

1          So you're saying if they pick representative claims, do

2     we have any input into that?

3          THE COURT:  Right.

4          MR. DAY:  I don't think so.  Yes, we -- I think if an

5     issue comes up, we would raise it with you, but in advance of

6     seeing what they are, it's hard for me to know.

7          THE COURT:  It's kind of like asserting claims.  They

8     get to pick which claims that they assert.

9          And, as a representative claim, it seems to me the only

10    thing would be -- because I think -- I think what I'm getting

11    from what Mr. McAndrews said is that, essentially, as a

12    representative claim, the idea would be if the jury decides that

13    a particular product infringes a representative claim, at least

14    from a damages perspective, all of the related claims are going

15    to, therefore, be treated as infringed, is that right, Mr.

16    McAndrews?

17         MR. MCANDREWS:  That's correct, your Honor.

18         THE COURT:  Okay.

19         MR. DAY:  So, in that case, absolutely, your Honor, we

20    should be -- you know, if they say Claim A, with, you know,

21    three elements is representative, and every other claim they

22    want that to represent has four elements, we would not agree

23    that proving up the -- you know, the narrowest claim is

24    representative of the broader claims on an infringement issue.

25         That wouldn't make sense and that would violate our due

1      process rights, frankly, so we would have to have input on that.

2            If --

3            THE COURT:  Well, okay.  That's the reason I bring it

4      up, because, I mean, it's not like I know what the answers are.

5            MR. DAY:  Yes, yes.  No, I -- I hadn't thought of that

6      before.  That to me is the answer to the question.

7            They can pick whatever they want.  If that's going to

8      apply to other claims, then I think we'd have to have input and

9      explain why we either agree or don't agree.

10           THE COURT:  In other words -- I think I understand what

11     you're saying and maybe this is something that's just a topic

12     for another day, or maybe even ideally a topic that you resolve

13     between yourselves -- but depending on what they would pick as a

14     representative claim, it may be, essentially -- I mean,

15     presumably, you're not picking as a representative claim, and

16     saying, well, anything that has the identical elements, it is,

17     therefore, representative of, because then, in fact, it's going

18     to be representative of nothing, unless I guess we have double

19     patenting going on here, right?

20           So it has to be -- if it's going to be representative,

21     and it's, you know, an independent claim in one of these

22     patents, that is probably a much better candidate to be

23     representative than if it is, as you say, the narrowest

24     dependent claim that they can find.

25           On the other hand, the broader the claim, the more

1    likely you might have some prior art or something else that

2    makes it a dubious claim, right?

3            MR. DAY:  That's all true, your Honor.

4            Frankly, I think that you're -- and we'll

5    meet-and-confer, and we'll do whatever you say -- but I think,

6    frankly, trying to come up with a scheme for representative

7    claims is going to be a lot of trouble, and difficult to get to

8    any sort of resolution, and the better approach is to limit the

9    number of claims in the case.

10           THE COURT:  But one of the things that I do recall --

11   you know, I tend to forget, as you can tell, most of these

12   conferences from one time to the next -- but one of the things

13   that I do recall is Mr. McAndrews saying in the first conference

14   -- and now that I've said I recall it, I'm probably going to

15   misstate it horribly -- but he said something about part of the

16   reason that they have so many claims in asserted patents is -- I

17   believe he used the word "stacking" -- to talk about his damages

18   theory, or maybe it was your brother, for all I know.

19           MR. MCANDREWS:  No, your Honor, it was me.

20           THE COURT:  And, so, one of the things that's

21   problematic about doing things that knock entire patents out of

22   the case is sort of dependent on whether that's going to affect

23   the damages theory, right?

24           MR. DAY:  I don't think that's right.  I also don't

25   think -- I think you have authority to set the number of claims,

1  and it can be smaller than the total number of the patents in

2  the case.  We've given you some case law that -- where the

3  Federal Circuit has approved that.

4          THE COURT:  Well, I thought they approved -- I mean, I

5  didn't read it, if you cited it in here -- but if it's the Katz,

6  I mean, I read that a long time ago.  I think it says I can

7  narrow claims.  I don't think that it necessarily was dealing

8  with something where I was just telling them to toss entire

9  patents.

10          MR. DAY:  In Katz there were 31 patents at issue.

11          The Court said, we're going to narrow the case down to

12  16 claims.

13          THE COURT:  Mm-hmm.

14          MR. DAY:  So you have the authority to do it.  What you

15  need to do, per Katz and the other cases, is allow them to show

16  good cause why they need to add a claim back in.

17          But I think that approach is going to probably to get

18  us -- is going to be more effective than trying to come up with

19  them picking a claim that is representative of any other claim,

20  because I'm going to want them to prove up their case against my

21  client.  I'm not going to want to just concede the case against

22  my client, really, on any claims.

23          THE COURT:  All right.

24          So, maybe the best thing to do here -- but you tell me

25  if -- just to kick the can down the road here, and not get to

1    far ahead of ourselves -- and, so...  but Mr. McAndrews, do you

2    have anything to say?

3         MR. MCANDREWS:  Well, I mean, so it sounds like we're

4    making some significant progress towards narrowing the case

5    based on Mr. Days statement that he believes it would violate

6    their due process rights to reach an agreement on a reasonable

7    way to narrow the case.

8         I think that proceeding down a path where they provide

9    invalidity contentions on fewer than all the claims is going to

10   be just another way to delay the case further.  I think we're

11   back at -- we need invalidity contentions on 64 claims then.

12        The problem is that defendants -- and this is -- and

13   I'll go back to what I said the first time around -- and the

14   analogy, your Honor, that you used is, we're sending a bunch of

15   soldiers across the field, and I only need a couple of them to

16   get to the fort on the other side.

17        And what I explained back is, under a damage theory

18   that the defendants raised in standard and central cases, they

19   argued that there's a royalty stack that they are subject to, by

20   having to comply with the standard, and, therefore, that royalty

21   stack needs to be taken into consideration when setting a

22   royalty rate.

23        And one way the court have done that is, they've looked

24   at the number of patents that are at issue in the case, you

25   know, part of the portfolio that was hypothetically being

1    licensed, and then the other patents that are not involved in

2    the case that allegedly is part of the royalty stack.

