```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -

 4
     TQ DELTA, LLC,                   :   CIVIL ACTION
 5                                    :
                 Plaintiff,           :
 6                                    :
           vs.                        :
 7                                    :
                                      :
 8   ZYXEL COMMUNICATIONS, INC.       :
     and ZYXEL COMMUNICATIONS         :
 9   CORPORATION,                     :
                                      :
10              Defendants.  :   NO. 13-2013 (RGA)

11
                             - - -
12
                              Wilmington, Delaware
13                            Tuesday, December 19, 2017
                              10:04 o'clock, a.m.
14
                             - - -
15
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
16
                             - - -
17

18

19

20

21

22

23
                              Valerie J. Gunning
24                            Official Court Reporter

25
```

1    **APPEARANCES:**

2

3              **FARNAN LLP**
               **BY:  MICHAEL J. FARNAN, ESQ.**

4
                            **-and-**
5

6              **McANDREWS, HELD & MALLOY**
               **BY:  PETER J. McANDREWS, ESQ.**
7                   **(Chicago, Illinois)**

8
                    **Counsel for Plaintiff**
9                   **TQ Delta, LLC**

10

11             **MORRIS JAMES LLP**
               **BY:  KENNETH L. DORSNEY, ESQ.**
12

13                          **-and-**

14

15             **ALSTON & BIRD**
               **BY:  ELIZABETH RADER, ESQ. and**
16                  **Jennifer Liu, Esq.**
                    **(Washington, D.C.)**
17

18                  **Counsel for Defendant**
                    **ZyXel Communications**
19

20                       **-  -  -**

21

22

23

24

25

1                         **P R O C E E D I N G S**

2

3                    (Proceedings commenced in the courtroom,

4    beginning at 10:04 a.m.)

5

6                    THE COURT:  All right.  Good morning, and please

7    be seated.

8                    This is TQ Delta versus ZyXel Communications,

9    Inc., Civil Action No. 13-2013.

10                   For plaintiff, Mr. Farnan, good morning.

11                   MR. FARNAN:  Good morning, Your Honor.  Brian

12    Farnan on behalf of the plaintiff, and with me is Jim

13    Murphy, and Peter McAndrew, all from McAndrews, Held &

14    Malloy.

15                   THE COURT:  All right.  Good morning to you all.

16                   MR. FARNAN:  Thank you.

17                   THE COURT:  Mr. Dorsney?

18                   MR. DORSNEY:  Good morning, Your Honor.  Ken

19    Dorsney from Morris James, and with me from Alston & Bird I

20    have Jennifer Liu and Elizabeth Rader.

21                   THE COURT:  All right.  Good morning to you all.

22                   Ms. Rader, do I presume you're making the

23    argument here?

24                   MS. RADER:  Yes, Your Honor.

25                   THE COURT:  All right.  So before we begin, is

09:55:29  1   the U.K. court a troll friendly court?

09:55:33  2         MS. RADER:  I would say yes, and I would say

09:55:35  3   that they would like to become more patent owner friendly

09:55:38  4   like the Eastern District of Texas used to be.

09:55:41  5         THE COURT:  All right.  Well, so I don't think

09:55:49  6   we really should -- you know, ad hominem sorts of things

09:55:59  7   don't really go too far, and so calling the other side a

09:56:02  8   patent troll and calling the U.K. Court a troll friendly

09:56:05  9   Court, that's not going to help you win.  All right?

09:56:10  10        MS. RADER:  Thank you.

09:56:11  11        THE COURT:  And, Mr. Dorsney, I expect that if

09:56:15  12  you have time enough to review these briefs, and I

09:56:17  13  understand you don't always, that's the kind of thing that

09:56:20  14  you counsel your out-of-town counsel not to say.

09:56:27  15        MR. DORSNEY:  Yes.

09:56:27  16        THE COURT:  But I appreciate that you may not

09:56:28  17  have had the time.

09:56:29  18        All right, Ms. Rader.  Go ahead.

09:56:31  19        MS. RADER:  Your Honor, TQ Delta --

09:56:34  20        THE COURT:  And actually, just on a different

09:56:37  21  point, what is the relief you actually seek?  I say that

09:56:43  22  because the proposed order that came in, which I apparently

09:56:48  23  now misplaced with the original brief, proposed that I order

09:56:56  24  TQ Delta to withdraw or dismiss without prejudice its action

09:57:00  25  against ZyXel, essentially I guess ending the case in the

09:57:10  1    U.K.

09:57:10  2               MS. RADER:  Well, we think it's not ending the

09:57:13  3    case.  They could always refile since it's without

09:57:16  4    prejudice.

09:57:16  5               THE COURT:  All right.  So does that impact what

09:57:17  6    you are saying that the law suggests that I have the power

09:57:19  7    and discretion to do right now?

09:57:24  8               MS. RADER:  I would say you have the power and

09:57:26  9    discretion to enter that injunction.

09:57:28  10              THE COURT:  All right.  And so that's what you

09:57:32  11   are seeking, that the injunction is to direct them to

09:57:34  12   withdraw or dismiss the case in the U.K.?

09:57:37  13              MS. RADER:  Until such time as the issues that

09:57:39  14   are common to both cases can be resolved by this Court.

09:57:42  15              THE COURT:  All right.  So on a slightly

09:57:47  16   different topic -- I will get back to that.  Go ahead.

09:57:54  17              MS. RADER:  TQ Delta does not deny that it's

09:57:58  18   suing ZyXel in the U.K. because it is trying to get a remedy

09:58:02  19   that it cannot get in this court, the so-called FRAND

09:58:04  20   injunction, and that means based on Unwired Planet, if they

09:58:07  21   win on even one patent, the U.K. Court will determine a

09:58:11  22   FRAND license covering the whole TQ Delta DSL portfolio, and

09:58:18  23   it is worldwide.  In that case, ZyXel wouldn't have the

09:58:22  24   luxury to wait and see if an injunction issued in the U.K.

09:58:25  25   or be enforceable in this court or other U.S. courts.

09:58:27  1          THE COURT:  Do you think this injunction is

09:58:29  2  likely to issue under the worst case scenario before the

09:58:32  3  spring of 2019?

09:58:36  4          MS. RADER:  I guess it could come out as soon as

09:58:40  5  January '19 under the worst case scenario.

09:58:42  6          THE COURT:  All right.

09:58:43  7          MS. RADER:  Obviously, we would hope to win on

09:58:46  8  the two patent on the liability issue.

09:58:47  9          THE COURT:  Which might moot the whole thing.

09:58:50  10          MS. RADER:  Indeed, but it's the threat hanging

09:58:52  11  over us that's causing irreparable harm, especially if our

09:58:55  12  customers were to find out about it and get nervous.

09:58:58  13          THE COURT:  Is the proceeding a written secret?

09:59:01  14          MS. RADER:  No.

09:59:02  15          THE COURT:  So if your customers care, why would

09:59:07  16  they find out already?

09:59:08  17          MS. RADER:  I'm not sure, but they have not.

09:59:10  18          THE COURT:  Who are your customers?  I mean, I

09:59:13  19  take it they're not Joe Q Public?

09:59:16  20          MS. RADER:  They're mostly large ISPs or medium

09:59:21  21  sized ISPs, Internet service providers.

09:59:24  22          THE COURT:  Right.  Right.  All right.  Go

09:59:27  23  ahead.

09:59:27  24          MS. RADER:  So we also think that the courts in

09:59:33  25  the European Union are likely to enforce U.K. issued

09:59:36    1    injunction, so getting an injunction would effectively be an

09:59:40    2    injunction all through Europe.  So --

09:59:43    3              THE COURT:  And under the best or worst case, or

09:59:47    4    under any case scenario, the limits of my authority are

09:59:53    5    pretty much the United States.  Right?

09:59:56    6              MS. RADER:  Correct.  But TQ Delta is a United

10:00:00    7    States company, so they're under your jurisdiction.

10:00:02    8              THE COURT:  Right.  But, in other words, if

10:00:03    9    you're busy violating E.U. law, or more to the point, U.K.