3         Now, that theory hasn't, you know, since we were last

4    here, that theory hasn't gotten a lot of legs, but it's still

5    there, and I don't hear the defendants agreeing that that's not

6    going to be a theory.

7         The Katz case, undoubtedly, involved a situation that

8    was not standard and central claims where the royalty stacking

9    argument was not, you know, while it may have been raised, it

10   wasn't something the courts latched on to at the time.

11        Also, since the last time we were here, there was an

12   Ericsson case that came out of Texas, and it the went through

13   the Federal Circuit.  And while the Federal Circuit reversed, in

14   general, the Federal Circuit agreed that a royalty stacking

15   instruction to a jury is not necessary in an instance where

16   royalty stacking is not shown to be an issue in the case.

17        And I do believe it's the case where the defendants are

18   not going to be able to a show a royalty stacking.  I think it's

19   highly unlikely that any of the defendants are paying any

20   royalties at all for the DSL products.

21        But, in any event, unless they are willing to give up

22   that theory at this stage, I can't give up my due process rights

23   for my client and eliminate patents from the case.

24        MR. DAY:  So, your Honor, this is all hypothetical when

25   Mr. McAndrews, as the defendants, have raised these things.

1    He's talking in a general sense in other cases that has been

2    raised.  It's all hypothetical for our case, and we haven't

3    gotten anywhere near talking about damages yet.

4         THE COURT:  Well, that's true.

5         MR. DAY:  But I think we don't -- you know, if you want

6    us to go to go ahead with invalidity contentions, we can do that

7    as we've discussed.  I think probably you are right that if

8    figuring out the way to narrow the number of claims can come as

9    the next step, once we get to 135 days from now, or whatever it

10   is.

11        I think if we want to narrow the case, we'll five them

12   the invalidity contentions, they can use that same amount of

13   time to come up with infringement contentions on the same 18

14   claims.  I suspect when they do that -- and I said this last

15   September, I continue to believe this is true -- if they

16   actually try to map the claims to our products, the patents will

17   fall out of this case, and products will fall out of this case.

18        They've got all the information we've given them over

19   the last year.  The discovery on infringement has been open for

20   seven months.  It remains open as far as I know.

21        They can go out, and they can create charts that say,

22   here's a claim element, here's your product, and here's where

23   that element exists.

24        Then we'll have the information we need to move forward

25   in the case, they'll have our invalidity contentions, so they

1   can move forward in the case, both sides will have information

2   to then talk about what are the claims we're going to go forward

3   on, and what are the products that we're going to go forward on,

4   because that's going to be -- those are the two next steps.

5        So, if we're going to make the next three or four

6   months productive, let's make it productive on both sides.

7        THE COURT:  I also take it that part of the discussion

8   of products is that, in fact, getting representative products,

9   if we think that the issue is based or relates to the DSL chips

10   and the products, why the products use the same chips.

11        That whatever our disagreements about representative

12   claims are, and due process and such, it should actually be

13   possible to, without anybody claiming their rights are being

14   violated, to narrow down the products, right?

15        MR. DAY:  I believe so.

16        MR. MCANDREWS:  Yes, your Honor.

17        THE COURT:  All right.

18        MR. DAY:  But, your Honor, again, we need to know what

19   the contentions are to do that.

20        THE COURT:  Yes, yes, I'm not saying right now, but it

21   seems to me that -- all right.

22        So, let's go ahead with these invalidity contentions

23   according to the schedule and, you know, part of what we'll be

24   doing -- and that includes Mr. McAndrews suggesting

25   representative claims, which will, you know, 30 days afterwards

1    without us having decided exactly what they mean -- but I think

2    for at least for my part, hopefully, somewhere down the road,

3    it's more concrete the discussion gets, the more I might

4    actually be able to make some reasonable decision about

5    something.

6            And, so, right now it's a lot more theoretical for me

7    than it is for anybody else in the room.

8            All right.

9            So, Mr. Day, you might have packed something into that

10   last little bit.

11           What is it that you would -- well, actually, before we

12   get to you.

13           So I think I kind of addressed -- I've addressed most

14   of your concerns in your letter, right?

15           MR. MCANDREWS:  Yes, your Honor, with one exception.

16           THE COURT:  Which is?

17           MR. MCANDREWS:  That relates in part to something that

18   Mr. Day just said.

19           THE COURT:  Okay.

20           MR. MCANDREWS:  So, one thing that we pointed out is

21   that the defendants, at least two of the defendants that

22   actually provided some -- in some way a substantive response,

23   uniformly what you would see, if you went through their

24   invalidity contentions in every single element of the claim they

25   say, we don't know.  They begin with, we don't know.  We have no

1    idea how our products work, but then, occasionally, they're

2    selectively experts on the topic.

3            THE COURT:  Well, so I saw that, and that's one of

4    those things when I see that my reaction is, what do you want me

5    to do about that?

6            MR. MCANDREWS:  Nothing, other than to understand the

7    reason why we are where -- we are where we are in the case.  The

8    defendants want to continue to complain that we haven't told

9    them why we believe they infringe.

10           You know, these are initial infringement charts, and

11   they want to continue to say that we haven't satisfied our

12   obligation under the local rule.

13           And I think your Honor agreed with us months ago that

14   that's not the case, but I just want to make sure that the

15   record isn't an indication --

16           THE COURT:  Right, and I'm not sure that I agreed with

17   you.  I don't know what I may have said.  Whatever I said is on

18   the record somewhere.

19           But go ahead.

20           MR. MCANDREWS:  Okay.  But the problem we face is, I

21   believe the defendants know a great deal about the way their

22   products work, but what they would like to do is like to thrust

23   us upon these third parties in a Rule 45 situation where we're

24   going to have limited ability to follow up and get the discovery

25   we may need.

1          THE COURT:  Well, and, so that's part of the reason

2    why, because you asked for, you know, provide us with documents,

3    provide us with people with knowledge.

4          I mean, at some point you're going to have to go to the

5    third parties, you're going to have to depose their people, and

6    find out what it is they know, right?

7          MR. MCANDREWS:  Correct, your Honor, but because we're

8    in a Rule 45 situation, and I think under the way the rules have

9    been rewritten, you may be in charge of that.  And I hope that's

10   the case, because you'll be in the best position to know why it

11   is that we've got this potential burden on a third party, but as

12   often happens in these types of cases, we'll go to a third

13   party, and he'll say we're not a defendant, we're not going to

14   disclose information, or to the extent we do, you'll get four

15   hours of deposition to figure out, you know, these 22 chips and

16   how they work.