10:00:08   10    law, and including that a patent, as I understand it, is

10:00:16   11    asserted against you that has not even got a counterpart

10:00:20   12    that's at issue here, don't they have an interest in

10:00:23   13    figuring out whether or not you do infringe it?

10:00:25   14              MS. RADER:  The U.K. Court, yes, they do, but,

10:00:29   15    in fact, we believe that we are licensed anyway and that the

10:00:33   16    terms just need --

10:00:34   17              THE COURT:  So you have defenses.  That's what

10:00:36   18    litigation is for.  Right?

10:00:39   19              MS. RADER:  Right.  So the harm that's

10:00:43   20    threatened to ZyXel could not be easily remedied after the

10:00:47   21    fact, but this Court does have the power to put the U.K.

10:00:50   22    action on hold just like the courts in Microsoft and

10:00:53   23    Realtek.  The methodology for calculating royalties is also

10:01:02   24    different in the United Kingdom.

10:01:07   25              THE COURT:  So if they have a different

10:01:09    1    methodology for calculating royalties -- well, never mind.

10:01:15    2    Go ahead.

10:01:15    3          MS. RADER:  My point is just that this case was

10:01:18    4    brought here under U.S. law four years ago and it should

10:01:21    5    stay here, not be decided.  This is a dispute between, it

10:01:25    6    used to be four, now three U.S. companies, so the center of

10:01:29    7    it is here even if there are a few U.K. patents asserted in

10:01:32    8    the U.K.

10:01:33    9          I'd like to read some language from the IP

10:01:38   10    Common Policy.  Recommendations and deliverables, and those

10:01:42   11    are standards, are non-binding.  Their objective is to

10:01:44   12    ensure compatibility of technology of their systems on a

10:01:47   13    worldwide basis.  To meet this objective, which is the

10:01:51   14    common interest of all participating, it must be ensured

10:01:54   15    that recommendations and deliverables, their applications,

10:01:57   16    et cetera, are accessible to everybody.

10:02:04   17          And that's the reason that the majority of U.S.

10:02:06   18    courts that have considered this issue have concluded that a

10:02:08   19    holder of patent alleged to be standard essential -- and

10:02:10   20    that's alleged, they don't even have to be proved to be

10:02:13   21    standard essential -- cannot sue for injunctive relief

10:02:16   22    absent certain circumstances that aren't present here.

10:02:22   23          This is not a case where anybody says ZyXel is

10:02:25   24    guilty of holdout, and that is because TQ Delta didn't even

10:02:29   25    offer rates and terms to ZyXel before suing.

THE COURT:  Well, so according to something, I think Mr. Dorsney submitted it, but there was a copy of the English Court's, or British Court's, the U.K. Court's approved judgment, which I gather was from November 21st, and Justice, the Justice said that they, TQ Delta made an offer 26 May 2016, which is like a year-and-a-half ago, for a global portfolio license which was rejected, and they say that you made an offer for a global portfolio license which has also been rejected.  I take it that was some time after May 26, 2016.

Is that all correct?

MS. RADER:  I believe that is correct.  I think we admitted that in the U.K. case, but in this case, they filed late in December 2013.

THE COURT:  That's true.

MS. RADER:  Before any concrete license had been offered to us.  They came to us and said, we think you'll take an interest in this license to the standard essential patents, you're practicing the standard.  And so we came back, said, yes, we'd like to talk about a license.

They said, tell us about your sales figures, tell us about your profits, tell us about your costs so we know what terms we can propose.  They wanted to get a little free discovery before filing.

We came back and said, we want an NDA, and then

| | |
|---|---|
| 10:04:09 | 1 |
| 10:04:12 | 2 |
| 10:04:16 | 3 |
| 10:04:20 | 4 |
| 10:04:25 | 5 |
| 10:04:29 | 6 |

the parties were negotiating the terms of an NDA for a few months and then TQ Delta got tired of waiting.  Perhaps they already wanted to bring the 2Wire suit and the Zhone suit and the Adtran suit at the same time.  They gave us an ultimatum and said, resolve the NDA by the day after Thanksgiving weekend.

7  THE COURT:  Yes.  I remember that.

8  MS. RADER:  Okay.

9  THE COURT:  I'm not saying -- I'm just saying I do remember that because, I don't know, the usual.

11  Well, so one of the questions that comes up is why -- I mean, this has nothing to do, really, I guess, with the motion today, but if they're busy making you an offer in 2016 and you made them an offer somewhere along the line, why don't you all agree to an arbitrator or something and let the arbitrator figure out where to split the difference and resolve the matter.

18  MS. RADER:  I'm not sure that's what anyone wants.  I mean, the parties have occasionally been discussing settlement, but it hasn't gotten anywhere.

21  THE COURT:  Right.  Well, I mean, you know, I have not figured out when the latest, how long this litigation is going to last if it lasts until the end.  I gather the U.K. litigation might, the immediate might end some time soon, but I gather, I saw somewhere in here that

10:05:42  1    if for some reason these two patents that are asserted fall

10:05:45  2    by the wayside, TQ Delta probably has more, so there's a

10:05:52  3    prospect of litigation into the future there, too.

10:06:00  4             If you can't negotiate a solution, why don't you

10:06:02  5    get some help?

10:06:03  6             MS. RADER:  Actually, the scheduling order

10:06:06  7    states the case is referred for mediation, but for some

10:06:09  8    reason, nothing has ever come of that.

10:06:15  9             THE COURT:  I don't know about that.  All right.

10:06:17  10   Well, go ahead.

10:06:19  11            MS. RADER:  So I was just reading you the public

10:06:21  12   policy of the ITU, and I was going to say that there's no

10:06:25  13   holdout here, so there's no exception to the general rule

10:06:27  14   that you can't get an injunction if you're asserting

10:06:30  15   supposedly standard essential patents.  And enforcing these

10:06:35  16   policies is an important public interest.  The U.S. is an

10:06:40  17   innovation economy.  These issues are terribly important

10:06:42  18   worldwide, and you can't have standard setting organizations

10:06:46  19   have interoperability of these technologies unless everybody

10:06:49  20   plays by the rules.  And Aware, TQ's predecessor, made these

10:06:59  21   declarations and then they sold patents to somebody else who

10:07:01  22   has no interest in complying with those rules.

10:07:03  23            So the U.K. action never should have been filed

10:07:05  24   in the first place.  And I guess because it's only involved

10:07:10  25   in two patents, TQ Delta learned that asserting 32 patents

10:07:15   1    was going to slow them down, they thought they could get the

10:07:18   2    same result with two patents and then get quickly to a FRAND

10:07:23   3    determination.   They jumped ahead of us.   And we said, why

10:07:27   4    couldn't it be resolved in January of 2019 unless you do

10:07:30   5    something about it.

10:07:31   6              THE COURT:   So let's assume for the sake of

10:07:33   7    argument that the U.K. Court gets to January 2019 and issues

10:07:38   8    some judgment saying that a FRAND rate is X and they issued

10:08:06   9    an injunction against TQ Delta, I'm sorry, against you that

10:08:14   10   included the United States, that you couldn't sell any

10:08:18   11   products in the United States or in the U.K. at the

10:08:23   12   worldwide FRAND rate.   Would you agree that I would then be

10:08:27   13   bound by that?

10:08:28   14              MS. RADER:   No, we don't.

10:08:31   15              THE COURT:   Okay.

10:08:32   16              MS. RADER:   But if we like the rate, we might

10:08:34   17   well take that license.

10:08:38   18              THE COURT:   I'm sorry.   I'm sorry.   Could you

10:08:40   19   repeat that again?

10:08:41   20              MS. RADER:   If we thought the U.K. issued FRAND

10:08:45   21   license rates and terms that were fair and reasonable, then

10:08:49   22   we have no reason not to take that.   But if they were

10:08:53   23   unreasonable, I think we would have a good argument that

10:08:56   24   they wouldn't apply here even if the U.K. says they do.   But

10:09:01   25   just enjoining our products to keep them out of the U.K. is

10:09:04   1   a huge sacrifice.  That's a big market for us.

10:09:07   2             THE COURT:  But, I don't know.  I mean, it seems

10:09:13   3   to me, and maybe I'm wrong, but it seems to me that the U.K.