17         So what we were hoping to do is to narrow the number of

18   issues that we need to take to the third party, then with the

19   understanding that the amount of discovery we need of a third

20   party may be larger than a typical case.

21         In any event, we -- so what I would propose is that we

22   learn what the knowledge of the witnesses are, learn what

23   documents they relied on for substantive information that was

24   provided, so in a case where Mr. Day says, I can promise you,

25   there's no way we infringe, I don't know how that can be given

1   that they say they don't know how their products work.  And, so,

2   whatever information they have, I would like to learn what that

3   is.

4           Then there's -- so there will be a time where we go

5   take the third party depositions, and I hope -- you know, it

6   shouldn't be too far in the future, if we can quickly get

7   through the party depositions that I'd like to take.

8           In addition to that, we have testing going on, so since

9   the last time we were in -- and we understand that, you know,

10  the defendants are claiming they don't know.  To the extent they

11  don't know, and the third party is going to make it very hard

12  for us to learn through the third party, we have gone out at

13  great expense and started -- started to test the products.

14          And I can say that there are instances where the

15  defendants are saying, the portion of the standard that you

16  pointed to is not mandatory, it's optional, and we don't

17  practice that optional portion of the standard.

18          We have learned that that is not true, and, so, some of

19  the discovery I'd like to take is to figure out why we have this

20  disparity.

21          THE COURT:  All right.

22          What are you asking me?  Is there a request there, or

23  are you just educating me, or what?

24          MR. MCANDREWS:  I'm just trying to -- I'm trying to

25  educate you to the extent that Mr. Day is going to suggest

1    something other than proceeding with discovery, in an ordinary

2    course, where we would take depositions of the parties.

3              THE COURT:  All right.

4              MR. DAY:  May I, your Honor?

5              THE COURT:  Yes, go ahead and educate me, too.

6              MR. DAY:  I think you understand the issue.  We've

7    talked about it now a number of times.

8              THE COURT:  Yes, don't assume that I understand what

9    the issue is.

10             MR. DAY:  All the things, other than the point about

11   testing, all of the arguments you just heard are precisely the

12   same arguments you heard last September about why the plaintiffs

13   couldn't give us reasonable charts, and, so -- what we consider

14   to be reasonable charts that identify anything in our products.

15             If you recall, there's not a single citation to a

16   single document from Zhone in these charts.

17             THE COURT:  Well --

18             MR. DAY:  And --

19             THE COURT:  -- leaving that aside, one of the things

20   that I think you said in your letter -- and I was just curious

21   whether Mr. McAndrews would actually agree with this -- the

22   infringement contentions, did you say they don't actually even

23   reference your product like in --

24             MR. DAY:  There --

25             THE COURT:  -- or was it just, they say, here's the

1    accused products, here's the standard, blah, blah, blah?

2        MR. DAY:  So there's a chart that lists accused

3    products, a list of a hundred families, and it says, Chart 1

4    shows how these infringe, and then the chart doesn't mention any

5    Zhone product.

6        So, it's not fair to say that they don't even mention

7    the products.  They do.

8        The chart doesn't do anything to compare claim elements

9    to our products.  It compares only to the standards.  There's

10   absolutely no -- there's not a single Zhone document, or a

11   single reference to a Zhone document in the charts.

12       THE COURT:  When you say in product literature, or

13   wherever you say it, that we comply with a particular standard,

14   part of the -- part of an issue is the standard might have

15   mandatory elements, it might have discretionary, or recommended

16   elements, non-mandatory elements -- presumably, if you say you

17   comply with it, that means anything that is a mandatory element

18   you should meet, right?

19       MR. DAY:  Right.

20       THE COURT:  And, so, the -- if the patent -- and, so,

21   if the infringement chart maps the claim to a mandatory element,

22   isn't that pretty good?

23       MR. DAY:  So, really, there's two issues.

24       There's a mandatory versus optional, and we pointed out

25   in our charts with specificity where we think requirements are

1    optional, so now they know that.

2           They have not pointed out that any of the requirements

3    are, in fact, mandatory, so there's an issue there.

4           Is it mandatory or not?

5           And we don't know their position on that.

6           In some cases that would be enough, your Honor, but

7    what happens in a lot of the cases is, the standard doesn't say

8    you have to have an X, a Y, and a Z.

9           We talked about a hypothetical last September where you

10   have a phone, and the standard might say, you need a means for

11   dialing a number.

12          THE COURT:  Okay.

13          MR. DAY:  And the patent might say, you need a rotary

14   with ten numbers on it.

15          So you can say -- so you can comply with the standard

16   without having a rotary dialer on your phone.  So even though

17   it's a mandatory requirement, and even though that claim is

18   similar, you're not infringing just because you comply with the

19   mandatory piece of the standard.  That was the hypothetical we

20   talked about.

21          So, in fact, no, your Honor, just because something is

22   mandatory, and just because you comply, doesn't mean you

23   infringe the patent.

24          What the Fujitsu case talked about is, you've got to

25   show it's mandatory, and you've got to show that every way that

1    you can meet the standard would infringe.

2          THE COURT:  Well, that was a discussion I had in this

3    case.

4          MR. DAY:  Yes, last September.

5          THE COURT:  Okay.  I remember that discussion, but I

6    didn't remember who it was with.

7          MR. DAY:  It was last September, your Honor.

8          And the point I wanted to make on this general topic,

9    your Honor is, we're hearing the exact same arguments that we

10   heard last September.  We don't know third party discovery to

11   take and it's going to be difficult to do.  The defendants are

12   lying to us about what they know.  I think it's just false, it's

13   baseless, and it's incorrect.  Those are the same arguments that

14   we heard last September.

15         If we want to move the case forward, I think, your

16   Honor, you have to set a date when we're going to get

17   infringement charts that map claims to products, show where the

18   elements are in the products, not just what we have today, and

19   it's not going to happen, your Honor, unless you set a deadline

20   for it.