10:09:17   4   ought to be the one who gets to decide whether or not you

10:09:21   5   can sell products in the U.K.  Right?  Not me.

10:09:26   6             MS. RADER:  I agree with that and that's why

10:09:29   7   we're asking that this just be enjoined while this Court is

10:09:32   8   working on the breach of contract issues, which may include

10:09:36   9   the, very likely include the FRAND rates and terms.  After

10:09:40   10   that, absolutely.  The U.K. Court should decide the U.K.

10:09:43   11   patent issues.

10:09:53   12             THE COURT:  So let's assume for the sake of

10:09:59   13   argument -- so let me ask you this:  One of the things that

10:10:05   14   seems to be suggested by the case from Philadelphia with

10:10:11   15   Judge Rufe and which seems to also be suggested in the last

10:10:18   16   page of your reply brief is that it's really premature to be

10:10:25   17   talking about this now?  That there's things that could

10:10:29   18   happen between now and January of 2019, not the least of

10:10:35   19   which seems to be the possibility that the U.K. trial on

10:10:40   20   infringement may -- could go either way, and that the whole

10:10:49   21   thing might become moot.

10:10:51   22             If I followed the logic of Judge Rufe, who after

10:10:55   23   all was interpreting at least the same Third Circuit law

10:11:01   24   that I should be interpreting, wouldn't that suggest that I

10:11:03   25   do nothing now and wait to see what happens even if I agree

10:11:10  1   that somewhere down the road I should be entering an

10:11:12  2   injunction?

10:11:13  3           MS. RADER:  I would say it's distinguishable

10:11:15  4   from the case in front of Judge Rufe, and the reason is that

10:11:20  5   I don't think they were faced with a threat of an injunction

10:11:22  6   in the, in that case.

10:11:25  7           THE COURT:  No.  They were faced with a default

10:11:27  8   judgment, but as Judge Rufe said, she respected the U.K.

10:11:33  9   Court to do justice, and I certainly would be inclined to

10:11:48  10  have the same approach.  But she also said that when

10:11:58  11  circumstances were advanced and perhaps changed, she still

10:12:02  12  had some arrows in her quiver and could address the problems

10:12:09  13  then.  I.

10:12:10  14           Mean, when you talk about comity, which seems to

10:12:15  15  be a big concern, doesn't that suggest not rushing in at the

10:12:25  16  first sign of smoke should shouldn't you wait until you see

10:12:32  17  whether there's actually a fire?

10:12:34  18           MS. RADER:  I think if you wait to see when

10:12:35  19  there's a fire, it's too late.  Once there has been a fire,

10:12:38  20  you can't build a house back again, and that's what we're

10:12:40  21  looking at here.  The whole point of the IT public policy is

10:12:43  22  to prevent the threat of an injunction from helping the

10:12:46  23  patentholder force the settlement just because of having a

10:12:52  24  lever like threat of an injunction.  So that's why this case

10:12:56  25  is different.  The defendant in Judge Rufe's case was

10:13:00    1    basically it sounds like brought into the lawsuit so he

10:13:03    2    would be a witness.  He was judgment proof.  He couldn't

10:13:05    3    defend himself in the U.K. case.  So I mean I think Judge

10:13:09    4    Rufe came to a right decision, but I don't think that

10:13:13    5    controls what should happen in this case.

10:13:15    6                    THE COURT:  All right.  What's the relationship

10:13:29    7    between the parties that are actually defendants in the U.K.

10:13:35    8    and the two parties that are defendants here?

10:13:38    9                    MS. RADER:  ZyXel Communications Corporation,

10:13:42    10   which is one of the defendants here, is a parent company to

10:13:45    11   the ZyXel Denmark and ZyXel, Inc., which is in Anaheim,

10:13:53    12   California, and I think ZyXel U.K. is a subsidiary of the

10:13:57    13   Denmark entity.

10:13:58    14                    THE COURT:  And the ones who are defendants in

10:14:00    15   the U.K. are the ZyXel Denmark and ZyXel U.K.?

10:14:05    16                    MS. RADER:  Correct.

10:14:09    17                    THE COURT:  All right.  And do you agree that

10:14:13    18   the two patents that are asserted in the U.K., one of them

10:14:15    19   does not have a counterpart here?

10:14:18    20                    MS. RADER:  I think it has a counterpart in the

10:14:19    21   same family.

10:14:21    22                    THE COURT:  But not a counterpart that's

10:14:22    23   asserted?

10:14:24    24                    MS. RADER:  I'm not a patent -- I mean, I'm not

10:14:27    25   a patent prosecutor, so sometimes the term counterpart is a

10:14:31  1    little confusing to me.  It's related.  I don't want to

10:14:34  2    overstate.

10:14:35  3              THE COURT:  Okay.  And the one that is

10:14:39  4    apparently more closely related, do you know what its, if

10:14:46  5    you're comfortable with the term in this situation, what its

10:14:49  6    counterpart is supposed to be?

10:14:50  7              MS. RADER:  I want to say it's in Family 5, but

10:14:54  8    I'm not a hundred percent sure on that.

10:14:58  9              THE COURT:  All right.  Anything else?

10:15:04  10             MS. RADER:  Sure.  We recognize that the Third

10:15:08  11   Circuit standard is different than the Ninth Circuit

10:15:11  12   standard and that we have a tougher time making this

10:15:13  13   argument even though our facts are really, really

10:15:16  14   compelling, and we think the Ninth Circuit cases are really

10:15:19  15   important and persuasive, and that's why we cited them.

10:15:23  16   But in the alternative, this Court could take some steps to

10:15:27  17   take some of these issues back and put them on a faster

10:15:30  18   track.

10:15:31  19             THE COURT:  Yes.  I'm not going to do that.

10:15:35  20             Actually, I remember the other question I had in

10:15:39  21   mind here, which was, the U.K. Justice in the Court of

10:15:45  22   Chancery, is he something that presumably if his judgments

10:15:54  23   are in error, there's somebody that you can appeal it to?

10:16:01  24             MS. RADER:  Yes, Your Honor.  I understand that

10:16:03  25   the Unwired Planet case is up on appeal now.

| | | |
|---|---|---|
| 10:16:07 | 1 | THE COURT:  So the law in Britain may not even |
| 10:16:10 | 2 | be what is -- what it is stated to be in the Unwired Planet |
| 10:16:17 | 3 | case? |
| 10:16:19 | 4 | MS. RADER:  Anything could happen on appeal, but |
| 10:16:22 | 5 | I think the best way to win an appeal is to win the District |
| 10:16:27 | 6 | Court level case, and so we feel like the threat is here |
| 10:16:29 | 7 | now, sure.  Anything could happen in the future, but the |
| 10:16:32 | 8 | threat of an injunction is the problem here, and that's |
| 10:16:34 | 9 | what's inconsistent with U.S. public policy. |
| 10:16:38 | 10 | THE COURT:  Okay.  And maybe I missed this. |
| 10:16:53 | 11 | Justice Carr, he's not the author of the Unwired Planet |
| 10:16:57 | 12 | decision, is he? |
| 10:16:59 | 13 | MS. RADER:  No, he's not. |
| 10:17:00 | 14 | THE COURT:  Okay.  But he's just like Judge |
| 10:17:02 | 15 | Stark over there.  He sits on the same Court as the Justice |
| 10:17:07 | 16 | who decided that? |
| 10:17:09 | 17 | MS. RADER:  Exactly. |
| 10:17:10 | 18 | THE COURT:  Okay. |
| 10:17:11 | 19 | MS. RADER:  And all the parties in the case |
| 10:17:12 | 20 | management conference, which we provided the transcript of, |
| 10:17:18 | 21 | I really was cautious of the Unwired Planet case.  In fact, |
| 10:17:22 | 22 | TQ Delta said that was one of the reasons why they filed in |
| 10:17:25 | 23 | the U.K. |
| 10:17:26 | 24 | THE COURT:  Okay.  Anything else? |
| 10:17:29 | 25 | MS. RADER:  If there's no further questions, I |

10:17:30  1    will submit, or reserve rebuttal.

10:17:33  2                THE COURT:  All right.  Go ahead.  Mr. Murphy?

10:17:37  3                MR. MURPHY:  Thank you, Your Honor.  Good

10:17:43  4    morning.