21         I think we've got the next 140 days or something.

22   They've got all of the information that we've given them over

23   last year.  There is no outstanding discovery right now, there's

24   no complaints about what Zhone has given to the plaintiffs,

25   other than a few names and documents that we'll give them,

1    there's nothing preventing them from -- if they want more

2    discovery, they can take it.  Infringement discovery has been

3    open for seven months.  They ought to be able to do it right

4    now, your Honor, but let's -- if they need --

5            THE COURT:  All right.

6            MR. DAY:  -- four months, give it to them.

7            THE COURT:  What do you have to say about that, Mr.

8    McAndrews?

9            MR. MCANDREWS:  Well, he's suggesting that we've had

10   information for the last year or more.  We've only had their

11   non-infringement contentions for 30 days now.

12           Now we understand some of -- you know, so it's not

13   enough for a defendant to say, I don't know how my product

14   works.  That's not a defense.  If I have -- if I can show by a

15   preponderance of the evidence that their product infringes, I

16   can show that they say they're standard compliant, and it's a

17   mandatory portion of the standard.  That should be enough.

18           I'm not sure what he's talking about elements that are

19   mandatory, and yet there's a rotary dial.  I'm not aware of any

20   argument that they've made that is an analogy to that one.

21           THE COURT:  Well, I mean, it seems like the argument

22   that's going on back and forth is -- is that your infringement

23   contentions, they say are quite general, because they map to the

24   standards, some part of the standards, and, you know apparently

25   for a lot of reasons it's not clear -- it's not clear to me just

1    how good your contentions are right now.

2           They then -- and, you know, I tried to look at some of

3    these things that were attached to the letters.  It's hard for

4    me to wade through all the boilerplate.

5           But it seemed as though they're also not interested in

6    doing anything to help you get more specific, and they say --

7    and, you know, I tend to believe what lawyers say, as long as,

8    you know, it's not some conflict that you can't both be telling

9    me the truth.

10          You know, they say, we don't know how the chips work,

11   maybe they know some things, but they don't know all things,

12   and, you know, you -- when they get around to naming some

13   people, you can find out, by talking to people, whether they

14   know more or less what they said, or a little bit more, or maybe

15   even a little bit less, but whatever the know.

16          And, so, the impression I get is that the contentions,

17   and the non-infringement contentions, they are not opposing each

18   other real closely just yet, and, so, that's what Mr. Day is

19   saying is much -- I think what he's saying in so many words is,

20   no, when push comes to shove -- and I don't know whether they

21   would actually do this -- is, if all you have is what you've

22   done so far, you can't -- you can't win.

23          Now, I understand what I've heard you say, which is,

24   yes, I think I can give it a pretty good shot with the

25   representations they're making, and the standards, and maybe --

1    maybe I don't even have to do any of this testing, and maybe I

2    don't have to take third party discovery, you know, I've got a

3    triable case, or I will have a triable case just with what I

4    have, you know, and I think as between the two parties, that if

5    somebody has to submit or amend contentions, it's going to be

6    you in the first instance.

7         I'm not -- so I have that general impression, but I

8    also have the impression that if you had to amend the

9    contentions today, you couldn't say much more than you've

10   already said, is that right?

11        MR. MCANDREWS:  Well, so, there's some ways now that I

12   can respond.

13        So, for example, if the defendant has said this element

14   claim is not mandatory, I can respond to that, and point to a

15   portion directly -- probably even in the chart that I've -- the

16   very chart that I provided them where it says "shall," and shall

17   is the buzz word in the standard for it's mandatory.

18        So I suppose I could respond and say, you're wrong, it

19   is mandatory, shall appears in these four places.

20        That's one way in which, I believe that their charts

21   have advanced the case in which -- you know, and if that's a way

22   to advance the case, I can provide that sort of response.

23        In some instances where they say, we don't know, or,

24   it's standard optional, and we don't do it, or we don't know if

25   we do it, I may, in short order, have testing information to

1     show otherwise, and I suppose I could provide --

2          THE COURT:  I'm sorry.  You know, I was just thinking.

3          I mean, in the end, what this is boiling down to, I

4     think is the defendants are saying that at some point -- and

5     they're suggesting the point is now -- that you actually need to

6     have whatever the accused products are mapped to the claims, and

7     I guess that is what we were probably discussing back in

8     September.

9          And I guess in a way -- and I kind of recall -- I mean

10    we were talking -- I think it was this was case, because this

11    would be the only case it could have been -- you know,

12    eventually in terms of proof, and I guess Fujitsu, how much you

13    rely on the standards to prove your case.

14         That's one thing.

15         The question is, in terms of the contentions, whether

16    it wouldn't be -- whether it wouldn't advance the case for you

17    to have, you know, infringement contentions, modem 15X, you

18    know, has a transceiver, here's a picture of the transceiver,

19    and actually match it against the claims, because there's this

20    layer of obscurity by having it mapped against the standard.

21         I mean, actually -- and I hate to be incredibly dense

22    -- but that's really what you've been saying all along is, you

23    would just like to have it mapped against the claims?

24         MR. DAY:  Yes.

25         MR. MCANDREWS:  Well, for example, the standard dose

1    say you have a transceiver.  It's mandatory.  But the elements

2    --

3          THE COURT:  Well, right, but, in other words the --

4    maybe for infringement contentions you have to say, you have a

5    transceiver, because here's -- and we know that because here's a

6    diagram of your phone, and because you say you practice the

7    standard, and the standard says you have to have a transceiver.

8          I mean, there are a lot of different things you could

9    offer in support of that, right?

10         MR. MCANDREWS:  Well, yes, but the primary one would be

11    the standard itself that calls out transceiver as the

12    fundamental units that are communicating with each other.

13         And, so, I guess what I'm wondering -- and maybe this

14    didn't really -- do you know, either of you, is there a Judge

15    you the out there who has -- you know, someone will tell me

16    you've cited five cases in your letter -- is there a Judge out

17    there who has said that you actually have to -- that essentially

18    in terms of contentions, what the plaintiff has done is

19    insufficient?

20         MR. DAY:  No, your Honor.  I think you asked the same

21    question last September, and I think we both conceded that

22    Fujitsu is at the summary judgment stage.

23         THE COURT:  Okay.

24         MR. DAY:  And I haven't found a case since then that's

25    talking about the contention stage.