10:17:43  5                Judge, we cited quite a few cases in our brief

10:17:45  6    that we have hard copies of.  If the Court would like a

10:17:48  7    copy, I have copies to hand up to the Court.

10:17:51  8                THE COURT:  I saw the hard copy of Brotech.  I

10:17:56  9    assume the rest are available?

10:17:58  10               MR. MURPHY:  They are all available, Judge.  No?

10:18:01  11   Okay.

10:18:02  12               Judge, as you alluded to originally here, what

10:18:06  13   ZyXel is requesting is extreme relief.  They are asking this

10:18:11  14   Court to grant an anti-suit injunction that will completely

10:18:14  15   shut down U.K. litigation to enjoin a U.K. Court from the

10:18:19  16   course of U.K. patents to stop infringement in the U.K.

10:18:22  17   It's an extreme remedy that this Court in the General

10:18:27  18   Electric case has said, quote, "Should almost always be

10:18:29  19   avoided."

10:18:32  20               And as you also alluded to, Judge, under Third

10:18:36  21   Circuit precedent, and, again, the Third Circuit has stated

10:18:39  22   that these parallel proceedings should always be allowed to

10:18:43  23   proceed at least until a judgment is won in one, set up as

10:18:48  24   res judicata to the other.

10:18:49  25               So, again, you mentioned it's premature,

10:18:52   1   certainly at least premature, and we agree.  ZyXel, bottom

10:18:56   2   line though here, Judge, has failed to show any of the

10:18:58   3   prerequisites for an anti-suit injunction under the Third

10:19:02   4   Circuit's restrictive approach, it announced in the General

10:19:06   5   Electric case.

10:19:09   6           The first prerequisite is that the enjoining

10:19:11   7   Court have the same parties and be dispositive of the

10:19:15   8   enjoined Court, and ZyXel does not even argue or assert that

10:19:21   9   that is the case.  So the first prerequisite is not met.

10:19:25   10  But if that prerequisite is met, then ZyXel would have to

10:19:30   11  argue that the U.K. litigation threatens jurisdiction of

10:19:33   12  this Court or threatens the important public policy of the

10:19:36   13  United States, and they fail to do those things as well.

10:19:40   14           THE COURT:  I mean, I think they say that the

10:19:45   15  important public policy is that standard essential patents

10:19:51   16  shouldn't be used or shouldn't be the basis of an

10:19:55   17  injunction.  Right?  Isn't that what they are saying?

10:19:58   18           MR. MURPHY:  That is one of the things they're

10:19:59   19  saying, Judge, and there are two responses to that.  One is,

10:20:04   20  the FRAND bargain, if you will, is an important public

10:20:07   21  policy, but here, they mischaracterize the threat of an

10:20:11   22  injunction.  There's a -- they say there's a policy in the

10:20:16   23  United States against injunctions for standard essential

10:20:20   24  patent holders, and as we've seen in the Federal Circuit

10:20:23   25  case that we cite to Your Honor, that's the Apple versus

10:20:26   1   Microsoft case, that says that there is no blanket

10:20:31   2   prohibition on injunctions for standard essential patent

10:20:34   3   holders.  It's one element that goes into the standard

10:20:41   4   elements when looking at Rule 65, looking for an injunction,

10:20:45   5   whether or not to apply an injunction is just one more

10:20:48   6   factor.  So there is no U.S. public policy against

10:20:50   7   injunctions for SEP holders.  So that is not an important

10:20:56   8   public policy that could possibly be threatened by the U.K.

10:20:59   9   litigation.  And this Judge, this Court Judge will decide

10:21:04   10  for itself those issues.  The U.K. action will not impose

10:21:10   11  its will on this Court, so there's no threat to that public

10:21:14   12  policy whatsoever in this court.

10:21:19   13          But just to address one quick point, Judge.  The

10:21:26   14  parties, excuse me, the defendant has asserted that there

10:21:31   15  is, isn't a prerequisite for the parties being the same

10:21:35   16  or --

10:21:36   17          THE COURT:  I'm sorry.  Did you say -- did you

10:21:37   18  cite Apple versus Microsoft as a Federal Circuit case?

10:21:42   19          MR. MURPHY:  Yes.

10:21:43   20          THE COURT:  Do you mean like versus Motorola?

10:21:45   21          MR. MURPHY:  I'm sorry, Judge.  Apple versus

10:21:47   22  Motorola, yes.

10:21:48   23          THE COURT:  Okay.

10:21:49   24          MR. MURPHY:  Sorry, Judge.

10:21:53   25          THE COURT:  That's all right.

10:21:54  1          MR. MURPHY:  Right.  The Federal Circuit holding

10:21:56  2     that there is no blanket prohibition.

10:22:03  3          ZyXel argued that there is no initial

10:22:08  4     prerequisite for this case being dispositive of the U.K.

10:22:12  5     litigation to be entitled to an anti-suit injunction, but in

10:22:17  6     the General Electric case, Judge, where the Third Circuit

10:22:21  7     re-ratifies, if you will, the restrictive approach for

10:22:24  8     anti-suit injunctions, that case cites to the Second Circuit

10:22:27  9     and the Sixth Circuit cases, which state that standard and

10:22:31  10    state that the Second Circuit, the China Trade case, which

10:22:34  11    is cited at 837 F.2d at 36, where that Court identifies the

10:22:41  12    restrictive approach and says, we agree with the two

10:22:44  13    threshold requirements.  One is the parties are the same;

10:22:48  14    and, two, whether the enjoining Court will be dispositive of

10:22:52  15    the enjoined Court.  So there is that prerequisite for even

10:22:57  16    getting to the next prongs of the anti-suit injunction

10:23:00  17    factors.

10:23:08  18          THE COURT:  Is it your position that the two

10:23:09  19    U.K. subsidiaries, or the two U.K. defendants, I guess is a

10:23:13  20    better word, they are not the same party, the same party as

10:23:22  21    the same parties here?

10:23:23  22          MR. MURPHY:  Well, they are slightly different,

10:23:24  23    Judge, but they are all in the same family.  We recognize

10:23:27  24    that.  They're all related entities.

10:23:30  25          But here, the difference here, Judge, is the

| | |
|---|---|
| 10:23:30 | 1 |
| 10:23:33 | 2 |
| 10:23:37 | 3 |
| 10:23:41 | 4 |
| 10:23:44 | 5 |
| 10:23:47 | 6 |
| 10:23:51 | 7 |
| 10:23:55 | 8 |
| 10:23:58 | 9 |
| 10:24:01 | 10 |
| 10:24:05 | 11 |
| 10:24:08 | 12 |
| 10:24:11 | 13 |
| 10:24:13 | 14 |
| 10:24:16 | 15 |
| 10:24:20 | 16 |
| 10:24:21 | 17 |
| 10:24:24 | 18 |
| 10:24:29 | 19 |
| 10:24:33 | 20 |
| 10:24:35 | 21 |
| 10:24:37 | 22 |
| 10:24:39 | 23 |
| 10:24:42 | 24 |
| 10:24:45 | 25 |

reason this case would not be dispositive of that is the
lack of complete overlap of patented technology.  You
mentioned it earlier.  The patents, of course, in the U.K.
litigation are just U.K. patents.  Here, they are just U.S.
patents, one of which in the U.K. is related to Family 5, as
you mentioned.  The other patent asserted in the U.K.
presently is not what we would call Family 11, if you will,
but it's not asserted here.  So there's no complete overlap
of technology or of patents.

        THE COURT:  So your position or view is one of
the asserted U.K. patents essentially has the same
limitations as one of the asserted Family 5 patents?

        MR. MURPHY:  Not the same limitations, Judge.
The same related specification based on the same technology,
but as you -- the patent law is different in the U.K., so
the claims would be a little different.

        THE COURT:  All right.  And the other one, you
mentioned Family 11.  I thought it was -- are you saying
it's related in some way to the Family 11 patents?

        MR. MURPHY:  Oh, I'm sorry, Judge.

        THE COURT:  Are there Family 11 patents?