1           THE COURT:  Okay.

2           MR. DAY:  I would say, though, your Honor, we're sort

3    of past the initial contentions, you know, they've set up their

4    initial contentions.  We thought they were inadequate.

5           But, I mean, we're a year past that, we've conducted

6    infringement discovery for seven months.

7           What I'm saying is, if we want to narrow the case down,

8    if we want to eventually particular pick representative claims,

9    we've got to know what it is they're accusing, what transceiver

10   are they talking about?

11          If we do that, we'll be able to say, oh, yes, okay,

12   well, that transceiver is the same in multiple products.  Now we

13   can join the issues.

14          They haven't done that.

15          You know, they have accused products where we don't

16   think there is a transceiver.  They must be thinking of

17   something else that we don't think is a transceiver.

18          Until they tell me what they are talking about, we

19   can't join the issues, and I think we're going to have serious

20   problems really narrowing down.

21          That's the next logical step, your Honor.

22          And we've jumped through every hoop they've asked us to

23   jump through for seven months, eight months.  It's time to put a

24   date on the calendar when they are going to update their charts,

25   and tell us what they are accusing, what it is in our products

1    they are accusing.

2        THE COURT:  Well, I don't mind -- and I hear Mr.

3    McAndrews saying in a kind of not very specific way that, yes,

4    he could do some updating of the charts, even though I think the

5    updating he has in mind probably isn't updating that would

6    impress you at all as being helpful.

7        MR. DAY:  Your Honor, I think if you put a date on the

8    calendar, he will go and take third party discovery and the case

9    will advance.

10        THE COURT:  I guess what I'm wondering is, you know, I

11    can put dates on the calendar, but what is it exactly that you

12    would have me order him to do by this date?

13        MR. DAY:  Identify where, in each accused product, each

14    element of each claim is found or practiced, what's the

15    structure, what's the function he's accusing in the products.

16        THE COURT:  And, so, in essence what you're saying is,

17    no more mapping to the claims -- I mean, no more mapping to the

18    standard, map to the claims?

19        MR. DAY:  Yes.

20        THE COURT:  Okay.

21        Mr. McAndrews, what do you have to say about that?

22        MR. MCANDREWS:  So no more mapping to the standard,

23    you're suggesting that we then map it to the product, and, as

24    Fujitsu says, it's -- mapping to the standard is the same as --

25    quote -- "It's the same as mapping to the product, when you show

1       that the product is complaint with the standard."

2              And that would be a mandatory situation that we can as

3       though in many instances, and in a --

4              THE COURT:  Well, right, but --

5              MR. MCANDREWS:  -- but in the optional steps --

6              THE COURT:  -- I think maybe this is the discussion

7       that we've had before, and I feel kind of -- because I don't

8       remember these discussions, but presumably somebody is busy

9       reading the transcripts of these things before you come here, so

10      that you all can remember them, or maybe you have better

11      memories -- but it's like you've done half of that.

12             You've said, here's the standard, you know, here's the

13      claim and here's the standard, but you haven't done the standard

14      to the product portion, right?

15             Isn't that kind of -- Fujitsu is like a triangle, and

16      you've just don't one side of the triangle?

17             MR. MCANDREWS:  Except that Fujitsu did not require the

18      patent owner to prove that the product complies with the

19      standard, where the standard section that is at issue is

20      mandatory, and the product purports data sheets, marketing

21      literature, purports to comply with the standard.

22             The whole reason -- I mean, the reason they have these

23      standards, they have to be -- and they're exceedingly detailed.

24      If you get one bit wrong in your communication that the other

25      side doesn't understand, it doesn't work.

1        The standards are very specific about what the product

2   has to do, can't do, or if they do it.  So even in a standard

3   optional situation, if they do that option, they have to do it

4   the way the standard calls for.

5        Otherwise, these systems would break down.  It's the

6   reason why we have multiple defendants in the room here, because

7   all their products can talk to each other.  That's the whole

8   reason why Fujitsu said that if -- if you will purport to comply

9   with the standard, and whether it's a mandatory situation, or

10  it's a standard optional situation where it can be shown that

11  they comply with that portion of the standard, you know, they

12  practice that portion of the standard, and that's the sort of

13  testing that we are able to do, we can see what comes out of a

14  box and goes into another box.

15       THE COURT:  So, in the charts that you have right now,

16  do you identify where their products say that they purport to

17  comply with the particular standards?

18       MR. MCANDREWS:  Your Honor, that would -- and we had

19  this discussion, and we actually had this discussion with the

20  defendants.

21       We asked them, do you want us to go simply go through

22  and cite your data sheets?

23       Because that's what we have from them.  We have data

24  sheets that say this product is compliant with, and it's not

25  just, you know, g.993.2 --

1          THE COURT:  Right, I saw that in the --

2          MR. MCANDREWS:  -- you know, version whatever, and

3    that's a very specific standard.

4          And then we -- and then, of course, that standard has

5    sections; some mandatory, some optional -- and we can point to

6    the sections that are mandatory.

7          There is some debate over that.  We didn't know that --

8          THE COURT:  But when it says it's complaint with the

9    standard, and we've got seven mandatory sections, presumably,

10   six of them are irrelevant to the claim chart, right?

11         MR. MCANDREWS:  Potentially, there's -- there's many

12   sections that are irrelevant to the claim chart, correct.

13         MR. DAY:  Your Honor, may I weigh in?

14         THE COURT:  Sure.

15         MR. DAY:  So Fujitsu says not only the standard section

16   you're looking at has to be mandatory, but you need to show that

17   every way to meet that standard mandatory requirement would

18   infringe, and they haven't done that either.

19         So, there's two pieces they would have to show to get

20   past summary judgment, so it's something not to forget.

21         Just showing that something says, shall, doesn't get

22   you there.  You've got to show that in order to meet that, shall

23   sentence, you necessarily have to infringe the claim, and they

24   don't get that, but, again, I think we're past what's the bare

25   minimum they have to do.

1          And we're talking about what do we do to get from 32

2     patents to something that we can actually litigate?

3          What I'm suggesting is, if you -- if you make them

4     create these charts, where they map to the products, then we're

5     going to start to see what it is they're pointing to that they

6     think is infringing.

7          I suspect it's going to be a lot of the same DSL chips

8     that they'll be pointing to.  And we'll see that a lot of the

9     elements have to do with DSL chips.