        MR. MURPHY:  No.  That's just our sort of how we
refer to it.  And here in Delaware, there are only Families
1 through 10.  I believe the ZyXel case deals with Families
1 through 9, if I have that right.

| | |
|---|---|
| 10:24:47 | 1 |
| 10:24:47 | 2 |
| 10:24:49 | 3 |
| 10:24:53 | 4 |
| 10:24:54 | 5 |
| 10:24:56 | 6 |
| 10:25:00 | 7 |
| 10:25:01 | 8 |
| 10:25:05 | 9 |
| 10:25:12 | 10 |
| 10:25:17 | 11 |
| 10:25:20 | 12 |
| 10:25:26 | 13 |
| 10:25:29 | 14 |
| 10:25:31 | 15 |
| 10:25:39 | 16 |
| 10:25:43 | 17 |
| 10:25:46 | 18 |
| 10:25:48 | 19 |
| 10:25:52 | 20 |
| 10:25:55 | 21 |
| 10:26:01 | 22 |
| 10:26:06 | 23 |
| 10:26:12 | 24 |
| 10:26:26 | 25 |

THE COURT:  Okay.

MR. MURPHY:  And so my point being that there's,
yes.  The second patent in the U.K. litigation is not in any
way involved in these cases here.

THE COURT:  All right.

MR. MURPHY:  And so -- excuse me, Judge.

MR. McANDREWS:  Sorry, Your Honor.

(Pause while counsel conferred.)

MR. MURPHY:  And so the U.K. patent that's
outside the families here, TQ Delta doesn't even own a
counterpart in the U.S. for that patent.  It's only in the
U.K.  So, in other words, the point being that this case
won't be dispositive of the U.K. litigation and ZyXel
doesn't even argue that it would be, and so we don't get
past that first prerequisite for any anti-suit injunction.

Importantly, Judge, there is no threat to this
Court's jurisdiction from the U.K. litigation.  As the
restrictive approach from the Third Circuit states, that's
one of the prongs that must be shown to be entitled to an
anti-suit injunction.  There's no threat to the jurisdiction
here.  The best that ZyXel argue is that the RAND issues in
the U.K. litigation may be decided first.  They don't --

THE COURT:  So what is your understanding of
what, in terms of RAND issues in the U.K. litigation, do --
what is your understanding of how much the issues there

10:26:31    1    overlap with the issues here?

10:26:32    2                MR. MURPHY:  My understanding, Judge, is that

10:26:35    3    there's a fair bit of overlap between the FRAND bargain and

10:26:39    4    those issues that are related to that FRAND bargain.

10:26:43    5    However, they'll be applied locally by the U.K. litigation,

10:26:46    6    applying its U.K. jurisprudence, just like this Court will

10:26:49    7    apply the FRAND issues with the obligations, commitments of

10:26:54    8    the parties using U.S. jurisprudence.

10:26:56    9                THE COURT:  So to the extent that the FRAND

10:27:02   10    obligation is based on some idea of the contract law and so

10:27:13   11    there's interpretation of a contract, what law am I supposed

10:27:20   12    to apply, what law is the U.K. supposed to apply to figure

10:27:23   13    out those issues?

10:27:24   14                MR. MURPHY:  I can't speak to the U.K. law,

10:27:29   15    Judge.  We've talked to our, of course, our lawyers in the

10:27:33   16    U.K.  They'll apply a different law, I think the U.K.

10:27:38   17    contract law.

10:27:39   18                I will give you an analogy, Judge.  In the

10:27:41   19    Microsoft/Motorola case that ZyXel relies on nearly

10:27:49   20    exclusively, in that case, the Court entered that injunction

10:27:51   21    against a proceeding for filing the bond for, in a German

10:27:56   22    Court, and one of the reasons it did that is because in

10:27:59   23    Germany, at least at that time, German courts did not

10:28:02   24    recognize third-party beneficiaries, and so Microsoft was

10:28:06   25    the implementer.  They got the benefit of the FRAND bargain

10:28:10   1   as a third-party beneficiary here in the United States.  The

10:28:13   2   Court recognizes that right if they meet certain

10:28:17   3   prerequisites and Microsoft met those prerequisites, and so

10:28:22   4   they're a third-party beneficiary able to assert those

10:28:25   5   contractual rights.  In Germany, that's not allowed.  So

10:28:28   6   that's why the different courts will look at different

10:28:30   7   things.  In the U.K., we don't have that problem.  The U.K.

10:28:34   8   as we know from the Unwired Planet case did an exhaustive

10:28:38   9   analysis of the FRAND issues and gave great respect to both

10:28:43   10  sides in showing commitment and obligations to both sides

10:28:46   11  trying to reach a FRAND reasonable and non-discriminatory

10:28:49   12  rate based on all circumstances.  And so the U.K. will apply

10:28:54   13  as law, but it's very similar to ours, and there's no threat

10:28:58   14  to our jurisdiction or any policies, any FRAND policies in

10:29:02   15  the United States, because not only do they show respect for

10:29:05   16  the FRAND bargain, but this Court will also be able to apply

10:29:08   17  its sole discretion in how it interprets the FRAND

10:29:11   18  relationships.

10:29:17   19            THE COURT:  Do you think the U.K. Court has the

10:29:20   20  power to enter an injunction that would have affected the

10:29:31   21  United States?

10:29:32   22            MR. MURPHY:  I don't think -- my understanding,

10:29:35   23  Judge, is that a U.K. injunction is limited to the

10:29:38   24  geographic territory of the U.K., just as I think a U.S.

10:29:42   25  injunction is limited to the geographic territory of the

10:29:46    1    United States.

10:29:49    2              THE COURT:  Do you have any authority for that

10:29:52    3    assertion?

10:29:53    4              MR. MURPHY:  Judge, I wish I did.  I've talked

10:29:55    5    to our U.K. lawyers about that.  I don't have a citation for

10:29:59    6    you under U.K. law, but that is my understanding, that any

10:30:04    7    U.K. injunction will be limited to the geographic area of

10:30:08    8    the U.K.

10:30:10    9              THE COURT:  So if you're right about that, then

10:30:18   10    your view is that an injunction -- if the U.K. Court

10:30:29   11    eventually entered an injunction against ZyXel Denmark and

10:30:33   12    ZyXel U.K., that would have -- you know, leave aside

10:30:47   13    questions of supply chain and things like that, but it would

10:30:50   14    have essentially no effect on the ability of the two

10:30:53   15    defendants in this case to sell, offer for sale, manufacture

10:30:58   16    in the U.S. whatever it is they do that you say infringes.

10:31:03   17    It would have no impact on that?

10:31:05   18              MR. MURPHY:  You know, Judge, I can't give you a

10:31:08   19    straight answer to that.  I don't know how an injunction

10:31:11   20    could be, you know, written in the U.K. that may or may not

10:31:16   21    have such an effect on any activities in the United States,

10:31:21   22    but we do know from things like the Brotech case that you

10:31:26   23    mentioned earlier, that there was a possibility of a default

10:31:29   24    judgment which presumably would turn into an injunction in

10:31:32   25    the U.K., and the District Court here said that doesn't

| | |
|---|---|
| 10:31:38 | 1 |

deprive the Court of jurisdiction, it doesn't warrant an

anti-suit injunction, because the Court here will look at

that and decide what it will in the U.S.  And that's

important.  This Court retains the ability to look at the

activities within its jurisdiction.  So it still in that

case doesn't deprive anybody of jurisdiction or threaten any

public policy.

THE COURT:  All right.  What else do you have to

say?

MR. MURPHY:  Pardon me, Judge?

THE COURT:  Go ahead.

MR. MURPHY:  Okay.  And so on the issue of not

threatening jurisdiction, Judge, again, as the Brotech Court

said, quote, res judicata is not a doctrine which would

defeat subject matter jurisdiction, and so anything that

would happen in the ZyXel U.K. litigation doesn't deprive

this Court of jurisdiction, and so it can't support an

anti-suit injunction here.

The other issue, Judge, that parties argue, the

Third Circuit looks to for anti-suit injunctions is whether

or not there's a threat of an important public policy, and

again we're back to the FRAND issues that may get decided by

the U.K. litigation, and we talked about those.