10          Those DSL chips will then be able to say, okay, well,

11     that one's in 20 products.

12          Now we know what the represented -- one product can

13     represent all 20 of those.

14          We can't do that today, your Honor, because we don't

15     know what it is they're pointing to, or they're not pointing to

16     anything in our products.

17          Every claim, virtually, requires a transceiver.

18          Okay.  What transceiver are you talking about?

19          And that's a great example.

20          We think there is none in some of the products they've

21     accused.  They think there is.

22          What is it you're pointing to?

23          If they don't know what the accusation is, and either

24     those products will fall out of the case, or we'll understand

25     that there is some difference in -- in what we both think that

1    term means.

2         That's the way to advance the case.  That's the way to

3    set it up, so that we can narrow things down.  Just through the

4    process, I think it will narrow down, but it will tell us what

5    we need to know on both sides, so then we can start doing things

6    like picking representative products, and narrowing the case

7    down maybe to representative claims.

8         THE COURT:  Do you have anything more to say on that?

9         MR. MCANDREWS:  Only that I think part of what he's

10   addressing is an outlier.

11        And we've gone over this before, and we've talked about

12   trying -- just real quick -- what he's talking about is there

13   are a few products that wound up in the case that I agree do not

14   have a transceiver in them.  It's an adapter of some kind.

15        I think that that's the outlier that he's talking about

16   here.  I don't think that the products that should be in the

17   case -- and there's very few.

18        We've talked about meeting, and conferring, and trying

19   to, let's go down and get rid of these few products by model

20   number that accidentally wound up in the case, where it's some

21   sort of adapter or something that actually is not a DSL

22   transmitter receiver, but -- so that's a very easy process to

23   do.

24        But if he's talking about something else, if he's

25   talking about, I need to take the DSL transceiver that that's in

1    his product, and get an electron microscope, and draw a dotted

2    line around the transistors that are involved in transmitting

3    and receiving, I don't think that's a useful process to advance

4    the case.

5          MR. DAY:  Well, if that's what the claim calls for,

6    that's what they have to do to prove it up, your Honor.

7          THE COURT:  All right.

8          So, Mr. Day, in your world -- and just speaking of your

9    defendant, or your client -- if they're asserting, let's say

10    Claim 1 of the first patent of the first family against -- who

11    are you, Zhone?

12          MR. DAY:  Zhone.

13          THE COURT:  Zhone.  And they're accusing a hundred

14    products, how many claim charts should they be producing for

15    that; one, or a hundred, or somewhere in between?

16          MR. DAY:  Well, I think somewhere in between.

17          They'll see -- again, we think what they're really

18    accusing are DSL chips, and it would probably be one chart per

19    DSL chip.

20          THE COURT:  So how many DSL chips -- when you say "DSL

21    chips," do you have an estimate as to how many DSL -- different

22    DSL chips are involved in this?

23          MR. DAY:  I don't, your Honor.  We gave them a list

24    back in January, but I don't -- it's some fraction of the total

25    number, right --

1              THE COURT:  A small fraction or big fraction?

2              MR. DAY:  I don't know the answer to that, your Honor.

3              MR. SCHUMAN:  Your Honor, this is Mr. Schuman.

4              For 2Wire there are seven different DSL chips.  Five

5      from Broadcom and two from a company called Ikonos.

6              I suspect Mr. Day may have slightly more, because as he

7      described earlier, they have at AT&T side of the products also

8      in the case, but for 2Wire it would be seven charts, one per

9      distinct DSL chip.

10             THE COURT:  So, Mr. Schuman, if I ordered plaintiffs to

11     produce new charts, you'd expect to get roughly seven charts for

12     each asserted claim?

13             MR. SCHUMAN:  That's right, your Honor.

14             (Pause)

15             Actually, let me are clarify.  I don't think the

16     plaintiff have accused each of those chips of infringing each of

17     the claims, so it would be at most seven.

18             For example if they accused -- to use your hypothetical

19     -- Claim 1, patent one, and family one, if they're asserting

20     that claim against all of the accused 2Wire products, that would

21     be seven charts.

22             But I think there's probably Claim 1 of patent family

23     two where they're only asserting it against a subset 2Wire

24     accused products, and in that case, it would only be a subset of

25     seven charts, whichever chips they're accusing.

1          And, as the Court knows from the letters, they have an

2     identification, and they verified in their interrogatory

3     responses, exactly which chip is in which 2Wire accused product.

4          THE COURT:  All right.

5          So here's what I'm thinking, Mr. McAndrews.

6          I am thinking that -- I am thinking that you should

7     amend your infringement contentions to map the products to the

8     claims.

9          You know, maybe part of that mapping involves, maybe a

10    large part of it involves the standards, but I think that would

11    -- seems to me like that would materially advance things.

12         And, so, what I would say is -- and, of course, I'm

13    only thinking about doing it for the 18 or 20 asserted for these

14    two defendants from whichever claims that you are going to be

15    getting invalidity contentions on -- that you should do

16    infringement, amended infringement contentions that, you know,

17    that actually do map them to the -- to match the accused

18    products to the asserted claims.

19         And I guess I don't necessarily have anything more to

20    -- is there a reason why you can't do that?

21         MR. MCANDREWS:  So it's for each chip?  So for each

22    chip?

23         THE COURT:  Well, I would leave that -- you know, I

24    hear what Mr. Schuman and Mr. Day have said, and maybe it is for

25    each chip, because if the chip is what really determines whether

1    it infringes or not, and you've got the products now identified

2    by which chip is in them, and there is, you know, maybe there's

3    up to seven at least for 2Wire, and maybe a few more for -- I

4    mean, I don't know what the other two are, but I heard Mr.

5    Schuman -- and, so, that if the chip is what makes a difference,

6    then at least it seems to me just sitting here, that, yes, one

7    chart for anything that has that chip in it probably works.

8            It's kind of a hypothetical to me, or maybe theoretical

9    is more -- but that would seem to me to be reasonable, and

10   certainly that's what Mr. Schuman -- he would not be expecting

11   anything more based on what I heard him say.

12           Starting from your two weeks from now, when you decide

13   which claims you want invalidity contentions on, how long would

14   it take you to do that?

15           MR. MCANDREWS:  Your Honor, it would depend the level

16   of detail that's required in the chart.