Importantly, Judge, the only thing that ZyXel argues in its

brief is that they might be decided before the issues are

| 10:33:02 | 1 | decided here.  They don't state that those issues or |
| 10:33:05 | 2 | whatever decision happens to come out in the U.K. will be |
| 10:33:09 | 3 | imposed on this Court or this Court will not be able to |
| 10:33:11 | 4 | decide its own issues on the FRAND obligations and |
| 10:33:17 | 5 | framework.  So again there's no threat to any public policy |
| 10:33:19 | 6 | in the United States. |
| 10:33:21 | 7 | U.K. laws will apply its own law, as you |
| 10:33:24 | 8 | mentioned, as you asked, and this Court will apply its own |
| 10:33:27 | 9 | laws to what the FRAND obligations are. |
| 10:33:30 | 10 | THE COURT:  Ms. Rader said, and I'm sure she's |
| 10:33:37 | 11 | correct that the Unwired case is on appeal.  Do you know |
| 10:33:43 | 12 | anything about the timing of that appeal? |
| 10:33:46 | 13 | MR. MURPHY:  I do not, Judge.  While Ms. Rader |
| 10:33:53 | 14 | has rebuttal, I will talk to co-counsel and see if I can get |
| 10:33:56 | 15 | an answer for you. |
| 10:33:57 | 16 | THE COURT:  Okay. |
| 10:33:57 | 17 | MR. MURPHY:  I know we talked to our local |
| 10:33:59 | 18 | counsel, our U.K. counsel about that, and I just don't |
| 10:34:02 | 19 | recall what he told us. |
| 10:34:04 | 20 | THE COURT:  All right.  All right.  Go ahead. |
| 10:34:15 | 21 | MR. MURPHY:  Okay.  I think lastly, Judge, and |
| 10:34:18 | 22 | you alluded to it immediately when you came out here, is |
| 10:34:21 | 23 | that they're asking this Court to shut down a complete U.K. |
| 10:34:27 | 24 | litigation for patent infringement in the U.K.  It's an |
| 10:34:30 | 25 | extremely broad and aggressive remedy that violates comity |

10:34:36  1    and it also violates the Third Circuit's approach.

10:34:39  2             THE COURT:  Yes.  You know, I think that comity

10:34:40  3    issue is -- you know, one thing I noticed about Judge Rufe's

10:34:47  4    opinion was that the tone was very much respect for a,

10:34:58  5    what's essentially an equal court in a different country.

10:35:02  6             I'm not so sure how much -- well, never mind.

10:35:08  7    Go ahead.

10:35:13  8             MR. MURPHY:  Show quite a bit of deference to

10:35:15  9    those courts.  But as to -- the General Electric case even

10:35:19  10   says, you know, that respect for comity encourages the rule

10:35:22  11   of law, and that's what we want.  Parallel proceedings are

10:35:26  12   allowed at least until one is set up as res judicata in the

10:35:30  13   other, so it would be very premature.  The injunction is

10:35:33  14   much too broad.  Keep in mind here, it's important that

10:35:36  15   ZyXel relies principally on the Ninth Circuit case or the

10:35:39  16   Microsoft versus Motorola, but even in that case, as that

10:35:44  17   Court stated, it was a very, very narrow injunction, and all

10:35:46  18   it said was, it was going to stop Motorola from filing the

10:35:49  19   bond necessary.

10:35:50  20            THE COURT:  Well, and, you know, I'm glad you

10:35:52  21   mentioned that, because I read the briefing and I have been

10:36:01  22   doing this long enough now so I ought to know where I should

10:36:05  23   start, and I should have started with the proposed order.

10:36:08  24   That's where I ended.  And it seems to me that the proposed

10:36:12  25   order greatly exceeded what is defendant's best day could

| | |
|---|---|
| 10:36:28 | 1 |
| 10:36:33 | 2 |
| 10:36:39 | 3 |
| 10:36:45 | 4 |
| 10:36:50 | 5 |
| 10:36:57 | 6 |
| 10:37:02 | 7 |
| 10:37:07 | 8 |
| 10:37:16 | 9 |
| 10:37:18 | 10 |
| 10:37:20 | 11 |
| 10:37:21 | 12 |
| 10:37:22 | 13 |
| 10:37:24 | 14 |
| 10:37:27 | 15 |
| 10:37:30 | 16 |
| 10:37:33 | 17 |
| 10:37:36 | 18 |
| 10:37:38 | 19 |
| 10:37:41 | 20 |
| 10:37:48 | 21 |
| 10:37:53 | 22 |
| 10:37:58 | 23 |
| 10:38:06 | 24 |
| 10:38:10 | 25 |

1  possibly be entertained, because it seemed as though respect

2  for other Courts, and other Courts in other countries,

3  requires the narrowest possible injunction if you find it

4  necessary to issue one, and that here, the narrowest

5  possible injunction is probably something like that the

6  injunction -- any injunction that were to be issued would

7  have no territorial effect in the United States, something

8  like that.  And I guess I'm actually the wrong person here.

9  But I take it you agree with that?

10         MR. MURPHY:  We agree -- of course, we agree any

11  injunction --

12         THE COURT:  I understand.

13         MR. MURPHY:  But, yes.  The very narrowest

14  possible injunction.  But keep in mind, it was something

15  interesting Ms. Rader said.  They said, well, if the rate is

16  right, then I guess the injunction would apply in the United

17  States.  So they still want to hedge their bets.

18         THE COURT:  Well, no.  No.  That's one of the

19  things, you know, Mr. Murphy, I expect the answer sitting at

20  the table, but you're the one that's standing up.  If you

21  made a FRAND offer, they didn't think it was a FRAND offer,

22  they made a FRAND offer, you didn't think it was a FRAND

23  offer.  Why don't you find some neutral party who can

24  quickly decide what a FRAND offer is and live with it?

25         I don't know how much money is actually at stake

10:38:13    1    here.  Maybe it's, you know, nine figures or ten figures or

10:38:20    2    something, but it just seems -- if it's just hanging over

10:38:29    3    dollars here, pounds, or something, and there must be a

10:38:35    4    cheaper way to resolve this than the way that you are doing

10:38:37    5    it.

10:38:38    6            MR. MURPHY:  Judge, part of the FRAND bargain

10:38:40    7    is, you know, the standard essential patent owner's

10:38:43    8    commitments, but it's also the commitments of the

10:38:45    9    implementers of the standards.  ZyXel here doesn't even

10:38:48   10    acknowledge that our patents are standard essential.  They

10:38:51   11    won't acknowledge that they practice the standard.

10:38:53   12            THE COURT:  Well, but as the U.K. Judge said,

10:38:56   13    did they make you an offer at some point?

10:38:59   14            MR. MURPHY:  You know, I was not part of this

10:39:01   15    negotiation.  Mr. McAndrews can answer that more directly,

10:39:04   16    and I will try to answer the question, Judge.  There was

10:39:06   17    some back and forth, but they effectively would not

10:39:09   18    negotiate with us in good faith.

10:39:11   19            THE COURT:  No.  I'm not asking.  You know, make

10:39:16   20    that an issue for another day.  I'm not interested in

10:39:19   21    getting the entire history, and maybe I should because I've

10:39:22   22    asked the question, but it just seemed to me that if, in

10:39:25   23    fact, as the U.K. Judge said, and I assume he, I mean, I

10:39:28   24    know he had a basis for saying it, is that both sides say

10:39:32   25    they have made an offer, and I'm just wondering if that's

| | |
|---|---|
| 10:39:38 | 1 |
| 10:39:44 | 2 |
| 10:39:50 | 3 |
| 10:39:53 | 4 |
| 10:40:03 | 5 |
| 10:40:05 | 6 |
| 10:40:09 | 7 |
| 10:40:09 | 8 |
| 10:40:09 | 9 |
| 10:40:13 | 10 |
| 10:40:15 | 11 |
| 10:40:17 | 12 |
| 10:40:18 | 13 |
| 10:40:19 | 14 |
| 10:40:20 | 15 |
| 10:40:25 | 16 |
| 10:40:29 | 17 |
| 10:40:29 | 18 |
| 10:40:31 | 19 |
| 10:40:35 | 20 |
| 10:40:37 | 21 |
| 10:40:37 | 22 |
| 10:40:38 | 23 |
| 10:40:40 | 24 |
| 10:40:42 | 25 |

actually correct, why instead of litigating on two

continents, parties don't figure out some way to get, to

reach that midpoint where, you know, which may not be a

midpoint rather than -- well, in any event, I'm not

expecting you to answer that, Mr. Murphy.