17           In large part, what is available in public information,

18   and sometimes not even available publicly, the chip vendors will

19   have a data sheet similar to the defendants having a data sheet

20   that says we comply with these standards.

21           The chip vendors will have a similar data sheet that

22   oftentimes it is publicly available, not always publicly

23   available.

24           We've gotten some chip specifications from -- from the

25   defendants.  I don't think that's uniformly true.

1          And which leads me -- you know, part of the reason why

2     we're asking for follow-up documents on the infringement

3     contentions, is it's difficult for me to understand how a party

4     could be specifying a chip for their product that they're going

5     then to sell to a consumer, or AT&T, without having at least a

6     data sheet on the chip, so I don't think we uniformly have data

7     sheets from the defendants for the chips they actually put in

8     their products.

9          If we don't have those, and they're not publicly

10    available, I would have a difficult time mapping the claim to

11    the chip.  I would only be able to rely on the data sheet the

12    defendant has provided that says, we complied with these

13    portions of the standard.

14         And then by extrapolation, because of the chip that

15    they have told me is in there, I would have to understand that

16    that chip complies with the standards, so that's one level of

17    the difficulty I might have here.

18         To the --

19         THE COURT:  Well, so, to the extent that rather than

20    triggering this from when you specify your 18 to 20 claims --

21    and I don't know how long it's going to take for you to resolve

22    the document issues that you have with the defendants -- but if

23    you said, I really need to get those documents, and I could be

24    pretty persuaded that that should be the starting point, or, you

25    know, whichever -- whichever is second, either when you specify

1    the 18, or when they provide the documents that you've asked

2    for, that Mr. Day seems to at least indicate could be provided

3    if you talk to each other.

4              MR. MCANDREWS:  So, from the date that we receive the

5    documents for a particular chip, this is, potentially, a lot of

6    paper.

7              THE COURT:  I appreciate that.

8              MR. MCANDREWS:  With a -- with a lot of repetition

9    simply because largely it's going to be taking a chip that says

10   we comply with the standard, and, again, mapping it to the

11   standard.

12             THE COURT:  Map it to the claim.

13             Use the standard as support for your mapping, right?

14             MR. MCANDREWS:  Correct.  But if we're talking about --

15   so there's mapping the claim to the standard, and then a product

16   says, I am standard complaint, in other words, mandatory, right?

17             So that's one issue in the -- and I don't mean to

18   rehash that -- but then I haven't heard this, but I think what

19   -- the only thing that's going to satisfy them is, if I take

20   third-party discovery, I get the source code from the chip

21   vendor, I isolate the sections of the source code that carry out

22   that mandatory portion of the standard, and I then point to

23   that.

24             Your Honor, that process will take -- I can't say,

25   because I don't have that discovery yet.

1          THE COURT:  Well, I mean, you don't have the source

2     code from the vendors, and, so, I don't think -- even though I

3     don't recall now that Mr. Day said otherwise -- I mean, one of

4     the issues you raised is, I don't know what source code I need,

5     so to speak.

6          I think if you have to map it out and say, here's where

7     I need some source code from a vendor, that will help focus on

8     what source code you're going to need down the road, right?

9          MR. MCANDREWS:  Correct, correct.

10         THE COURT:  So I'm not, necessarily, myself imagining

11    that these amended contentions are -- do -- after doing the

12    third-party discovery so much as part of the process for

13    figuring out how to do sensible third party discovery.

14         MR. DAY:  That's fine, your Honor, as long as they're

15    pointing to things in our products.

16         If the answer to it one element is, well, something on

17    that chip must do what's called for here, that advances the

18    ball, because then we know they need to go talk to whoever made

19    that chip.

20         But if all we're going to get is a rehash of what we

21    already have, the standard calls for this, and, therefore, you

22    must have it, that doesn't advance the ball at all.

23         I think at a minimum we would ask that they identify

24    actual things in our products.

25         THE COURT:  Well, I mean, part of doing this is, you

1    provided whatever technical specifications you provided, data

2    sheets, I don't know what, you know, there ought to be some

3    reflection of the information you provided in these amended

4    contentions, right, Mr. McAndrews?

5            MR. MCANDREWS:  Your Honor, yes, we can do that.  Yes,

6    we can do that.

7            I consider that in part to be gathering of evidence,

8    and that's not what initial infringement contentions are for,

9    but I agree that if --

10           THE COURT:  Well, I think we're beyond initial now,

11   right?

12           MR. MCANDREWS:  I agree.  I agree.

13           And, so, at this stage if the parties believe, and the

14   Court believes that collecting evidence, you know, per chart is

15   going to advance the case, then we will do that.

16           THE COURT:  Well, I mean, I think it is, because I do

17   think it's going to, you know, because my preferred way of doing

18   this would negotiations between the parties, who are a lot more

19   confident at this than me, in terms of trying to figure out how

20   to make this into something that could actually be resolved down

21   the road, and, so...  but I do think we're past -- we're

22   definitely past the initial infringement contentions.

23           And, you know, to -- I mean, I think Mr. Day says he's

24   expecting, so, therefore, I'm expecting to, that there's going

25   to be -- and this might not be your characterization of it --

1    but there's going to be -- well, I would say the fair

2    characterization is, it's going to indicate things where there

3    needs to be discovery done, but it's also going to reflect the

4    information you've already gotten.

5            I mean, so with that in mind, what kind of time frame

6    do you want?

7            MR. MCANDREWS:  Assuming we can -- I guess once we

8    receive a certification that we have received all of the chip

9    specifications in their possession --

10            THE COURT:  And by "certification," you just mean some

11    interrogatory or Request for Production saying, here it is,

12    here's what we've got, right?

13            I noticed this, I'm figuring this is a Chicago thing or

14    something, because it's not a language that I usually hear.

15            What do you mean by "certification"?

16            MR. MCANDREWS:  Well, that they're not going to all of

17    a sudden show up at trial with, oh, well, here's the chip

18    specification --

19            THE COURT:  Okay.

20            MR. MCANDREWS:  -- and it says we don't infringe.

21            THE COURT:  So, basically, you want a representation

22    through discovery, or letters from counsel, or something.