       Mr. McAndrew, why don't you sit down for a

second.

       MR. McANDREWS:  Sure.

       THE COURT:  Let me finish this.  Is there

anything else, Mr. Murphy.

       MR. MURPHY:  That's it.  I'd like to take a

quick rebuttal.

       THE COURT:  Okay.  Usually, a response, two,

three.

       MR. MURPHY:  Okay.

       THE COURT:  So why don't we do this.  Why don't

you have a seat.

       Mr. McAndrews, if there's stuff you want to

throw in on the collateral issues which is stuff that

Mr. Murphy has not dealt with, go ahead.

       MR. McANDREWS:  Yes, Your Honor, and I will be

as brief as I can be.

       So on the question about the negotiations, and I

understand the Court's reluctance to get into too much what

may be 408 discussions between the parties, but one of the

10:40:45   1    major problems with the, with attempting to reach the

10:40:48   2    approach you described, which we believe would be a very

10:40:51   3    reasonable approach, the problem is that to the extent ZyXel

10:40:56   4    has offered anything, what they have offered is a rate, but

10:41:01   5    always couched in terms of, we will only pay that rate where

10:41:05   6    you have proven that you have an infringed patent that

10:41:10   7    remains valid in any jurisdiction on the planet.  So the

10:41:13   8    rate only applies in each nook and cranny of the earth that

10:41:17   9    we then go and prove a full infringement case.  And that's

10:41:21   10   not, that's not the FRAND bargain.  The FRAND bargain is

10:41:24   11   that the parties want to arrive at a rate --

10:41:27   12            THE COURT:  All right.

10:41:27   13            MR. McANDREWS:  Okay.  So there's that.  I just

10:41:29   14   wanted to add one other thing, because maybe Ms. Rader can

10:41:32   15   address this.  But you had asked a question about whether

10:41:34   16   there would be any impact of injunction entered in the U.K.

10:41:40   17   anywhere outside the U.K., and as Mr. Murphy said, our

10:41:43   18   understanding is that there will be no impact at all.  And

10:41:45   19   we can, and if Your Honor would prefer, we can get some

10:41:48   20   authority from our U.K. counsel just to -- we can get that

10:41:52   21   in in the next couple days just to make sure that you

10:41:54   22   understand that to be the case.  Our understanding though is

10:41:56   23   that an injunction entered in the U.K. would have no impact

10:42:00   24   outside the territory of the U.K., and including, and this

10:42:04   25   is why I wanted to say it before Ms. Rader gets up.

10:42:09   1          The products we understand are not made anywhere

10:42:11   2   near the U.K., and so products sold in the U.S. don't, are

10:42:15   3   not made in the U.K., so an injunction wouldn't impact them

10:42:18   4   that way and they don't transit through the U.K. is our

10:42:20   5   understanding.  So an injunction in the U.K. would have zero

10:42:23   6   impact on U.K., on ZyXel's sales in the United States.

10:42:31   7          THE COURT:  All right.  Thank you,

10:42:32   8   Mr. McAndrews.

10:42:33   9          Ms. Rader?

10:42:35   10          MS. RADER:  Thank you, Your Honor.  I will try

10:42:40   11   to be brief.

10:42:41   12          My first point is at the beginning of

10:42:43   13   Mr. Murphy's argument, I heard a concession that I wasn't

10:42:46   14   expecting to get, that the enforcing RAND really is an

10:42:51   15   important public policy, so I just wanted to note that.

10:42:53   16   That's I guess no longer in dispute in this motion.

10:42:56   17          Second, speaking about the Apple versus Motorola

10:43:02   18   case, it is fairly important because it's a Federal Circuit

10:43:04   19   case.  It did say there was no blanket per se rule against

10:43:08   20   denying an injunction, against granting an injunction, but

10:43:14   21   if you go on and read the next section of that case, it

10:43:17   22   actually upheld the denial of an injunction in the Apple

10:43:22   23   versus Motorola case.  It did say you could apply the

10:43:25   24   traditional injunction factors asset out in eBay and that's

10:43:29   25   why we briefed those factors, including irreparable harm.

| | |
|---|---|
| 10:43:32 | 1 |
| 10:43:37 | 2 |
| 10:43:40 | 3 |
| 10:43:43 | 4 |
| 10:43:46 | 5 |
| 10:43:51 | 6 |
| 10:43:54 | 7 |
| 10:44:00 | 8 |
| 10:44:03 | 9 |
| 10:44:06 | 10 |
| 10:44:12 | 11 |
| 10:44:15 | 12 |
| 10:44:19 | 13 |
| 10:44:25 | 14 |
| 10:44:28 | 15 |
| 10:44:32 | 16 |
| 10:44:36 | 17 |
| 10:44:38 | 18 |
| 10:44:40 | 19 |
| 10:44:42 | 20 |
| 10:44:48 | 21 |
| 10:44:51 | 22 |
| 10:44:54 | 23 |
| 10:44:58 | 24 |
| 10:45:01 | 25 |

The third point I want to make is about the restrictive approach.  There are different species of restrictive approach in the Third Circuit, the Second Circuit and the Sixth Circuit.  The General Electric case just does not say that the first case has to be dispositive of the second case.  I've read it.  I read the section that is cited in TQ Delta's brief and then I went back and cite checked it and read every Third Circuit case and every District Court case that cites General Electric for the anti-injunction suit point and they all don't set out any kind of restrictive requirement that requires the one case be dispositive of the other one.  It's just not there.  They all talk about the res judicata point at that cite.

Your Honor asked a question about why we're not going to arbitration or mediation.  The answer is it's a business decision, so it shouldn't have any effect on how you decide this motion.

THE COURT:  No.  I think that's right.

MS. RADER:  I think I have a factual correction for TQ Delta.  I wasn't involved in discussions of patent negotiations myself, but I'm pretty confident that even though our position in our pleadings is that we'll take a FRAND license on patents that are proved to be essential, valid and infringed, in the patent negotiations for a license, everybody was talking about a global license for

10:45:04　1　all the patents in the portfolio.

10:45:07　2　　　　　　THE COURT:  That would certainly be the

10:45:09　3　reasonable business decision approach, I'm sure.

10:45:12　4　　　　　　MS. RADER:  Unless the Court has any further

10:45:14　5　questions, I will sit down.

10:45:17　6　　　　　　THE COURT:  I think I asked Mr. Murphy, and you

10:45:19　7　may actually not be in quite as good a position to even

10:45:24　8　answer, but do you have any sense of what the timing is for

10:45:26　9　this Unwired Planet appeal?

10:45:30　10　　　　　　MS. RADER:  No, I don't.

10:45:31　11　　　　　　THE COURT:  Okay.

10:45:31　12　　　　　　MS. RADER:  I have a sense it will take a long

10:45:34　13　time, but I don't know exactly what that means.

10:45:36　14　　　　　　THE COURT:  Okay.  All right.  And so

10:45:45　15　Mr. McAndrews said the U.K. counterparts say that the effect

10:45:59　16　of the injunction, if there were to be one, is limited to

10:46:02　17　the U.K., and he said he was supplied presumably from the

10:46:16　18　U.K. counterpart authority to back up that statement.  Is

10:46:21　19　your position different?

10:46:26　20　　　　　　MS. RADER:  No.  I think we would agree with

10:46:27　21　that, and we would certainly fight to prevent that

10:46:30　22　injunction from being enforced in the U.K.

10:46:32　23　　　　　　THE COURT:  Well, that enforcement in the U.K.,

10:46:34　24　that's definitely not my concern.

10:46:36　25　　　　　　MS. RADER:  I meant enforced in the U.S.  I

10:46:39  1     misspoke.

10:46:39  2           THE COURT:  Sorry.  All right.  So they are

10:46:44  3     saying it's only good in the U.K.  You are saying you don't

10:46:49  4     want to see it at all, but if you do want to see it, you

10:46:52  5     want it to only apply to U.K.  So, okay.