23            All right.

24            I understand that.  How much time?

25            MR. MCANDREWS:  I'd like 90 days, but the starting

1    line, your Honor, would be in addition to receiving these

2    documents, I would like to have at least -- at least one

3    deposition, because --

4         THE COURT:  One deposition of whom or what?

5         MR. MCANDREWS:  Of each -- one 30(b)(6) deposition of

6    each defendant.  And, you now, I can't think of all the topics

7    right now, but it would be -- so what Mr. Day is representing is

8    that there's a chip, and then, you know, saying what the

9    defendants are essentially representing is that there's a chip

10   that does DSL in their product, and to them it's a black box.

11        I would like to know how much they know about that

12   black box, and what additional functionality they lay on top of

13   that, in terms of, for example, there are products that have two

14   DSL chips in them.  And those two DSL chips may have to

15   coordinate one to the other.  That coordination is more likely

16   to be -- and I may learn differently -- but it's more likely to

17   be something they do know about, and there's a possibility that

18   coordination is where the infringement lies, rather than in the

19   chip.

20        I think largely we'll find that the element of the

21   claim map to the chips, that that is not universally true, so I

22   would like to have one round of depositions to figure out what

23   additional information may be --

24        THE COURT:  Do you have any objection to that?

25        MR. DAY:  No, your Honor.

1              THE COURT:  Ms. Rader?

2              MS. RADER:  I don't have an objection, but I don't

3      think it's likely to be fruitful with respect to that topic.

4              THE COURT:  Okay.  Well, Mr. Schuman, do you have

5      anything to say?

6              MR. SCHUMAN:  I don't have any objection, your Honor,

7      as long as it's not the first of three or four 30(b)(6)

8      depositions.

9              So, no, I'm okay, and discovery's been open, and the

10     plaintiff could have taken that deposition at any time.  If they

11     want to take that now, that's fine.  It's got to be subject to

12     the usual rules that they need good cause for multiple 30(b)(6)

13     depositions.

14             THE COURT:  All right.

15             Well, I'm not going to -- whatever the rules are, is

16     what the rules are -- but it does seem is to me that there's a

17     very reasonable chance, based on what I've heard that the

18     plaintiff will have a pretty decent chance of being able to

19     cover some of the same ground a second time, because I think

20     this is -- you know, most of the time in the 30(b)(6)'s I see

21     are near the end of the case.  This is really the beginning of

22     the case in terms of depositions, or anything like that.

23             So, even though from what I'm -- I mean I'm also

24     hearing it could very well be that Mr. McAndrews has some

25     topics, and you'll produce your knowledgeable witness, and maybe

1      that will be sufficient on the topic.  I just can't tell.

2             So, in any event, basically, I would like Mr. McAndrews

3      to come up with his actually 30(b)(6) topics, and for you all to

4      try to expeditiously get a 30(b)(6) deposition per defendant.

5             So 90 days from when the deposition is taken?

6             MR. MCANDREWS:  Yes, your Honor, that's sufficient.

7             MR. DAY:  For each party, your Honor --

8             THE COURT:  For each party.

9             MR. DAY:  -- so 90 days after the --

10            THE COURT:  Right, right.  If yours is -- if you take

11     them two weeks apart, somebody will be two weeks ahead, or

12     behind.

13            All right.

14            What else can we address?

15            I have something else I have to do at 1:15, and I have

16     to eat lunch before then.

17            MR. DAY:  Maybe just setting another conference, your

18     Honor?

19            THE COURT:  Well, I can do that.

20            Mr. McAndrews?

21            MR. MCANDREWS:  I have nothing further, your Honor.

22            THE COURT:  All right.

23            Well, so, when would you see us setting a conference?

24            MR. DAY:  I would think after the 120 plus 14 days when

25     we give them invalidity contentions.

1          THE COURT:  How about 150 days from now?

2          MR. DAY:  Yes, that's likely to be after all this stuff

3   gets done, so...

4          THE COURT:  All right.

5          That's kind of what I'm thinking is the two weeks and

6   the -- I'm thinking, particularly, from Mr. McAndrews, who has

7   more flexibility in the schedule that he's just set forth

8   himself, because he has got these 30(b)(6) depositions, but it

9   would seem to me that if both sides are trying, that's something

10  that ought to be able to done in 45 days.

11         And, so, 150 days from now is five months, does that

12  takes us to November or December?

13         Let's see.

14         (Pause)

15         It's October.

16         All right.

17         What about -- it's not exactly five months -- but what

18  about Monday, October 19th?

19         MR. DAY:  Your Honor, that works for me.  Not Monday is

20  better for travel.

21         THE COURT:  Well, the only reason is, I have on my

22  calendar here the 3rd Circuit conference, so I don't know

23  exactly when -- that starts on Tuesday at some point.

24         But I'm pretty sure, actually, I could do it Tuesday

25  morning, October 20th, if you wanted?

1              MR. DAY:  That's better for travel.

2              MR. MCANDREWS:  That works for us.

3              THE COURT:  Ms. Rader?

4              MS. RADER:  That works for ZyXEL.

5              THE COURT:  Mr. Schuman?

6              MR. SCHUMAN:  That works fine.  Thank you, your Honor.

7              THE COURT:  Okay.  Why don't we say October 20th at

8      9:00 a.m.

9              And, again, if you could send me letters by October

10     16th, which is a Friday, just ideally a joint status report, but

11     you can also send individual letters, or whatever, but somehow

12     or other, give me advanced, or give me a head's up as to how

13     things are going, all right?

14             MR. DAY:  Yes, your Honor.

15             MR. MCANDREWS:  Yes, your Honor.

16             THE COURT:  Okay.  Is there anything else?

17             (No response.)

18             THE COURT:  All right.  Thank you.

19             I will try, when we do this in October, not to ask all

20     the same questions again, but you may have to remind me in the

21     letters that I should read the transcripts of the prior

22     conferences.

23             All right.

24             Well, thank you very much.

25             Good day, Mr. Schuman.

1          MR. SCHUMAN:  Thank you, your Honor.

2          THE COURT:  All right.

3          Have a good afternoon.

4          MR. DAY:  Thank you, your Honor.

5          MR. MCANDREWS:  Thank you, your Honor.

6          MS. RADER:  Thank you, your Honor.

7          (The proceedings adjourned at 12:45 o'clock p.m.)

8                         *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25