10:46:58  6           And do you agree with Mr. McAndrews' sort of

10:47:07  7     second point there, which is, so an injunction in the U.K.,

10:47:11  8     that may cause, or he didn't say this.  That may cause large

10:47:18  9     business interruption, disruption for ZyXel U.K. and ZyXel

10:47:22  10    Denmark, but in terms of the product that you sell here,

10:47:33  11    they would not be impacted because they're not manufactured

10:47:36  12    in Great Britain and they don't transit Great Britain.

10:47:40  13          Do you have any reason to disagree with that?

10:47:42  14          MS. RADER:  It's hard to assess the impact

10:47:44  15    except to say that ZyXel U.K. and ZyXel Denmark are part of

10:47:49  16    this larger ZyXel group.

10:47:51  17          THE COURT:  But that is a different kind of

10:47:53  18    impact I think to say if we got an adverse judgment against

10:48:01  19    us in the U.K., that would hurt our sister companies, and

10:48:06  20    because they're all kind of related, it might hurt us, too.

10:48:10  21    That's one thing.  It's a different thing, I think, to say

10:48:17  22    if the U.K. enjoined these two companies, that would disrupt

10:48:24  23    our operations in the U.S. because we could no longer get

10:48:28  24    materials made or we could no longer get materials

10:48:31  25    delivered?

| | |
|---|---|
| 10:48:32 | 1 |
| 10:48:34 | 2 |
| 10:48:37 | 3 |
| 10:48:41 | 4 |
| 10:48:45 | 5 |
| 10:48:48 | 6 |
| 10:48:51 | 7 |
| 10:48:53 | 8 |
| 10:49:02 | 9 |
| 10:49:06 | 10 |
| 10:49:11 | 11 |
| 10:49:18 | 12 |
| 10:49:26 | 13 |
| 10:49:29 | 14 |
| 10:49:31 | 15 |
| 10:49:35 | 16 |
| 10:49:43 | 17 |
| 10:49:46 | 18 |
| 10:49:49 | 19 |
| 10:49:53 | 20 |
| 10:49:56 | 21 |
| 10:50:00 | 22 |
| 10:50:03 | 23 |
| 10:50:07 | 24 |
| 10:50:09 | 25 |

Do you see what I'm saying?

MS. RADER:  I see what you are saying, but the fact is, these products are not designed country by country. And the products sold in the U.K. I believe are made in China and so they would have to change all kinds of different products because --

THE COURT:  Well, so, but if they change, you know, if the manufacturing in China -- if you all wanted to change it because you had an adverse judgment in the U.K., that would be just a business decision on your part, right, as opposed to you manufacture these things outside of London and your manufacturing plant gets shut down by an injunction.  That's really what I was driving at.

MS. RADER:  Sure.  I would say anything is relative, but the threat to ZyXel Corporation includes this huge sort of Damocles hold hanging over the U.K.  I want to point out that the Microsoft Court considered the threat in Germany to be significant enough and to be a violation of the ITU obligations.  That was enough to grant an injunction halting the German litigation for a while.

THE COURT:  Okay.  All right.

MS. RADER:  Additionally, the remedy is the Microsoft case included damages caused by the German action, including Microsoft had to shut down one of its facilities in Germany.  So it's enough to make the Court take notice,

10:50:13   1    at least in the Microsoft case.

10:50:14   2                    THE COURT:  Okay.  Thank you.

10:50:17   3                    MS. RADER:  Thank you.

10:50:18   4                    THE COURT:  All right.  Well, so we're done.

10:50:23   5    Right?

10:50:24   6                    MR. MURPHY:  Yes, Your Honor.

10:50:25   7                    THE COURT:  Okay.  So I'm going to take this

10:50:31   8    under advisement in the sense that I will write some order.

10:50:40   9    I doubt that it will be very long.  And I don't think

10:50:45   10   there's any necessity for expedition, so it will happen in

10:50:53   11   due course.  And so that's the end of that.

10:51:04   12                   All right.  So when is the next time now that

10:51:09   13   I'm supposed to see you, at least see you all?  Is it like

10:51:13   14   some time like the second week of January?

10:51:15   15                   MR. McANDREWS:  January 10th, Your Honor.

10:51:16   16                   THE COURT:  Okay.  And I recognize that two of

10:51:20   17   the three defendants are not here right now.  I need to --

10:51:33   18   there were some scheduling issues, one of which was which

10:51:38   19   defendants were going to handle which formal Zhone trials,

10:51:45   20   and my impression is that the defendants amongst themselves

10:51:48   21   had worked out who they wanted to have handle which trial,

10:51:52   22   and I couldn't tell from the scheduling order, does TQ Delta

10:51:58   23   care which defendant handles which trial?

10:52:00   24                   MR. McANDREWS:  Your Honor, no, but with one

10:52:02   25   exception that would lead to some efficiency here.  If you

10:52:05  1    recall, Adtran has explained to the Court, including when

10:52:10  2    they filed the motion for summary judgment on the issue of

10:52:13  3    license, they explained that the vast majority of their

10:52:16  4    products use Lantek/Intel chips as opposed to some of the

10:52:21  5    other chip suppliers.

10:52:23  6              THE COURT:  Right.

10:52:23  7              MR. McANDREWS:  And one of the patent families

10:52:25  8    that TQ Delta concedes that they have a license to for

10:52:29  9    Lantek chips is Family 4.  It's also 4, 5 and 6.  But the

10:52:34  10   families that they don't have a license to for which they

10:52:39  11   claim was the vast majority of the products at stake in the

10:52:41  12   case that use Lantek chips are Families 2, 8 and 9 and so

10:52:47  13   from TQ Delta's perspective, it would have been most

10:52:50  14   efficient to try 2, 8 and 9 against Adtran before we start

10:52:55  15   loading up to some of these less significant families like

10:52:58  16   Family 4 for them.  So if we had a preference, we would have

10:53:05  17   2Wire and ZyXel divide up Family 4, 5 and 6, and then we

10:53:09  18   would wrap around --

10:53:11  19             THE COURT:  But Adtran has some, so to speak,

10:53:15  20   interest in at least one of these families 4, 5 and 6,

10:53:18  21   whichever one it is they are going to do, because I presume

10:53:20  22   they're not going to go to trial over a family in which they

10:53:23  23   have no accused products.

10:53:25  24             MR. McANDREWS:  I didn't mean to -- so they have

10:53:28  25   a few accused products, but the relative scale is, according

| 10:53:35 | 1 | to Mr. Sykes, is, you know, three percent of the total of |
| 10:53:39 | 2 | their sales.  The vast majority of what's at stake in the |
| 10:53:43 | 3 | case in Lantek. |
| 10:53:45 | 4 | THE COURT:  All right.  It seems to me I'm going |
| 10:53:48 | 5 | to let the defendants decide which order they do things, so |
| 10:53:51 | 6 | I'm going to go with defendants' suggestion on that. |
| 10:53:54 | 7 | Something else.  I don't want to talk about it |
| 10:53:57 | 8 | because all the parties are not here right now, but I also |
| 10:53:59 | 9 | have to decide whether I'm going to rearrange trials 1, 2 |
| 10:54:02 | 10 | and 3, and that is tied in with the, or possibly tied in |
| 10:54:08 | 11 | with the question of substituting patents. |
| 10:54:16 | 12 | Are there any other scheduling issues other than |
| 10:54:20 | 13 | those two that are left for me to decide? |
| 10:54:25 | 14 | MR. McANDREWS:  I believe the parties are able |
| 10:54:27 | 15 | to work out essentially everything else.  I think you picked |
| 10:54:29 | 16 | the two that -- |
| 10:54:30 | 17 | THE COURT:  Okay.  All right.  All right.  Well, |
| 10:54:33 | 18 | thank you very much.  Have a nice holiday.  I will see you |
| 10:54:36 | 19 | all in the New Year. |
| 10:54:37 | 20 | (Hearing concluded at 11:05 a.m.) |
| 10:54:37 | 21 | -   -   - |
|  | 22 |  |
|  | 23 |  |
|  | 24 |  |
|  | 25 |  |